IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MT. HAWLEY INSURANCE COMPANY, )
an Illinois corporation authorized to transact )
business in Maryland, )

          Plaintiff / Counter-Defendant )

          vs. )

ADELL PLASTICS, INC., )
a Maryland Corporation, )

          Defendant / Counterclaimant )

Civil Action No. 1:17-cv-00252

**FILED UNDER SEAL**

**HEARING REQUESTED**

## ADELL PLASTIC'S OBJECTIONS AND MOTION TO STRIKE SHAM DECLARATIONS AND OTHER IMPROPER MATERIALS

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | MT. HAWLEY SUBMITS SHAM DECLARATIONS FOR THOMAS SCALLY AND JOHN BRYAN | 2 |
| II. | MT. HAWLEY SUBMITS PURPORTED "DECLARATIONS" FROM EIGHT INDIVIDUALS THAT THE INSURER NEVER IDENTIFIED IN RESPONSE TO ADELL'S DISCOVERY REQUESTS | 6 |
| III. | MT. HAWLEY CONTRADICTS ITS PRIOR DISCOVERY RESPONSES AND RULE 30(B)(6) TESTIMONY WITH A SHAM DECLARATION FROM ANOTHER COMPANY EXECUTIVE | 8 |
| IV. | MT. HAWLEY SUBMITS SHAM DECLARATIONS TO CONTRADICT THE DEPOSITION TESTIMONY OF ITS REPRESENTATIVES AND INTRODUCE INADMISSIBLE MATERIAL | 11 |
| | A. | Michael Spadea Declaration | 11 |
| | B. | Gene Adami Declaration | 12 |
| | C. | John Stenhouse Declaration | 13 |
| | D. | Michael Errera Declaration | 14 |
| | E. | Kwasi Koranteng Declaration | 15 |
| V. | MT. HAWLEY USES PURPORTED "EXPERT" DECLARATIONS TO CONTRADICT ITS PRIOR ADMISSIONS AND CREATE A SELF-SERVING NARRATIVE UNSUPPORTED BY FACT | 16 |
| | A. | Daniel Arnold Declaration | 18 |
| | B. | Frederick Mowrer Declaration | 19 |
| | C. | Richard Long Declaration | 20 |
| | D. | Carl Wilms Declaration | 22 |
| | E. | Mark Newton Declaration | 24 |
| VI. | MT. HAWLEY CANNOT SUBSTITUTE "DEMONSTRATIVES" FOR ACTUAL EVIDENCE | 25 |
| VII. | MT. HAWLEY'S TRIAL COUNSEL SUBMITS A DECLARATION SEEKING TO CONTRADICT THE RECORD WITH SUBSTANTIVE TESTIMONY THAT IS INCOMPETENT AND KNOWINGLY FALSE | 27 |
| CONCLUSION | | 29 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Awah v. Capital One Bank, N.A.*,
  2016 WL 930975 (D. Md. Mar. 11, 2016) ........................................................................ 8

*Barwick v. Celotex Corp.*,
  736 F.2d 946 (4th Cir. 1984) ..................................................................................... 8, 11

*Boosahda v. Providence Dane LLC*,
  462 F. App'x 331 (4th Cir. 2012) .................................................................................. 14

*Braxton v. Eldorado Lounge, Inc.*,
  2017 WL 4865476 (D. Md. Oct. 27, 2017) ...................................................................... 8

*Charter Oak Fire Co. v. Am. Capital Ltd.*,
  2017 WL 3315306 (D. Md. Aug. 3, 2017) ..................................................................... 14

*In re CitX Corp., Inc.*,
  448 F.3d 672 (3d Cir. 2006) ............................................................................................ 5

*Contech Stormwater Solutions, Inc. v. Baysaver Tech., Inc.*,
  534 F. Supp. 2d 616 (D. Md. 2008) ........................................................................... 8, 10

*Doe v. AE Outfitters Retail Co.*,
  2015 WL 9255325 (D. Md. 2015) ............................................................................ 17, 24

*In re Family Dollar*,
  637 F.3d 508 (4th Cir. 2011) ..................................................................................... 8, 11

*Finch v. Hughes Aircraft Co.*,
  57 Md. App. 190, 469 A.2d 867 (1984) ......................................................................... 14

*In re Fosamax Prod. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009) ................................................................. 18, 19, 20

*Frostbutter v. Bob Evans Farms, Inc.*,
  2013 WL 4026985 (D. Md. Aug. 6, 2013) ................................................................... 9, 11

*Hackert v. First Alert, Inc.*,
  2005 WL 6021862 (N.D.N.Y. June 14, 2005) ............................................................... 20

*Hoyle v. Freightliner, LLC*,
  650 F.3d 321 (4th Cir. 2011) ........................................................................................... 8

*Int'l Paper Co. v. Deep S. Equip. Co.*,
   2014 WL 12605563 (W.D. La. Sept. 24, 2014) .................................................................. 20

*JFJ Toys, Inc. v. Sears Holdings Corp.*,
   237 F. Supp. 3d 311, 325 (D. Md. 2017) .....................................................................*passim*

*Merck-Medco Managed Care, LLC v. Rite Aid Corp.*,
   1999 WL 691840 (4th Cir. 1999) .................................................................................... 10

*Microbix Biosystems, Inc. v. Biowhittaker, Inc.*,
   172 F. Supp. 2d 680 (D. Md. 2000) ............................................................................ 17, 22

*MicroStrategy, Inc. v. Business Objects, S.A.*,
   429 F.3d 1344 (Fed. Cir. 2005) ....................................................................................... 10

*Miskin v. Baxter Healthcare Corp.*,
   107 F. Supp. 2d 669 (D. Md. 1999) ............................................................................ 17, 22

*Nationwide Mut. Ins. Co. v. Regional Elec. Contractors, Inc.*,
   111 Md. App. 80 (1996).................................................................................................... 13

*Puckett v. United States*,
   2016 WL 4593468, at *4 (D. Md. Sept. 2, 2016)............................................................... 8

*Rohrbough v. Wyeth Labs, Inc.*,
   916 F.2d 970 (4th Cir. 1990)........................................................................................ 8, 11

*Stalnaker v. Gen. Motors Corp.*,
   972 F. Supp. 335 (D. Md. 1996) ................................................................................. 17, 22

*Stevenson v. City of Seat Pleasant, Md.*,
   743 F.3d 411 (4th Cir. 2014)........................................................................................ 8, 11

*TEKsystems, Inc. v. Bolton*,
   2010 WL 447782 (D. Md. Feb. 4, 2010).......................................................... 8, 11, 17, 24

*United States v. J.M. Taylor*,
   166 F.R.D. 356 (M.D.N.C. 1996) .................................................................................... 18

*United States v. Janati*,
   374 F.3d 263 (4th Cir. 2004).................................................................................... 25, 26

## Other Authorities

Fed. R. Civ. P. 26(a)............................................................................................................ 7

Fed. R. Civ. P. 30(b).......................................................................................................... 17

iii

Fed. R. Civ. P. 30(B)(6) ................................................................................................... 8, 18

Fed. R. Civ. P. 37 ............................................................................................................... 8

Fed. R. Civ. P. 37(1) ........................................................................................................... 8

Fed. R. Civ. P. 37(c) ...................................................................................................... 21, 29

Fed. R. Civ. P. 37(c)(1) ......................................................................................... 7, 10, 18, 20

Fed. R. Civ. P. 37(c), 56(c), and 56(h) ................................................................................ 1

Fed. R. Civ. P. 56(e) .......................................................................................................... 17

Fed. R. Civ. P 56(h) ........................................................................................................... 29

Pursuant to Rules 37(c), 56(c), and 56(h) of the Federal Rules of Civil Procedure, Adell Plastics, Inc. ("Adell") moves to strike various improper declarations and materials that Mt. Hawley Insurance Company ("Mt. Hawley") has submitted as purported "exhibits" to its summary judgment filings.  Unable to glean support from actual evidence in the record, Mt. Hawley brazenly manufactures the exhibits it cites in its papers in a desperate attempt to evade summary judgment and avoid fulfilling its insurance obligations to Adell.  Specifically, Mt. Hawley relies on the following improper and inadmissible materials:

(1) Declarations that Mt. Hawley's counsel drafted to influence the testimony of two county employees (Thomas Scally and John Bryan) in advance of their depositions, withheld from Adell until just moments before those depositions, and which were flatly contradicted by the witnesses' sworn deposition testimony when they were subjected to questioning;

(2) Declarations from eight individuals that Mt. Hawley never identified in response to Adell's discovery requests and whose alleged statements were never cited as bases for the insurer's claims and defenses in this action (and whose declarations follow the same mold as the other declarations authored by Mt. Hawley);

(3) A declaration from a Mt. Hawley executive (Matt Campen) that attempts to (i) contradict Mt. Hawley's verified interrogatory answers and the sworn deposition testimony of its corporate designee, and (ii) introduce inadmissible hearsay, offer legal conclusions, and make assertions regarding matters beyond the declarant's personal knowledge;

(4) Declarations from other Mt. Hawley representatives (Michael Spadea, Gene Adami, John Stenhouse, Michael Errera, and Kwasi Koranteng) that attempt to

1

contradict their prior deposition testimony, introduce inadmissible hearsay, offer

legal conclusions, and make assertions regarding matters about which they have

no personal knowledge;

(5)   Purported "expert" declarations that Mt. Hawley seeks to use to contradict its

previous admissions and construct self-serving narratives that are divorced from

the factual record, and that Mt. Hawley submits in violation of the agreed upon

schedule order which provides for resolution of summary judgment without

expert submissions;

(6)   Demonstratives created by Mt. Hawley that are not "evidence," lack foundation,

and assume purported "facts" that Mt. Hawley has not and cannot establish; and

a declaration from Mt. Hawley's trial counsel that seeks to give incompetent and

knowingly false testimony, and to introduce documents that were not produced,

are unauthenticated, and involve multiple layers of hearsay.

Adell respectfully requests that the Court strike these materials as further detailed below.

Adell also requests a show cause hearing to address the insurer's misconduct and an award of

attorneys' fees and any other appropriate sanctions.

## I.   MT. HAWLEY SUBMITS SHAM DECLARATIONS FOR THOMAS SCALLY AND JOHN BRYAN

Mt. Hawley has no good faith basis for submitting declarations for Thomas Scally and

John Bryan.  The declarations are sham documents that reflect the misstatements, opinions,

and suppositions of the insurer and its counsel – not factual testimony based on the personal

knowledge of the witnesses.  As detailed below, Mt. Hawley drafted the declarations to

subvert the deposition process, interfere with the testimony of witnesses already under

subpoena, and manufacture self-serving "testimony" that the insurer could not elicit through legitimate questioning during depositions.

Unbeknownst to Adell, Mt. Hawley rushed to prepare the sham declarations after Adell served its deposition subpoenas and before the unadulterated testimony of the witnesses could be obtained. Mt. Hawley then sought to ambush Adell by withholding the sham declarations for weeks despite the fact that they were directly responsive to pending discovery requests. *See infra* Part II (discussing Adell's discovery requests). Instead, Mt. Hawley sprung the declarations on Adell just moments before the depositions were set to begin, and attempted to misrepresent the source of the documents as originating with the witnesses themselves. *See, e.g.*, Ex. 1 (Scally Dep. Tr.) at 8:12-12:4, 14:7-9.

This scheme came to light when the witnesses repeatedly contradicted the purported declarations during their depositions and revealed the true source of the documents to be Mt. Hawley and its counsel. *Id.* at 13:5-15:7, 122:2-3, 131:5-132:1. Indeed, notwithstanding the insurer's ambush and Adell's limited opportunity to review the declarations (mere minutes), the depositions demonstrated that the insurer-authored documents were (and are) complete and utter shams. As highlighted during the depositions and in follow-up correspondence to Mt. Hawley, the declarations are filled with misstatements and self-serving opinions on matters to which the witnesses have no personal knowledge and are not competent to testify. Ex. 2 at 3. Nonetheless, the insurer has submitted these declarations to the Court knowing that the declarations are contrary to the witnesses' sworn deposition testimony, not based on personal knowledge, and incompetent.[1]

---

[1] The deposition also revealed that the insurer paid Mr. Scally a $150 fee for a prior meeting. Ex. 1 (Scally Dep. Tr.) at 26:7-12. Discovery also revealed that the insurer groomed Mr.

Most notably, Mt. Hawley's declaration misattributes expert opinions regarding the functioning of Adell's sprinkler system to Mr. Scally.  But Mr. Scally confirmed during his deposition that he is completely incompetent to offer such opinions.  Mr. Scally is a former police officer.  Ex. 1 (Scally Dep. Tr.) at 33:3-5.  He is not a fire protection engineer, does not have a Ph.D. in fire science, and has no experience evaluating the functioning of sprinkler systems – let alone the sprinkler systems at Adell.  *Id.* at 37:15-39:5 (**"Q. And you've never been involved in evaluating the functioning of a sprinkler system? A. No."** (emphasis added)); *id.* at 62:15-17, 99:8-22, 108:1-3.  Indeed, Mt. Hawley tacitly acknowledged that the witness is unqualified to offer such opinions when its own counsel objected to cross examination on such matters as "call[ing] for expert testimony."  *Id.* at 125:17-126:1.

Moreover, the former police officer conceded that he did not know the design specifications for Adell's sprinkler systems, had no idea how long the fire would have had to have burned to trigger the systems, and did not know when the PIV outside of Building 5 was shut.  *See, e.g.*, *id.* at 125:17-21, 127:14-128:10 (unaware of design); *id.* at 101:5-104:4 (unaware how long it would take to trigger the sprinkler systems); *id.* at 95:5-8, 150:1-21 (unaware of tamper alarms); *id.* at 129:4-13, 131:5-132:5 (unaware whether a water motor gong was utilized); *id.* at 147:3-148:5 (unaware when PIV shut).  Yet, Mt. Hawley prepared a declaration attesting to his purported "knowledge" and "competence" regarding such matters. *See* Dkt. 110-12 at ¶¶ 1, 5, 9, 14-15.

Similarly, Mt. Hawley authored (and now seeks to submit) a declaration for Mr. Bryan that goes well beyond the limited scope of the witness' knowledge and perceptions while at

---

Scally in the days after the fire, having its fire investigator court him with expensive lunches and gratuities.  Mt. Hawley's investigator readily admitted that the efforts were designed to create a productive/positive relationship.  Ex. 7 (Spadea Dep. Tr.) at 237:1-240:3.

4

the fire scene.  Among other things, the insurer misleadingly suggests that Mr. Bryan sought to assess the functioning of the sprinkler systems in Buildings 5 and 6.  *See* Dkt. 110-11 at ¶¶ 4-5, 9.  During his deposition, however, Mr. Bryan testified that his focus was limited to safety and the buildings that were <u>not</u> involved in the fire (i.e., Buildings 1-4).  *See, e.g.*, Ex. 3 (Bryan Dep. Tr.) at 50:5-52:12, 55:10-57:21, 70:19-71:2, 85:8-12.  He also confirmed that he arrived at the scene hours into the fire, that the roof was already in a state of collapse by the time he arrived, and that he was "uncomfortable" giving any opinions regarding the functioning of the sprinkler system for Buildings 5 and 6.  *Id.* at 41:7-17 (*"I have no idea what time the fire started, none.  Q. And … you have no idea of what happened before you got there?  A.  No. Absolutely none."* (emphasis added)); *id.* at 42:17-43:1, 84:8-25, 89:21-90:5, 100:2-102:1.  In short, Mr. Bryan's observations were limited by his own admissions, and not pertinent to the questions before this Court.  Mt. Hawley merely introduces the declaration it drafted to confuse the timing and scope of his purported observations.

Both Mr. Scally and Mr. Bryan were deposed.  If the insurer wanted legitimate testimony, not crafted by counsel, then it should have attempted to obtain it from witnesses through the question and answer process.  That, however, would not have provided the insurer with the results it wanted: the self-authored sham statements that improperly interfered with the witness process.  Such gamesmanship is exposed by the actual deposition testimony of the witnesses and the insurer should not be permitted to muddy the record by relying on the misleading declarations it drafted in an effort to evade summary judgment.  *See, e.g., In re CitX Corp., Inc.*, 448 F.3d 672 (3d Cir. 2006) (affirming summary judgment and the decision to disregard a sham declaration prepared in advance of deposition as a scheme to manufacture a factual dispute).

5

## II.   MT. HAWLEY SUBMITS PURPORTED "DECLARATIONS" FROM EIGHT INDIVIDUALS THAT THE INSURER NEVER IDENTIFIED IN RESPONSE TO ADELL'S DISCOVERY REQUESTS

Mt. Hawley continues to engage in "ambush litigation" at the summary judgment stage. The insurer now submits purported "declarations" from eight individuals that it never identified during discovery and never cited as having information bearing on its claims and defenses in this action. *See* Dkt. 110-3, 110-4, 110-5, 110-6, 110-7, 110-8, 110-9, and 110-10. As with the Scally and Bryan declarations, the insurer now ambushes Adell with the purported statements of various Baltimore County employees (six firefighters and two police officers) concerning their alleged observations during the fire.[2]  Mt. Hawley had an obligation to disclose such information during discovery and failed to do so despite it being responsive to multiple discovery requests.  Adell propounded interrogatories that specifically called upon Mt. Hawley to identify:

> "[A]ll facts, documents, and communications that form the bases for Your allegations concerning statements and opinions purportedly expressed *by fire officials* after the Subject Fire."

> "[*A*]*ny other person* who may have knowledge or information concerning the claims and defenses alleged in the Pleadings, and state the subject matter of the knowledge or information possessed by each such person."

---

[2] Once again, Mt. Hawley's counsel appears to be the true author of these documents.  The documents reflect obvious cutting and pasting from one declaration to the next and even reflect the misspelling of a declarant's name in three instances before being corrected by hand. *See* Dkt. No. 110-7 (misspelling "Lukas" as "Lucas" three times).  The declarations also follow the same template from the Scally and Bryan declarations that bear Mt. Hawley's fingerprints.  The statements include a carefully crafted, repetitive paragraph about the purported witness not "observing" water, even when the individual witness states that he could not see or was not in the building. *See, e.g.*, Dkt. 110-6 at ¶¶ 6 ("We immediately experienced thick black smoke limiting our visibility.") 9 (repetitive paragraph); Dkt. 110-7 at ¶¶ 6 ("I never saw fire through all the smoke.") 8 (repetitive paragraph).  The use of this template highlights that this exercise is merely Mt. Hawley drafting sound bites to use in its arguments.

"[A]ll facts, documents, and communications concerning Your investigation of the *automatic sprinkler system, post indicator valves (PIVs), and automatic fire alarm after the Subject Fire*."

Ex. 4 at Interrogatories 10, 5, and 9 (emphasis added); *see also* Ex. 20 at Document Request 4 (requesting "all document concerning the subject fire, including … *any statements or reports concerning the Subject Fire*" (emphasis added)).  Nonetheless, Mt. Hawley never identified these eight individuals and never cited their alleged statements about the fire, the sprinkler systems, or anything else as a purported basis for the insurer's claims and defenses in this action.  *See id.*  Accordingly, the declarations should be excluded under Rule 37(c)(1).

Rule 37(c)(1) protects against such discovery abuses and ensures that a party who "fails to provide information or identify a witness as required by Rule 26(a) or (e), … is *not allowed to use that information or witness to supply evidence on a motion*, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1) (emphasis added).  Mt. Hawley cannot possibly demonstrate that its failure was "justified" or "harmless" here.  The insurer repeatedly and systematically failed to disclose these witnesses and the purported substance of their statements and opinions.  The insurer did not disclose the information in its initial responses, in its supplemental responses, or during the deposition of its corporate designee.  Ex. 5 (Driscoll Dep. Tr.) at 344:4-20 (simply referring Adell to Mt. Hawley's interrogatory responses for witnesses).  Mt. Hawley's conduct is particularly egregious given that following the revelation of the insurer's misconduct with respect to Messrs. Scally and Bryan, Adell wrote to Mt. Hawley highlighting the impropriety of tampering with witnesses and withholding discoverable material.  Ex. 2 at 3-4.  Mt. Hawley has nonetheless repeated the misconduct many times over.  Even worse, the insurer was

7

secretly providing the declarations to its alleged "experts" while withholding them from Adell.
*See supra* Part V.

The insurer waited to spring the declarations on Adell after the close of fact discovery
and after Adell's motion for summary judgment was filed.  Such conduct is precisely what
Rule 37 guards against.  *Braxton v. Eldorado Lounge, Inc.*, 2017 WL 4865476, at *2-4
(D. Md. Oct. 27, 2017) ("The basic purpose of Rule 37(1) is to prevent surprise and prejudice
to the opposing party."); *see also Hoyle v. Freightliner, LLC*, 650 F.3d 321 (4th Cir. 2011)
(striking declaration submitted in opposition to summary judgment because the witness was
not identified during discovery); *Awah v. Capital One Bank, N.A.*, 2016 WL 930975, at *6
(D. Md. Mar. 11, 2016) (striking affidavits and exhibits submitted for the first time during
summary judgment briefing); *Contech Stormwater Solutions, Inc. v. Baysaver Tech., Inc.*,
534 F. Supp. 2d 616, 625-26 (D. Md. 2008) (striking new information disclosed for the first
time during summary judgment briefing).

## III.   MT. HAWLEY CONTRADICTS ITS PRIOR DISCOVERY RESPONSES AND RULE 30(B)(6) TESTIMONY WITH A SHAM DECLARATION FROM ANOTHER COMPANY EXECUTIVE

Mt. Hawley "may not submit an affidavit or declaration at the summary judgment
stage contradicting its earlier deposition testimony."  *See, e.g.*, *TEKsystems, Inc. v. Bolton*,
2010 WL 447782, at *8 (D. Md. Feb. 4, 2010) (refusing to consider declaration contradicting
30(b)(6) testimony).  "A genuine issue of material fact is not created where the only issue of
fact is to determine which of the two conflicting versions of the … testimony is correct."
*Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984); *Rohrbough v. Wyeth Labs, Inc.*,
916 F.2d 970, 975 (4th Cir. 1990); *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 421-
22 (4th Cir. 2014); *In re Family Dollar*, 637 F.3d 508, 512-13 (4th Cir. 2011); *Puckett v.*

*United States*, 2016 WL 4593468, at \*4 (D. Md. Sept. 2, 2016); *Frostbutter v. Bob Evans Farms, Inc.*, 2013 WL 4026985, at \*4 (D. Md. Aug. 6, 2013).  Nonetheless, Mt. Hawley submits a sham declaration from its Assistant Vice President, Matthew Campen, for precisely that purpose.

Mr. Campen's declaration seeks to contradict the insurer's prior assertions and admissions in this case and replace them with inadmissible hearsay, legal conclusions, and self-serving statements on subjects to which Mr. Campen has no personal knowledge.  *See* Dkt. 110-18.  Among other things, Mt. Hawley uses Mr. Campen's declaration to contradict and deviate from its prior interrogatory answers – which were verified by *Mr. Campen* more than eight months ago.  Adell propounded interrogatories that specifically called on Mt. Hawley to "identify all bases" for its purported October 27, 2016 "reservation of rights," and for its denial of coverage on January 27, 2017.  When the insurer initially served non-responsive answers that obfuscated the reasons for its actions at these critical points in time, Adell moved to compel and the Court ordered Mt. Hawley to correct its responses.  *See* Order [Dkt. 44] at 8 ("Mt. Hawley is instructed to supplement its answers to Interrogatories 6 and 7 to make clear the information known to Mt. Hawley at the two particular points in time referenced.").  Mt. Hawley served its amended responses on September 22, 2017, with a signed verification from Matt Campen.  Ex. 4 at Interrogatories 6, 7, and Verification.  The insurer never supplemented its responses after that date.

Mr. Campen's declaration suggests new bases for the insurance company's actions on October 27, 2016 and January 27, 2017, which are contrary to its prior discovery responses.  For example, Mt. Hawley's previous answer to Interrogatory 6 highlighted the lack of facts underlying the insurer's shift in position on October 27, 2016.  *See id.* at Interrogatory 6.  The

insurer relied on an email regarding the non-fire buildings, self-serving hearsay from its

agents, and did not request the system monitoring logs despite the advice of its former expert,

Mr. Schroeder.  Recognizing that this does not reflect well on its investigation or good faith,

Mt. Hawley now seeks to submit a declaration asserting new purported reasons for its actions.

*Compare* Dkt. 110-18 ¶¶ 9(b), 9(c), 9(d), 9(e), 9(g), *with* Ex. 4 at Interrogatory 6; and *compare*

Dkt. 110-18 ¶¶ 16, 18-21, *with* Ex. 4 at Interrogatory 7.[3]  Such tactics are contrary to the

Federal Rules and cannot be used to escape summary judgment.  *See, e.g.*, *Contech*,

534 F. Supp. 2d at 623-25 (striking material not disclosed); *MicroStrategy, Inc. v. Business

Objects, S.A.*, 429 F.3d 1344, 1356 (Fed. Cir. 2005) (affirming exclusion of material where

party failed to supplement interrogatory responses); Fed. R. Civ. P. 37(c)(1).

     The declaration also contradicts the testimony of Mt. Hawley's corporate designee and

other agents.  For example, the declaration asserts that Mr. Campen "was responsible for all

decisions" regarding the Adell claim through the denial of coverage.  Dkt. 110-18 ¶ 3.  But

Mt. Hawley's designee confirmed that Mr. Campen was the lowest among three levels of

internal claims personnel involved with the claim, did not have the authority to decide whether

Mt. Hawley would pay $1,000,000, and did not even have the authority to issue the

---

[3] The declaration also includes self-serving hearsay regarding alleged conversations between other Mt. Hawley agents and third-parties (*id.* at ¶ 9(e)), and alleged conversations between Mr. Campen and third-parties, that were never disclosed.  *Id.* at ¶ 16. "***Inadmissible hearsay cannot be used to oppose summary judgment***." *See Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 1999 WL 691840, at \*4 (4th Cir. 1999) (citing *Greensboro Prof. Fire Fighters Ass'n v. Greensboro*, 64 F.3d 962, 967 (4th Cir.1995)) (emphasis added).  The declaration is also filled with references to the actions and mental states of other persons and entities to which Mr. Campen is incompetent to testify.  *See, e.g.*, *id.* at ¶ 3 (attempting to testify to what Engle Martin adjustors "understand" and "do").

The sham declaration also asserts that the October 27, 2016 letter was sent based on video that purportedly "show[s] the fire reaching to the ceiling at 1:05 p.m." *Id.* at ¶ 9(d).  But the insurer never asserted this in response to Interrogatory 6 – no doubt because there is no actual video "showing the fire reaching to the ceiling" at 1:05 pm or otherwise.  This is argument, not fact.

October 27, 2016 letter without supervisor approval. *See, e.g.*, Ex. 5 (Driscoll Dep. Tr.) at 30:7-13, 75:20-77:10, 89:8-91:10, 129:16-131:18. The declaration also attempts to contradict the admissions that Mt. Hawley never requested the monitoring logs from Fireline or AlarmWatch. *Compare* Dkt. 110-18 ¶ 20 (now asserting that Mt. Hawley "repeatedly asked for all documentation from … Fireline and AlarmWatch relating to … monitoring"), *with* Ex. 5 (Driscoll Dep. Tr.) at 52:13-54:20, 155:18-157:8, 226:19-228:8; *see also* Ex. 6 (Errera Dep. Tr.) at 170:13-176:19, 205:6-15.

## IV. MT. HAWLEY SUBMITS SHAM DECLARATIONS TO CONTRADICT THE DEPOSITION TESTIMONY OF ITS REPRESENTATIVES AND INTRODUCE INADMISSIBLE MATERIAL

Mt. Hawley's summary judgment filings are devoid of *any* deposition testimony from the insurer's own representatives in this case. Instead, the insurer tellingly relies on carefully manicured declarations that contradict their prior deposition testimony, introduce inadmissible hearsay, make legal conclusions, and offer suppositions on matters beyond their personal knowledge. Such declarations cannot be used to evade summary judgment. *Barwick*, 736 F.2d at 960; *Rohrbough*, 916 F.2d at 975; Stevenson, 743 F.3d at 421-22; *Family Dollar*, 637 F.3d at 512-13; *Frostbutter*, 2013 WL 4026985, at *4; *TEKsystems, Inc. v. Bolton*, 2010 WL 447782, at *8. The following declarations should be disregarded:

### A. Michael Spadea Declaration

Mt. Hawley submits a sham declaration from its first fire investigator, Michael Spadea. Mr. Spadea was deposed and testified, *inter alia*: (i) that his investigation proceeded from a mere "assumption" that the sprinkler system "may have not operated" (Ex. 7 (Spadea Dep. Tr.) at 44:10-45:17); (ii) that he "directed" demolition efforts at the fire scene (*id.* at 60:9-62:21, 141:4-14, 218:3-224:20); (iii) that he had special access to the scene not available

11

to the general public and could have physically accessed the PIV outside of Building 5 as early as October 5, 2016 (*id.* at 223:7-228:7; Ex. 8); (iv) that he had no idea when the PIV was shut based on his observations after the fire (Ex. 7 (Spadea Dep. Tr.) at 135:19-136:16, 139:17-140:1); and (v) that he never requested the system monitoring logs because such communications would have to go through subrogation counsel (*id.* at 189:2-190:4).

By contrast, Mt. Hawley drafted Mr. Spadea's declaration to contradict this testimony, and to now assert: (i) that an Adell employee "confirmed that the sprinkler system was not working"; (ii) that the only person directing demolition at the scene was an unidentified "fire department officer in charge"; (iii) that the first opportunity to access the PIV outside of Building 5 was on October 12, 2016; (iv) that the PIV outside of Building 5 "had likely been shut since before the fire"; and (v) that he "repeatedly requested" the system monitoring logs as part of his investigation.  Dkt. 110-19 at ¶¶ 3, 4, 6, 7, 10. [4]

## B.   Gene Adami Declaration

Mr. Adami testified that Mt. Hawley retained him as the full assignment adjuster to "completely investigate and adjust [Adell's] claim."  Ex. 9 (Adami Dep. Tr.) at 28:8-29:10, 41:19-42:8.  He also confirmed that Mt. Hawley gave him ***no protocols or steps*** to follow while acting on its behalf.  Ex. 9 (Adami Dep. Tr.) at 41:6-42:14.  Moreover, he testified at length about the extensive loss valuation analysis he performed, over the course of his four

---

[4] Mr. Spadea also confirmed under oath that he did not rely or have any factual information beyond what was discussed in his deposition: "Q.  Anything we haven't discussed.  A. No." Ex. 7 (Spadea Dep. Tr.) at 153:3-16, 156:7-157:10, 160:20-161:8.  His declaration, however, seeks to introduce inadmissible hearsay regarding alleged conversations that were never mentioned during his deposition (¶ 9), and assertions regarding the alleged awareness and suppositions of other persons (*e.g.*, John Bryan) to which the witness is incompetent to testify (¶ 8) – as he himself acknowledged.  Ex. 7 (Spadea Dep. Tr.) at 109:8-110:9 (confirming that he never met Mr. Bryan, never spoke with Mr. Bryan, and did not know the bases for any statements made by Mr. Bryan).

month investigation. Ex. 9 (Adami Dep. Tr.) at 147:22-153:16, 159:11-18, 167:5-168:21, 213:4-217:4. He confirmed under oath multiple times that he consistently calculated Adell's loss to exceed Mt. Hawley's full policy limits, which was precisely the job Mt. Hawley hired him to perform. *Id.*

Now, however, Mt. Hawley submits a sham declaration from Mr. Adami to contradict his deposition testimony and inject improper and incorrect legal conclusions regarding his ability to waive Mt. Hawley's rights as its representative interacting with Adell. *Compare* Dkt. 110-21 ¶ 6 (arguing that he "could not" waive Mt. Hawley's rights as its outside adjuster), *with Nationwide Mut. Ins. Co. v. Regional Elec. Contractors, Inc.*, 111 Md. App. 80, 92-93 (1996) (whether an insurer authorizes its agent's statements is irrelevant to waiver and estoppel).[5] Mr. Adami's declaration contradicts his "full assignment" authority with repeated assertions regarding the adjuster's alleged limited "authority" of what he purportedly could and could not do, and the purported requirements (i.e. new protocols) of Mt. Hawley. The declaration also contains self-serving assertions undercutting Mr. Adami's four months of work calculating Adell's loss. Dkt. 110-21 ¶ 7.

## C. John Stenhouse Declaration

Mt. Hawley also submits a sham declaration from its Vice President of Underwriting, John Stenhouse. As Mt. Hawley's corporate designee on the application process and other underwriting matters, Mr. Stenhouse confirmed that he could not identify *any* alleged misrepresentations in connection with Adell's insurance application. Ex. 10 (Stenhouse Dep. Tr.) at 14:19-15:5, 102:21-104:11, 108:6-109:5. This testimony is consistent with the

---

[5] The declaration also contains suppositions regarding the alleged "understanding" of third parties to which the witness is incompetent to testify. Dkt. 110-21 ¶¶ 3, 5.

insurer's discovery responses affirming that "this case does not include any allegation of misconduct during the application, negotiation, or issuance of the Mt. Hawley policy." *Id.* at 108:6-109:5.  Yet now, Mt. Hawley submits a declaration from Mr. Stenhouse that purports to identify alleged misrepresentations in Adell's insurance application.  Dkt. 110-22 ¶¶ 4-7.  The declaration contradicts his testimony and the formal position of Mt. Hawley in this case.  Indeed, Mt. Hawley has never pled a rescission claim in this case and does not even attempt to address all of the elements for rescission in its summary judgment brief.[6]  Therefore, the declaration is also irrelevant and misleading.

### D.   Michael Errera Declaration

The insurer also attempts to rely on a sham declaration from one of its subrogation counsel, Michael Errera.  Dkt. 110-20.  The declaration primarily consists of inadmissible and self-serving hearsay (*see id.* ¶¶ 2, 5, 8) and purports to discuss the substance of conversations that Mr. Errera could not recall during his deposition.  Indeed, given the jumbled state of his notes, Mr. Errera could not even recall ***who he was speaking to*** during the purported conversations, let alone the details.  *See, e.g.*, Ex. 6 (Errera Dep. Tr.) at 81:3-82:20, 89:20-95:6 (attributing hearsay to Mr. Adami and speculating that the "engineer" referenced "may have been" Paul Ferguson).  Yet now, his declaration purports to make definite statements.  Dkt. 110-20 at ¶ 5 (attributing hearsay to Mr. Spadea and identifying Mr. Ferguson as the engineer).  Such attempts are not tolerated in this Circuit.  *See, e.g.*, *Boosahda v. Providence Dane LLC*, 462 F. App'x 331, 335-36 (4th Cir. 2012) (deeming later declaration "troubling" given the failure to recall during deposition).

---

[6] *See, e.g.*, *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 244–45, 469 A.2d 867, 894 (1984) (requiring return of premium); *Charter Oak Fire Co. v. Am. Capital Ltd.*, 2017 WL 3315306, at *14 (D. Md. Aug. 3, 2017) (requiring misrepresentation, materiality, reliance, promptness).

14

More fundamentally, the declaration conflicts with Mr. Errera's deposition testimony. For example, the declaration misleadingly suggests that Mr. Errera advised Adell to consider hiring its own lawyers, experts, and consultants "to protect itself" in case Mt. Hawley denied coverage for its claim. *See* Dkt. 110-20 at ¶ 10. But Mr. Errera's deposition testimony makes it clear that he did not advise Adell to protect itself vis-à-vis Mt. Hawley, but rather discussed the potential that Adell's losses could *exceed* Mt. Hawley's insurance limits, in which case Adell might want to pursue some other party for the excess amounts. Ex. 6 (Errera Dep. Tr.) at 98:10-100:18. As counsel acknowledged during his deposition, the insurer could only subrogate to the extent it paid Adell's claim, and thus, Adell would retain any rights to pursue third-parties for losses in excess of limits. *Id.* at 21:17-23:1, 24:5-10.

### E.   Kwasi Koranteng Declaration

Mt. Hawley also submits a sham declaration from the loss control inspector it hired to inspect Adell's Baltimore facility just three (3) months before the fire. Dkt. 110-23. The declaration attempts to suggest that the inspector had limited access to the facility, only saw the riser and PIV for the sprinkler system in Buildings 1-4, and did not know that there was "a second sprinkler system" with a riser and PIV for Buildings 5-6. However, the inspector's report (which is attached to his declaration) indicates that he inspected the entire facility and was well aware that it featured more than one sprinkler system. Dkt. 110-23 at 7 ("During the visit I accessed the roof, all sections of the building, and the exterior grounds."); *id.* at 8 (identifying multiple "sprinkler system**s**" for the facility); *id.* at 22 (depicting one of the sprinkler standpipes and noting that it was "typical of the other 8 in the bldgs"). Moreover, the witness conceded during his deposition that he has never been prevented from accessing areas during a site visit in all of his 25 years as a loss control inspector for insurance

companies.  Ex. 11 (Kortanteng Dep. Tr.) at 16:13-17:3, 20:9-19, 31:19-32:3, 47:19-54:12.

He said nothing about being unaware of the riser and PIV for Buildings 5-6 during his

deposition and Mt. Hawley made no such assertions in their discovery responses.[7]

## V.      MT. HAWLEY USES PURPORTED "EXPERT" DECLARATIONS TO CONTRADICT ITS PRIOR ADMISSIONS AND CREATE A SELF-SERVING NARRATIVE UNSUPPORTED BY FACT

Given the "straightforward" nature of the case,[8] the parties agreed to defer expert

discovery unless dispositive motions failed to resolve the dispute.  Mt. Hawley now seeks to

obscure its lack of record evidence by submitting a series of purported "expert" declarations in

any event.  In doing so, the insurer seeks to short-circuit the summary judgment process to

which it previously agreed and improperly attempts to use "expert" declarations as a substitute

for actual facts.  The Court should reject this attempt and stricken the declarations for at least

four independent reasons.

First, the parties expressly agreed that summary judgment would proceed to resolution

without expert discovery.  Scheduling Order [Dkt. 17] at 2 ("By agreement of the parties

during the teleconference on April 11, 2017, and with the consent of the Court, expert

discovery will be deferred until after resolution of dispositive motions.").  Clearly, this did not

contemplate a party simply submitting undisclosed and untested "expert" opinions in an effort

to avoid summary judgment and delay the resolution of the case.

---

[7] Indeed, Mt. Hawley avoided making such assertions during discovery because of how readily they can be refuted.  The photographs included in the inspector's report confirm that he was directly next to the riser for Buildings 5-6 (that PIV 1 supplied with water) while taking a picture of the sprinkler cabinet.  *Compare* Dkt. 110-23 at 19, *with* Ex. 12 (showing sprinkler cabinet in the Building 5 debris).

[8] Mt. Hawley Opp. [Dkt. 27] at 2 (describing case as "straightforward and relatively simple").

Second, Mt. Hawley's purported "experts" are not fact witnesses and cannot be used to manufacture "facts" that are contrary to the record and unsupported by actual evidence in the case. *Microbix Biosystems, Inc. v. Biowhittaker, Inc.*, 172 F. Supp. 2d 680, 700 n. 68 (D. Md. 2000) ("Rule 56(e) requires the party opposing a summary judgment to 'set forth specific facts' establishing the presence of a genuine issue…. Thus, expert affidavits or opinions must be based on specific facts.  An expert's 'naked opinions' … may not suffice to defeat summary judgment.").  A genuine issue of material fact cannot be created based solely on the "say so" of a purported "expert." *See, e.g.*, *JFJ Toys*, 237 F. Supp. 3d at 322 ("[W]e are unprepared to agree that it is so if an expert says it is so." (quoting *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 421 (4th Cir. 1993))); *Miskin v. Baxter Healthcare Corp.,* 107 F. Supp. 2d 669, 674 n. 7 (D. Md. 1999) (same); *Stalnaker v. Gen. Motors Corp.*, 972 F. Supp. 335 (D. Md. 1996) (expert opinion did not create a genuine issue of material fact because it was based on an assumption that found "no support in the record").

Third, Mt. Hawley improperly uses the purported "experts" to contradict its formal positions during discovery and the testimony of its own fact witnesses.  *See, e.g.*, *Doe v. AE Outfitters Retail Co.*, 2015 WL 9255325, at *5 (D. Md. 2015) ("An opinion is irrelevant when it assumes facts inconsistent with the record, because it lacks a logical connection between the expert's theory and the facts of the case."); *see also TEKsystems*, 2010 WL 447782, at *8 ("Under Fourth Circuit law as a general proposition, a party may not submit an affidavit or declaration at the summary judgement stage contradicting its earlier testimony.…  This rule has been repeatedly applied to bar evidence contradicting the prior Rule 30(b) deposition testimony of a corporate designee.").

And fourth and finally, the declarations present narratives, supposition, and argument rather than legitimate expert submissions.  *See, e.g.*, *JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311, 325 (D. Md. 2017) (experts cannot be presented for the purpose of providing a narrative review and offering legal conclusions); *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (experts cannot "merely read, selectively quote, or 'regurgitate' the evidence").

### A.    Daniel Arnold Declaration

Mt. Hawley already admitted that it ***does not know when*** the PIV outside of Building 5 was closed. Ex. 5 (Driscoll Dep. Tr.) at 241:2-244:10; Ex. 7 (Spadea Dep. Tr.) 135:19-136:16, 139:17-140:1, Ex. 13 at 5.  Yet, the insurer seeks to contradict its verified interrogatory response, the testimony of its corporate designee, and the testimony of its representatives at the scene with a declaration from Mr. Arnold opining that the "PIV was closed at the time" of the fire.  Dkt. 110-13 ¶ 20.  This is merely another declaration seeking to change Mt. Hawley's position at the eleventh hour in an effort to avoid summary judgment.  Mt. Hawley never disclosed Mr. Arnold's assertions during discovery and should not be permitted to spring them on Adell at the summary judgment stage.  Fed. R. Civ. P. 37(c)(1); *see also United States v. J.M. Taylor*, 166 F.R.D. 356, 362 (M.D.N.C. 1996) (recognizing that when a party asserts it has no knowledge as to a set of alleged facts or an area of inquiry at a Rule 30(b)(6) deposition, it cannot argue a contrary position at trial).

Moreover, Mr. Arnold's declaration reflects neither the qualifications nor the substance of proper expert testimony.  The declaration is entirely conclusory, contains no methodology, and does not even attempt to explain how the witness's experience purportedly qualifies him to draw such conclusions.  It is simply a narrative "regurgitation" of

18

Mt. Hawley's theory of the case based on the same improper materials discussed above. *See id.* at ¶¶ 8(h), 8(i), 8(j) (relying on declarations from Scally, Bryan, Koranteng, and the eight undisclosed public officials); *id.* at ¶¶ 13-19 (narrative). Courts have consistently recognized that such narratives are not legitimate expert testimony. *JFJ Toys*, 237 F. Supp. 3d at 325; *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d at 192.

### B.   Frederick Mowrer Declaration

Mt. Hawley hired Mr. Mowrer prior to this lawsuit.  The insurer hired him as a claim consultant after Mt. Hawley terminated its initial consultants (who had already advised the insurer that further investigation of the scene was futile given the demolition at the site).  In its discovery responses, Mt. Hawley identified Mr. Mower's involvement as limited to two issues: (1) the operability of the automatic sprinkler system and (2) the capability of the system to control and confine the fire.  Ex. 4 at 5.  These were the only issues ever disclosed in Mt. Hawley's discovery responses and the only issues addressed in the lone report from Mr. Mowrer that was produced during discovery reflecting his work in connection with the claim.  *See* Dkt. at 110-14 at 26 ("The scope of this analysis is limited to ….").  Mr. Mowrer did not discuss or address the position of PIV 1 – "Open" or "Shut" – which is the insurer's sole defense and the issue before the Court on summary judgment.  Discovery thus revealed that Mr. Mowrer's pre-litigation consulting work has no relevance to this dispute.  But now, Mt. Hawley seeks to make Mr. Mower relevant by proffering him as a purported "expert" on a new issue: (3) "an assessment of the approximate time it would have taken to activate the sprinkler system installed in Building 5 of the Adell facility in response to the fire."  *See id.* at

4-6 at ¶¶ 10(c), 13-17.  His assertions on this issue were not previously disclosed and should be excluded from consideration under Rule 37(c)(1).[9]

The remainder of Mr. Mowrer's declaration should also be struck as improper. Mr. Mowrer attaches his original consulting report (which is hearsay and which he admits was prepared "more than a year ago") and merely asserts that he has seen nothing new that changes his opinions.  This is conclusory and fails to rectify the deficiencies in the original consulting report which (much like the other "expert" declarations now submitted) merely sought to construct a self-serving narrative based on Mt. Hawley's view of the evidence more than a year ago.  Furthermore, Mr. Mower makes his conclusory assertion based on the same improper declarations and materials discussed above.  *See* Dkt. at 110-14 at 23 (relying on sham declarations from Scally, Koranteng, and the eight undisclosed public employees).  Such narrative advocacy pieces do not constitute admissible evidence.  *JFJ Toys*, 237 F. Supp. 3d at 325;  *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d at 192.

## C.   Richard Long Declaration

Mt. Hawley also hired Mr. Long's firm, Exponent Failure Analysis ("Exponent"), as part of the second group of claim consultants retained after the insurer admitted coverage and paid $1 million, but before the insurer retreated and denied Adell's insurance claim.  During discovery, Mt. Hawley identified Exponent's pre-litigation claim consulting as limited to "fire protection engineering investigation and consultation" and disclosed a single report opining on "source supply calculations" for various sprinkler-head configurations.  Ex. 4 at 5; Dkt. 110-

---

[9] Mr. Mowrer is no stranger to having his materials excluded for improper disclosures.  *See Int'l Paper Co. v. Deep S. Equip. Co.*, 2014 WL 12605563, at *5 (W.D. La. Sept. 24, 2014) (striking "Mowrer's report and testimony" for untimeliness); *Hackert v. First Alert, Inc.*, 2005 WL 6021862 at *3 (N.D.N.Y. June 14, 2005) (striking Mowrer as "previously undisclosed").

15 at 17. Again, discovery revealed that this consulting work was not relevant to the one defense that the insurer asserts (i.e. that Fireline allegedly closed PIV 1 before the fire). Now, however, Mt. Hawley submits a thirty-one (31) page declaration from Mr. Long that in reality is an advocacy piece that embodies a mere wish list for Mt. Hawley's defense theory.

As an initial matter, the insurer never disclosed any such assertions from Mr. Long in response to Adell's discovery requests. Accordingly, the declaration should be barred under Rule 37(c). Even more importantly, however, the substance of Mr. Long's declaration does not reflect legitimate testimony (as a consultant or otherwise). The declaration constructs a narrative predicated on inadmissible material, speculation, and vague assertions that lacks any factual support in the record and contradicts Mt. Hawley's formal admissions regarding the status of the PIV for Buildings 5-6. *Compare* Dkt. 110-15 at ¶ 26 (opining that the PIV was closed prior to the fire); *with* Ex. 5 (Driscoll Dep. Tr.) at 241:2-244:10, Ex. 7 (Spadea Dep. Tr.) at 135:19-136:16, 139:17-140:1, Ex. 13 at 5 (admitting that Mt. Hawley does not know when the PIV was closed or who closed it).

The declaration also seeks to construct a narrative based on numerous factual assertions that are uncited, uncorroborated by any actual evidence in the record, and beyond the personal knowledge of the witness. For example, Mr. Long seeks to attribute times to unauthenticated video footage and then draw conclusions based on those purported times – without offering any competent evidence to corroborate his assertions as to timing in the first instance. *See, e.g.*, Dkt. 110-15 at ¶ 15 (speculating that the time reflected on unfiled and unauthenticated surveillance footage that was forensically restored by a third-party is "approximately" 51 minutes off); *id.* at ¶ 24 (claiming that WBAL SkyCam footage was taken sometime between 1:30-1:45 pm, while omitting the video and providing only a screenshot

21

with no time stamp); *id.* at ¶¶ 27 (claiming that a cell phone video was time stamped 1:05:26, when the footage reflects no such time stamp).

Merely getting a purported "expert" to make statements does not make them facts or admissible evidence. *JFJ Toys*, 237 F. Supp. 3d at 322 ("[W]e are unprepared to agree that it is so if an expert says it is so."); *Miskin,* 107 F. Supp. 2d at 674 n. 7; *Stalnaker v. Gen. Motors Corp.*, 972 F. Supp. 335 (D. Md. 1996). Purported "experts" cannot be used to manufacture facts. They must rely on actual evidence and facts supported by the record. Their opinions are irrelevant and inadmissible when they lack a factual basis or assume facts inconsistent with the record. *See, e.g.*, *Microbix Biosystems*, 172 F. Supp. 2d at 700 n. 68.

### D.    Carl Wilms Declaration

The insurer also submits an improper "expert" declaration from Carl Wilms. The substance of the declaration suffers from the same fundamental deficiencies as the other purported "expert" declarations. Mt. Hawley attempts to use his declaration to construct a narrative that is conclusory, self-serving, and based on the same improper materials discussed above. *See id.* at ¶¶ 9(g), 9(h), 9(i) (relying on declarations from Scally, Bryan, Koranteng, and the eight undisclosed public employees).

Mt. Hawley also seeks to contradict its prior admissions regarding the status of PIV 1 based on Mr. Wilms' subjective beliefs. Mr. Wilms asserts that "[b]ased on the totality of the evidence, *I believe* that PIV Zone 1 was … in the closed position on the date of the fire." Dkt. 110-16 at ¶ 20 (emphasis added). Subjective belief is irrelevant and "does not suffice" as expert testimony. *JFJ Toys*, 237 F. Supp. 3d at 322 ("Expert testimony rooted in subjective belief or unsupported speculation does not suffice." (quoting *Zuckerman v. Wal-Mart Stores E., L.P.*, 611 Fed. App'x 138, 138 (4th Cir. 2015))).

More fundamentally, the substance of the declaration shows that Mr. Wilms' opinions

lack the basic relevance and reliability that are the cornerstones of expert discovery.  *See, e.g.*,

*JFJ Toys*, 237 F. Supp. 3d at 321.  Indeed, his opinions are illogical and irrelevant because

they are based on a purported analysis of information and data concerning ***the wrong PIV***.

Both parties agree that the PIV for the Zone 2 sprinkler system is irrelevant to this dispute.

PIV 2 was part of the sprinkler system for the buildings that were not destroyed by the fire

(i.e., Buildings 1-4).  The PIV for the Zone 1 sprinkler system protected the destroyed

buildings (Buildings 5-6) that are at issue here.  Yet, Mr. Wilms inexplicably purports to draw

conclusions regarding the ***PIV for the Zone 1*** sprinkler system based on past events that

involved only the ***PIV for the Zone 2*** sprinkler system.  For example, Mr. Wilms emphasizes

the February 17, 2015 incident as purported support for his opinion:

> On 2/17/2015, there were three waterflow alarm signals logged from ***Zone 2***.  The
> fire department was dispatched on the waterflow alarm signal received at 2:10:2 am
> and again on the waterflow fire alarm signal received at 15:00:07.  Following the
> second dispatch, two actuations of Gate Valve Sensor – Zone 3 were logged at
> 15:10:34 and 15:12:01 that were not followed by any restoral.  Based on the totality
> of the evidence, I believe that ***PIV Zone 1*** was closed at this point in time and was
> also in the closed position on the date of the fire.

Dkt. 110-16 at ¶ 20 (emphasis added).  Mr. Wilms cannot (and does not even attempt to)

explain how events involving "Zone 2" lead him to believe that the PIV for "Zone 1" was

shut.  The monitoring logs and the undisputed testimony from fact witnesses confirm that this

Zone 2 event had nothing to do with the PIV for Zone 1.  Ex. 14 (Chenowith Dep. Tr.) at

118:14-23, 116:1-117:19; Ex. 15 (Ferguson Dep. Tr.) at 65:23-66:11; 61:1-61:22; 125:12-

126:2; Dkt. 110-16 at 140-141.[10]

---

[10] The declaration is misleading to the extent that it asserts that the monitoring logs reflect
"two actuations" of the gate valve sensors.  Even a cursory review of the log excerpts attached

Mr. Wilms also focuses on the wrong zone when relying on a field report discussing a September 7, 2017 event. It is undisputed that this event involved Zone 2. Mt. Hawley's corporate designee admitted that the event involved the wrong buildings and a different PIV. *See, e.g.*, Ex. 5 (Driscoll Dep. Tr.) at 252:7-253:2, 254:12-19, 277:10-279:13 (***"That is on a different PIV."***) (emphasis added).[11] Thus, Mr. Wilms' declaration is irrelevant, unreliable, and fails to meet the basic standards for expert testimony. *See, e.g.*, *AE Outfitters Retail Co.*, 2015 WL 9255325, at *5 ("An opinion is irrelevant when it assumes facts inconsistent with the record, because it lacks a logical connection between the expert's theory and the facts of the case."); *see also TEKsystems*, 2010 WL 447782, at *8 (prohibiting a party from submitting a declaration contradicting the testimony of its coporate designee).

### E.   Mark Newton Declaration

Mt. Hawley entrusted the valuation of Adell's insurance claim to Mr. Adami and the other consultants he retained to assist him during the valuation process (which included the forensic accounting firm Matson Driscoll & Damico LLP, J.S. Held, and Halliwell Engineering). Ex. 9 (Adami Dep. Tr.) at 149:5-150:22. The insurer's agents evaluated

---

to the declaration reveals that the 15:12:01 entry is a duplicate signal for the same event. Dkt. 110-16 at 141 ("Dup-Sig Dup-Event"). Mr. Wilms also fails to mention the subsequent entries indicating that this issue (which again, involved the wrong zone) was resolved. *Id.*

Moreover, Mr. Wilms' theory that Fireline closed PIV 1 on February 17, 2015 and never reopened it represents a factual impossibility. The undisputed evidence proves that water flowed through PIV 1 on multiple dates after February 17, 2015, and PIV 1 was physically confirmed to be "Open" long after the "expert" speculates it was closed. *See, e.g.*, Ex. 14 (Chenowith Dep. Tr.) at 96:25-97:22, 118:24-119:11, 100:24-101:17, 120:10-12; 125:10-126:10; Ex. 15 (Ferguson Dep. Tr.) at 132:24-134:5.

[11] Faced with monitoring logs that contradict his belief, Mr. Wilms simply takes his belief as a given and speculates that the alarms registered on the day of the fire may have been the result of a wiring failure. Dkt. 110-16 at ¶ 30(A) (assuming PIV 1 was not manipulated after the fire broke out and then speculating that the signals were the result of a wiring failure). There is no evidence in the record remotely supporting this speculation.

Adell's loss for four (4) months, calculated the loss according to the provisions of the insurance policy, and never waivered from the recognition that Adell had suffered a full policy limits loss that exceeded $12.7 million. *See id.* at 147:22-153:16, 159:11-18, 167:5-168:21, 213:4-217:4.

But Mt. Hawley now contradicts the official valuation by its own representatives, submitting a declaration from Mr. Newton that is irrelevant on its face. Tellingly, Mr. Newton's declaration does not even attempt to calculate the actual losses resulting from the fire. Instead, Mt. Hawley's new "expert" offers improper legal conclusions regarding the policy and seeks to critique the level of *documentation* that the insurer's own representatives used when valuing Adell's claim as a full policy limits loss. The absurdity of this approach is exemplified by the fact that the declaration assigns *zero value* (*$0*) to the two buildings destroyed in the fire. Mr. Newton simply asserts "[t]hose buildings have not been rebuilt." Dkt. 110-17 at ¶ 10. This is a non-sequitur, and ignores the simple fact that the buildings have not been rebuilt because Mt. Hawley refuses to pay. Mt. Hawley's refusal to provide Adell with the coverage necessary to rebuild does not mean that two large industrial buildings are worthless. Ex. 16 (Hicks Dep. Tr.) at 120:25-121:14. It means that Mt. Hawley is in breach.

## VI. MT. HAWLEY CANNOT SUBSTITUTE "DEMONSTRATIVES" FOR ACTUAL EVIDENCE

Mt. Hawley relies on "demonstratives" it created rather than actual evidence. This fundamentally misconstrues the role of demonstratives. Demonstratives are not evidence and cannot be used to create "facts" unsupported by the record. *See, e.g.*, *United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004) ("These 'pedagogical' devises are not evidence themselves, but are used merely to aid the jury in its understanding of the evidence that has already been

admitted…. in the end they are not admitted as evidence."). Nonetheless, Mt. Hawley seeks

to uses the demonstratives to manufacture a timeline of events that has no underlying support

in the record. Instead, the purported demonstratives are based on Mt. Hawley's interpretation

of unauthenticated, unverified, and unfiled video footage purportedly resulting from forensic

restoration efforts.[12]

More fundamentally, the insurer does not simply take the video footage as it is.

Mt. Hawley admittedly *alters the times* reflected on the video footage to match its own self-

serving timeline of events. *See* Dkt. 110-26 at 24-30. The insurer's belief that the video is

"approximately" 51 minutes off does not make it so. Mt. Hawley cannot simply assume that

and create demonstratives representing it as fact. The demonstratives are not a substitute for

actual evidence. *See, e.g.*, *Janati*, 374 F.3d at 273.

Mt. Hawley also attempts to manufacture "facts" by creating a series of diagrams that

are filled with uncited and unsupported commentary regarding the alleged timeline of events

on the day of the fire. *See* Dkt. 110-26 at 31-52. These documents are pure argument and

obfuscate rather than assist the Court in understanding the actual evidence in the record. For

---

[12] In December 2016, Mt. Hawley's consultants pulled a burnt DVR unit from the wreckage that potentially contained video surveillance footage from the fire. Adell preserved the DVR unit at the insurer's request and made it available throughout this litigation. Nonetheless, the insurer inexplicably waited until the final days of discovery to engage a forensic restoration consultant. After discovery was already closed, the insurer sent Adell copies of what the insurer claimed was the complete video footage despite the unexplained cutoffs in the video before firefighters arrived on the scene.

As part of its summary judgment argument, Mt. Hawley attempts to attribute these cutoff points to the fire (rather than errors or incompleteness in the forensic restoration process). Of course, Mt. Hawley's delay in pursuing its forensic efforts has denied Adell the ability to test those assertions. At minimum, the video footage raises questions regarding completeness, chain of custody, the methodology used during the restoration process, and whether any data was compromised during that process. This insurer cannot simply rely on the video footage without demonstrating that it is reliable and admissible.

example, the diagrams that purport to depict the movements of various witnesses do not match

the diagrams that were drawn, and made exhibits, during the witnesses' depositions.  Among

other things, the "demonstratives" omit the sightline obstructions that multiple witnesses

identified and drew in response to questions from Mt. Hawley's counsel.  *Compare, e.g.*,

Dkt. 110-26 at 44; *with* Ex. 17 (Osei-Tutu Dep. Tr.) at 33:9-35:16; Ex. 18 (depicting rows of

gaylords).  The insurer's new diagrams are also argumentative to the extent they seek to

exaggerate the size of the fire in the early stages with disproportionately large clipart images

of flames.  These artistic renditions bear no correlation to the actual facts and testimony

developed during discovery.

## VII.   MT. HAWLEY'S TRIAL COUNSEL SUBMITS A DECLARATION SEEKING TO CONTRADICT THE RECORD WITH SUBSTANTIVE TESTIMONY THAT IS INCOMPETENT AND KNOWINGLY FALSE

Even Mt. Hawley's *pro hac vice* counsel, Dean Burnick, attempts to contradict the

record by giving substantive testimony.  While purporting to introduce documents through his

declaration, Mr. Burnick repeatedly makes assertions that are beyond his personal knowledge,

incompetent, and incorrect:

- Mr. Burnick misrepresents the PIV involved in the February 17, 2015 incident.

  Dkt. 110-24 ¶ 3 (asserting that the incident involved "post indicator valve servicing

  sprinkler System #1").  Mt. Hawley's counsel knows this is false.  Indeed, Mr. Burnick

  conducted the very depositions that confirmed the incident involved Zone 2 and PIV 2.

  Ex. 14 (Chenowith Dep. Tr.) at 118:14-23, 116:1-117:19; Ex. 15 (Ferguson Dep. Tr.)

  at 65:23-66:11; 61:1-61:22; 125:12-126:2.

- Mr. Burnick repeatedly misstates the record in asserting that Adell's former insurer

  (Hanover/Verlan) "nonrenewed" Adell.  Dkt. 110-24 at ¶¶ 10-12.  Mt. Hawley's

27

counsel was present at the deposition where Hanover/Verlan's corporate designee confirmed that Adell was never non-renewed.  Ex. 19 (Krozy Dep. Tr.) at 22:20-28:7 ("Yeah, we did not issue a nonrenewal.").

- Mr. Burnick seeks to manufacture a time for the cell phone video taken by Mr. Badra. Specifically, counsel asserts that the video was taken at "approximately 1:05 p.m." and then misleadingly implies that Mr. Badra testified to that effect. Dkt. 110-24 at ¶ 2. Counsel has no basis for attributing any time to the cell phone video.  Mr. Badra specified no time during his deposition and the video reflects no time stamp.

- Mr. Burnick attempts to introduce an email that was never produced during discovery. Seeking to conceal this discovery failure, counsel claims that the document was part of the materials produced by Mr. Scally at his deposition.  *Id.* at ¶ 14.  That is incorrect. Indeed, the inaccuracy of that statement is readily apparent from the document itself. The email shows that it was printed from *Mr. Bryan's* email account.  *Id.* at 111.

- Mr. Burnick attempts to introduce improper and inadmissible documents that contain multiple levels of hearsay (*id.* at ¶¶ 7-10), were drafted by a third-party, and cannot be authenticated by counsel (*id.* at ¶¶ 8-9).

Mt. Hawley's counsel has no basis to be a fact witness, and indeed, is forbidden to be one, which raises substantial issues with the proffered written testimony that counsel has submitted. The declaration is replete with incorrect and incompetent statements and improperly seeks to introduce inadmissible evidence.  The above referenced paragraphs and documents should thus be excluded.

## CONCLUSION

Adell respectfully requests that the Court grant this motion to strike and preclude

Mt. Hawley from relying on the following improper declarations and materials for the reasons

set forth in Parts I-VII above:

(I)   Scally Declaration (**Dkt. 110-12**), Bryan Declaration (**Dkt. 110-11**);

(II)  Janowitz Declaration (**Dkt. 110-3**), Langelan Declaration (**Dkt. 110-4**), Adkins

Declaration (**Dkt. 110-5**), Bury Declaration (**Dkt. 110-6**), Melcher Declaration

(**Dkt. 110-7**), Schreiber Declaration (**Dkt. 110-8**), Singer Declaration (**Dkt. 110-9**),

and Riley Declaration (**Dkt. 110-10**);

(III) Campen Declaration (**Dkt. 110-18**);

(IV) Spadea Declaration (**Dkt. 110-19**); Adami Declaration (**Dkt. 110-21**); Stenhouse

Declaration (**Dkt. 110-22**); Errera Declaration (**Dkt. 110-20**); Koranteng Declaration

(**Dkt. 110-23**);

(V)  Arnold Declaration (**Dkt. 110-13**), Mowrer Declaration (**Dkt. 110-14**), Long

Declaration (**Dkt. 110-15**), Wilms Declaration (**Dkt. 110-16**), Newton Declaration

(**Dkt. 110-17**);

(VI) Compendium of Demonstratives (**Dkt. 110-26**); and

(VII) Burnick Declaration (**Dkt. 110-24**).

Adell also requests an award of attorneys' fees and any other appropriate sanctions

under the Rules to address Mt. Hawley's misconduct.  Fed. R. Civ. P. 37(c) (authorizing, *inter*

*alia*, an award of "reasonable expenses, including attorney's fees caused by the failure" to

supplement discovery responses); Fed. R. Civ. P 56(h) (authorizing, *inter alia,* an award of

"reasonable expenses, including attorney's fees" when the Court is satisfied that an affidavit or declaration has been submitted in bad faith or solely for delay).

As discussed above, Mt. Hawley's summary judgment filing is rife with improper and inadmissible materials.  Moreover, the nature and extent of the materials submitted highlights the level of misconduct that has occurred.  Witness tampering, undisclosed witnesses, sham declarations, unproduced documents, misleading demonstratives, disregard for the scheduling order, and submitting multiple bogus "expert" declarations in an effort to manufacture facts – cannot be chalked up to mere inadvertence or mistake.  The insurer's transgressions have been intentional and part of a concerted effort to undermine the summary judgment process and delay the resolution of this case.

Dated:  May 29, 2018                           BLANK ROME LLP

                                                  ___/s/ John Gibbons_____
                                                  John A. Gibbons (Bar No. 15669)
                                                  Omid Safa (Bar No. 20027)
                                                  Blank Rome LLP
                                                  1825 Eye Street, NW
                                                  Washington, DC 20006-5403
                                                  JGibbons@BlankRome.com
                                                  Tel: (202) 420-2200
                                                  Fax: (202) 420-2201

                                                  Mark H. Kolman (Bar No. 00424)
                                                  9483 E Ironwood Bend
                                                  Scottsdale, AZ 85255
                                                  mhkolmanaz@gmail.com
                                                  (480) 268-9025

                                              *Attorneys for Defendant Adell Plastics, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2018, a copy of Adell Plastic's Objections and Motion to Strike Sham Declarations and Other Improper Materials, and its accompanying exhibits, was served via First-Class Mail on the following recipients (with courtesy copies sent by electronic mail):

Andrew T. Stephenson
Jessica Ayd
FRANKLIN & PROKOPIK, A.P.C.
2 N. Charles Street, Suite 600
Baltimore, MD 21201
(410) 230-3638 telephone
(410) 752-6868 facsimile
astephenson@fandpnet.com
jayd@fandpnet.com

AND

Michael D. Prough (*pro hac vice*)
Dean Burnick (*pro hac vice*)
MORISON & PROUGH, LLP
2540 Camino Diablo, Suite 100 Walnut Creek, CA 94597
(925) 937-9990 telephone
(925) 937-3272 facsimile
mdp@morisonprough.com
dcb@morisonprough.law

By:   */s/ John Gibbons*

John Gibbons (Bar No. 15669)
Blank Rome LLP
1825 Eye Street, NW
Washington, DC 20006
(202) 420-2200