IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MT. HAWLEY INSURANCE COMPANY,
an Illinois corporation authorized to transact
business in Maryland,

             Plaintiff,

   vs.

ADELL PLASTICS, INC., a Maryland
corporation, and DOES 1-25 ET AL.

             Defendant.

Civil Action No. 1:17-cv-00252-JKB

## REPLY MEMORANDUM IN SUPPORT OF MT. HAWLEY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT

## INTRODUCTION

<u>Silence</u> can be deafening.  Filtering out the angry rhetoric from Adell's briefing, however oft-repeated, its <u>evidence</u> is starkly silent and fails to dispute the material facts.  Adell offers no evidence from which a reasonable trier of fact could find, *inter alia*: (1) the sprinklers in B5 activated, sprayed water, on October 4, 2016; (2) any audible fire alarm sounded—either the electric horn located in its maintenance room, or the water motor gongs on the outside walls above each PIV; (3) any visual fire alarm (strobe light) was seen; (4) that PIV#1 (found "SHUT" after the fire) was turned from OPEN to SHUT during or after the fire; (5) that working sprinklers would take over 20 minutes to come on (the experts say 1 to 2 minutes); or (6) that working sprinklers would have made no difference.  Adell has no explanation for (7) the absence of any "restore" code on Zone 3 (its PIV's) since 2/16/15; or (8) the barrage of nonsense signals sent by its alarm panel from 1:21-1:24 as its wires melted together.  So Adell ignores those facts and fires *ad hominem* attacks at "the insurer" and its lawyers.  Mt. Hawley introduced actual evidence to the contrary on each point, percipient witness testimony from Adell employees and first responders, findings of seasoned fire investigators that inspected the scene and interviewed witnesses, opinion testimony from some of the premier fire protection engineers in the country.

<u>Fire alarms</u>, too, can be deafening.  Have you ever heard one?  Ear-splitting.  They are meant to be *heard*.  There is no doubt, when one is blaring or ringing.  Yet no Adell employee or first responder heard any audible alarm.  5 Adell employees and 10 first responders have testified they heard no alarm.  Many more told Detective Scally the same thing.  Strobe lights can be near-blinding.  Eye-piercing, they are meant to be seen.  Nobody saw those either.  Water spray too is readily visible.  And it drips down your face or helmet.  You get wet, step in puddles.  It is something one would notice in a fire, especially as a firefighter sizing up the threat.  Nobody saw or felt it here.  Badra's cell phone video also confirms it:  no water is visible, no alarm is audible.

Adell invites all to ignore what was truly seen, heard, felt, recorded and said, by the human beings (and cameras), at its building on October 4, 2016. Adell offers no evidence of what happened from 1:00 p.m., when the fire started, to 1:21:14 p.m., when the first of 20 nonsensical electric signals was received on an AlarmWatch machine 28 miles away. Ironically, if those signals were reliable, they would make Mt. Hawley's case; for the *first* signal is a Zone 3 (PIV) "restore" – which could only occur if its prior state was "supervisory," meaning "SHUT."

Adell's invocation of the AlarmWatch "monitoring logs" ("activity reports") as the sole, exclusive, probative evidence, fails to raise a genuine issue of fact, as against the undisputed evidence of what happened in Building 5 between 1:00 and 1:21 p.m. on October 4, 2016. Nor does Adell's interpretation of the electronic records of AlarmWatch hold up, upon scrutiny. For careful review of the AlarmWatch reports and raw data, and the proper interpretation of the signals AlarmWatch's machine received between 1:21 and 1:24, do not show a working system.

It is highly unusual that Adell has offered *no* declarations/affidavits. One explanation for that has come into focus. A declaration or affidavit must include facts demonstrating the personal knowledge of the witness. That is a predicate for any fact witness testimony bearing on summary judgment. Fed.R.Civ.P. 56(c)(4); Fed.R.Evid. 602. Adell cites repeatedly to Rule 30(b)(6) deposition testimony of a third-party, Fireline (Chenowith), or *its own* designees (Hicks/ Ferguson). But Rule 30(b)(6) testimony is not constrained to personal knowledge. That is fine for discovery; but not for FRCP 56(c)(4) or FRE 602. *Souter v. Equifax Info. Servs.*, 299 F.R.D. 126, 132 (E.D. Va. 2014) ("There is a significant difference between a Rule 30(b)(6) deposition and an affidavit"). The designee *might* also happen to have personal knowledge; but that must be affirmatively shown for any fact offered into evidence. The distinction vitiates nearly every cite to Mr. Chenowith's deposition. He lacks personal knowledge of most of what he said.

I.     THE PROTECTIVE SAFEGUARD ENDORSEMENT IS A CONDITION
       PRECEDENT TO COVERAGE; ADELL MUST PROVE ITS COMPLIANCE

Adell agreed, "As a condition of this insurance" that the sprinkler system and automatic

fire alarm "will be maintained in complete working order."  (Dkt. 110-22 at 85.)  Where a

condition relates "to the scope of the risks to be covered (either by inclusion or exclusion) or to

the dollar amount of coverage, it is to be dealt with as a 'coverage' matter." *Creveling v.*

*GEICO*, 828 A.2d 229, 243 (Md. 2003); *Minnesota Lawyers Mut. Ins. Co. v. Baylor & Jackson,*

*PLLC*, 852 F.Supp.2d 647, 662 (D. Md. 2012) (holding clause that was incorporated into the

definition of coverage "became a condition precedent to coverage"); *United Capital Ins. Co. v.*

*Kapiloff*, 155 F.3d 488, 495, 497 (4th Cir. 1998) ("the policy imposed conditions for coverage

that the premises contain 'protective safeguards' and that they not be vacant").  *Kapiloff* is on-

point, correct, and controls here.  If the PSE were merely a condition subsequent, it could be

subject to waiver/estoppel.  The Fourth Circuit rejected the insured's waiver/estoppel arguments,

in the first instance, because "we would in effect be extending coverage beyond that provided for

in the policy, in contravention of Maryland law." *Id.*  Maryland law comports with that of other

courts nationwide, which also enforce the PSE as a condition precedent to coverage.[1]  That is

logical, for it imposes an obligation on the insureds *prior* to the loss (to maintain its systems in

complete working order), not a post-loss condition (e.g., to cooperate with the loss investigation).

---

[1]      *See, e.g., American Way Cellular, Inc. v. Travelers Property Casualty Co.*, 157 Cal.Rptr.3d 385, 396-99
(Cal.Ct.App. 2013) (PSE is a condition precedent; collecting and following authority, including *Kapiloff*); *Mt.
Hawley Insurance Co v. Pallet Consultants Co.*, 2009 U.S. Dist. LEXIS 134864 (S.D. Fla. 2009) ("the insured is
mandated to 'maintain any protective safeguard . . . in complete working order' as a condition of coverage"); *Great
Lakes Reinsurance (UK), PLC v. JDCA, LLC*, 2014 U.S. Dist. LEXIS 163863, *31 (D. Conn. 2014) ("the existence
of a functioning sprinkler system within the property is unambiguously a condition precedent of the contract");
*Indian Harbor Insurance Co. v. Randolph Partners, LLC*, 2010 U.S. Dist. LEXIS 81149, *15 (N.D. Ill. 2010)
(insureds "were required to maintain a central station burglar and fire alarm as a condition of coverage"); *Tuscany
Bistro, Inc. v. Sirius Am. Ins. Co.*, 2011 N.J. Super. Unpub. LEXIS 2182, *11 (Sup. Ct. NJ App. Div.) ("the trial
court correctly found that the terms of the [PSE] were unambiguous and enforceable. The fire alarm system was
clearly denoted in the policy as a condition of coverage"); *Coos Head Timber Co. v. Unigard Indem. Co.*, 699 P.2d
1143 (Oregon Ct.App. 1985) ("the language of the sprinkler clause and of the introduction to the [PSE] makes it
clear that plaintiff's compliance with the clause is a condition of coverage").

Adell argues that Mt. Hawley must prove that Adell was directly "at fault" for the failure of its fire suppression system.  But this is not a negligence case, it is a contract case and the contract imposes no such requirement.  Rather, Adell undertook the affirmative obligation (vis-à-vis Mt. Hawley) to maintain its systems in "complete working order."  Adell's hiring a third-party (Fireline) to allegedly help it meet its obligation does nothing to eliminate its own obligations to Mt. Hawley.  *See Breton, LLC v. Graphic Arts Mut. Ins. Co.*, 446 Fed.Appx. 598, 604 (4th Cir. 2011) ("even if Breton delegated its duty to maintain the sprinkler system to [contractor], Breton would still owe a maintenance duty to [insurance company]"); *Mt. Hawley*, 2009 U.S. Dist. LEXIS 134864, *22 ("regardless of whether it was [insured] or [contractor] that was at 'fault' for failing to restore the automatic sprinkler system, insurance was suspended during the time the sprinklers were not in complete working order").  "Complete working order" means that the Adell must keep the system functional and operational, not that it merely exists. [2]

Adell cites a separate contract clause, "Control of Property," providing that "[a]ny act or neglect of any person other than you beyond your direction or control will not affect this insurance."  [Dkt. 110-22 at 53.]  But Adell offers no evidence that the failure of its fire suppression system on October 4, 2016 was the result of the act or neglect of any other party (indeed Adell insists its system worked), nor that responsibility for Adell's system was beyond its "direction or control."  *See Breton*, 446 Fed.Appx. at 604; *see also* conc. op. at 608.

---

[2]        *See, e.g.*, *Berenato v. Seneca Specialty Ins. Co.*, 240 F.Supp.3d 351, 357 (E.D. Pa. 2017) ("To 'maintain' a system in 'complete working order' necessarily means that the system is operational, not merely that it exists"); *Schwartz & Schwartz of Va., LLC v. Certain Underwriters at Lloyd's*, 2009 U.S. Dist. LEXIS 80625, *24 (W.D. Va. 2009) ("When not exercising this valve, it was left in the closed position, which undisputedly caused that loop not to be in 'complete working order' as required in part (b)" [of PSE]); *Lake States Insurance Co. v. River City Metal Prods.*, 2004 Mich.App. LEXIS 2040, *20 (Mich.Ct.App. 2004) ("Read as a whole, there can be no question that the purpose of the PSE was to make sure the system was operational").

In fact, to the contrary, Fireline only did the work requested by Adell [3]; and Adell always had complete control over and access to its own property, including control over the keys to the PIV's necessary to turn the water on and off.  [Dkt. 110-25 at 33-35, 41-42 (Ferguson); 101-04 (Saia)].  Moreover, Adell's duty to maintain its sprinkler and alarm systems in good working order is not delegable under the Baltimore County Fire Prevention Code and the NFPA.  [Dkt. 110-13 at ¶7 (Arnold); 110-15 at ¶¶44-46 (Long); 110-16 at ¶8 (Willms).]  The undisputed evidence also proves that Adell failed to perform its NFPA and Code required inspections and testing which allowed its sprinkler and alarm system problems to go unresolved and the total loss by fire of B5 and B6.  [Dkt. 110-15 at ¶¶47-56; Dkt. 110-16 at ¶34, 39.R.]

## II.  UNDISPUTED EVIDENCE PROVES THE FAILURE OF ADELL'S SPRINKLERS TO RESPOND TO THE FIRE AND THAT THE FAILURE CONTRIBUTED TO THE LOSS OR THE EXTENT OF THE LOSS

Adell does not introduce evidence to raise a genuine dispute of fact regarding the failure of its sprinklers, on site, to respond to the October 4, 2016 fire.  These facts are undisputed.

### A.  The Zone #1 Sprinkler System Did Not Activate

The fire started at or shortly before 1:00 p.m. on October 4, 2016.  (Dkt. 110-15 (Long), ¶¶ 15-19.)  The sprinkler heads would have reached 212 degrees and opened up within a couple minutes of the fire starting, by 1:05.  (Dkt. 110-14 (Mowrer), ¶ 17; 110-15 (Long), ¶ 42.)  Upon sprinkler activation, a strobe light, an electric horn (inside) and a water motor gong (outside) would be activated.  (Dkt. 110-15, ¶ 11.)

---

[3]  *See, e.g.*, Dkt. 110-25 at 381, et seq. (Gavin, Ex. 23.M) at 69:20-70:9 (President of Fireline, testifying regarding Fireline's procedures upon receiving a "fail to test" report from AlarmWatch: "The procedure at this point is, the customer is contacted and told that there is something wrong or not reporting correctly with the fire alarm system.  And that we recommend that we come out to take a look at it, to inspect it, to – to repair it. Q. You're not obligated to go out and take a look; correct? A. We are not obligated to."); 79:2-25 (sprinkler and alarm inspections were scheduled per NFPA requirements unless Adell requested otherwise); 82:8-23 (At Adell's request, Fireline agreed to perform only annual inspections of sprinkler systems); 82:16-19 (referring to the Adell contract: "It does not require Annual.  That's the customer's request.  We default to quarterly.  And if a customer request it to only be annually, we will only provide annually"); Rep. Ex. 30.A at 93:9-22 ("It's the customer's responsibility to maintain their own system.  Fireline does not own the sprinkler system.  The customer does.").

The evidence in support of Mt. Hawley's motion will not be fully repeated here.  It includes the following.  Five Adell employees who were in Building 5 between the time the fire was first reported and their evacuation (by 1:07 p.m.) were deposed.  They observed a large fire (at least to the top of the Gaylords (12') or higher), yet none saw any water discharging from the sprinklers or said they heard an alarm.  (Dkt. 110-25 at 14, 15, 22, 27, 32 (Ferguson); 91-92, 94-95 (Saia); 109-12 (Badra); 134,136, 138-9, 142-43, 145-46, 150 (Overstreet); 169-70, 175-79 (Osei-Tutu)).  Ten first responders (7 firefighters and 3 policemen) also signed declarations (Scally and Bryan were deposed too), recounting their observations during the first minutes and hours of the fire.  (Dkt. 110-3 to 110-12).  None of them reported seeing evidence of water flow from the B5 sprinkler system, seeing strobes, or hearing any audible alarms, at any time.  Employee Badra shot a cell phone video (with sound) that his phone time-stamped 1:05:26 (Dkt. 110-24; 110-27(A)); it showed a substantial fire, no sprinkler water discharge, and no audio or visual alarms. Adell had 16 security cameras recording at its facility, 3 of which covered parts of Building 5.  Before they failed in the heat of the fire between 1:11 and 1:13, none recorded any image of water spraying from the sprinklers or pooling on the floor.  One camera (#9) was in the maintenance room and trained toward the wall where the strobe-horn mechanism was; prior to its failure at 1:14, the strobe light had not activated.  (Dkt. 110-15, ¶ 34; Rep. Ex. 31, Ex. K)  Chief Bryan attempted to charge the Fire Department Connection, to augment the waterflow to the sprinklers, some 2 hours into the fire; but he could achieve no waterflow.  (Dkt. 110-11, ¶ 7.)  Det. Scally interviewed every Adell employee and firefighter he could find, and none reported seeing water discharge from the sprinklers, seeing strobes, or hearing any audible alarm. (Dkt. 110-12, ¶ 5-7.)  After the fire, the PIV regulating water into Zone #1 (the affected buildings) was found in a "SHUT" position, with indicia of its wrench, unlocked padlock, paint and rust

indicating it had been in that position for a long time.  (Dkt. 110-12 (Scally), ¶ 13; 110-20

(Spadea) ¶ 6-7.)  Debris observed around the base of the Zone 1 riser shows that water was not

flowing through the PIV during the fire.  (Dkt. 110-13 (Arnold), ¶ 18(j).)  A review of the fire

damage in Buildings 5 & 6 revealed no water spray patterns.  (Dkt. 110-15 (Long), ¶ 36.)  The

fire's rapid spread itself is evidence that there was no sprinkler activity.  (Dkt. 110-13, ¶ 18f, g.)

Adell submits no fact or expert witness testimony, photograph, video or other evidence to

dispute any of these facts: the sprinklers did not discharge water, the strobe light did not activate,

and no audible alarms (horn or gong) activated, in response to the October 4, 2016 fire.

B.   PIV#1 Was "SHUT" Since Before the Fire

PIV#1 was found to be in a "SHUT" position when it was first observed by Det. Scally

and Mr. Spadea, after the fire.  Both observed additional facts that led them to conclude that it

had been shut since before the fire.  (Dkt. 110-12 (Scally), ¶ 13; 110-20 (Spadea) ¶ 6-7.)  Mt.

Hawley noted that factor in support of its initial reservation of rights letter, and again in its

declination letter.  (Dkt. 110-18 at 18, 150.)  Fire protection engineering experts have evaluated

the facts.  Dan Arnold opined: "the Zone 1 sprinkler system did not activate . . . because the PIV

[] supplying Zone 1 was closed at the time."  (Dkt. 110-13, ¶ 20.)  Dr. Mowrer opined: "The

Zone 1 automatic sprinkler system protecting Buildings 5 & 6 was not in service on the day of

the fire."  (Dkt. 110-14, ¶ 11.)  Tom Long opined: "The sprinkler system did not discharge water

as the sprinkler system control valve PIV#1 was closed. . ." (Dkt. 110-15, ¶ 26.)

Adell has no evidence to explain when, how or why PIV#1 was closed.  This is Adell's

facility.  Lacking evidence, Adell has speculated that maybe it was closed by a firefighter during

or after the fire.  But it was already closed as of approximately 3:30-4:00 p.m., when Chief

Bryan tried to boost the sprinklers by charging the FDC but could achieve no waterflow.  And it

was not closed during the first several hours of the fire, because Lt. Riley arrived in the first wave of firefighters and was stationed outside the locked gate leading back to the alcove where PIV#1 was hidden, and nobody went into the area.  (Dkt. 110-10, ¶ 5.)

Adell has repeatedly mis-framed the issue in its briefing, suggesting that Mt. Hawley must definitively prove the exact historical date PIV#1 was closed, or by whom.  Not so.  If PIV#1 was in a "SHUT" position the moment the fire started, on October 4, 2016, then Adell's fire suppression system was not in "complete working order."  The first time it was seen, after 10/4/16, PIV#1 was found "SHUT."  Substantial evidence supports the conclusion that it was shut since before 10/4/16.  Adell has no evidence it was shut during or after the fire on 10/4/16.

C.    Working Sprinklers Would Have Come on Within a Couple of Minutes

Dr. Mowrer opined that the first sprinkler activation time in the Adell facility would be "in the range of one to two minutes from when the fire started to develop and grow in Building 5."  (Dkt. 110-14, ¶ 17.)  Mr. Long calculated that the first sprinkler activation near the area of origin likely would have occurred "within the first 2 ½ minutes of the fire or sooner."   (Dkt. 110-15, ¶ 42.)  That puts it no later than 1:05.  Similar was Det. Scally's expectation, based on his experience as a seasoned fire investigator: "I would expect to see electronic activation signals generated well before the fire department's arrival and at and around the same time as the initial call to 911 reporting the fire."  (Dkt. 110-12, ¶ 15.)  That was at 1:04.

Adell offers no evidence to dispute these conclusions.  No expert opinions.  No fire investigator saying it is common and expected for the sprinklers to take 22 minutes to activate in an industrial fire with plastics.  Nothing.  Adell argues that the signals its alarm panel sent AlarmWatch at 1:22 evidence a working system, but offers no explanation—much less evidence—for why the sprinklers would take 22 minutes to come on.

D.      Working Sprinklers Would Have Suppressed the Fire

Adell has been aware of Dr. Mowrer's analysis and conclusions, since the start of this case, that "If the Zone 1 automatic sprinkler system protecting Buildings 5 & 6 had been in proper operating condition on the day of the fire, operation of the sprinkler system would have controlled the fire in Building 5 until firefighters could complete suppression of the fire."  (Dkt. 110-14, ¶ 11.d.; 110-14 at 32-36.)  This conclusion bears upon the final clause of the PSE; whether the failure of the system "contributed directly or indirectly to the loss or damage or to the extent of such loss or damage."  (Dkt. 110-22 at 86.)

Adell responds with no expert opinion to the contrary, and no other evidence.  If the Court finds the sprinklers failed to activate, that ends the analysis.  Mt. Hawley prevails.

E.      Both PIV's Were Never Open At the Same Time Since 2/16/15; The PIV
        That Was Closed as of 10/4/16 Had to be PIV#1

Adell insists that the "Monitoring Logs are dispositive."  (Opp. 18.)  They are not; but even if they were, there is a large, unexplained problem that Adell simply ignores.  If you take the AlarmWatch records and data at face value, *both* of the PIV's were "SHUT" on February 17, 2015; but there is no "restore" code received by AlarmWatch from Adell, at any point in time thereafter, to indicate that *both* PIV's were ever turned back to "OPEN."  In other words, the "monitoring logs"—if they are accurate—clearly say that *at least* one of the PIV's was in the "SHUT" position ever since 2/17/15.  (Dkt. 110-16, ¶¶ 20-24, 39M, 39N.)

Adell offers no contrary evidence.  Adell's corporate designee testified that it never touched or inspected its PIV's, ignoring its legal obligation to inspect them monthly and to keep a log.  Nor did it contract with Fireline to inspect its PIV's as often as the law required.  Adell truly has no idea if one PIV, or the other, or both, were open or closed.

The fact that at least one PIV was closed at the time the fire started, on 10/4/16, invites the question was it PIV #1 or PIV #2 (or both)?  Several facts compel the conclusion that the closed PIV, as of 10/4/16 anyway, must have been PIV#1.  First, on 3/3/16, Adell told the Fire Department that it had closed the "water main" to Zone #1 because a forklift ran into and cracked a pipe on one of the firehose pipes (in B6).  (Rep. Ex. 29.A.)[4]  Second, on 7/14/16, PIV#2 was observed to be in an "OPEN" position during Kwasi Koranteng's inspection.  (Dkt. 110-23, ¶¶ 9-10.)  Third, on 9/7/16, Fireline came out to work on a Zone 2 leak (in B4), reporting no problems with PIV#2 (thus it was OPEN).  Fourth, PIV#2 was observed to be OPEN during the fire on 10/4/16.  (Dkt. 110-11 at 9 (Bryan e-mail).)  Fifth, the sprinklers in Zone 1 did not activate during the fire on 10/4/16.  Sixth, PIV#2 was found OPEN after the fire.  (Dkt. 110-12, ¶ 11.)  Seventh, PIV#1 was found in a SHUT position on 10/12/16.  Eighth, because of the manner in which PIV#1 and PIV#2 were connected to the single Zone 3, both would have to be "OPEN" to generate "restore" codes; but the ongoing closure of PIV#1 made the system incapable of detecting the opening or closing of PIV#2 (explaining why it does not appear on the logs in conjunction with Fireline's 9/7/16 work).  (*See* Supp. Decl. of Carl Willms, ¶ 7-10, Ex. B.)

F.   The Nonsense Signals Received by AlarmWatch on 10/4/16 From 1:21-1:24

Mt. Hawley explained at some length, supported by expert testimony, that the 20 individual signals logged by AlarmWatch between 1:21 and 1:24 p.m. on October 4, 2016, were

---

[4]      That break was never repaired.  (Rep. Ex. 29B, C.)  Mr. Ferguson, testifying as a Rule 30(b)(6) designee and not from personal knowledge, made a naked assertion at his deposition that it was fixed the next day (like he did with the 2/17/15 work); but Fireline has no record of sending any workers to Adell or of doing the referenced work, either time.  (Rep. Ex. B.)  Adell did confirm that only Fireline would have performed any such work.  Mr. Ferguson was not personally involved in any repairs to the sprinkler or alarm system, so that corporate guess that the work maybe must have been done the next day, can be completely disregarded for purposes of summary judgment.  FRCP 56(c)(4); Fed.R.Evid. 602.  Obviously, a party cannot cite to *its own* Rule 30(b)(6) deposition to circumvent the requirement for personal knowledge.  *McDonald v. OneWest Bank*, 929 F.Supp.2d 1079, 1090 (W.D. Wash. 2013).  Just as a party cannot cite to its own interrogatory responses, if they were verified on "information and belief" rather than personal knowledge.  (Adell MSJ Exs. 38, 56, 64.).  If a party could cite to *its own* interrogatory responses as evidence, it could just write its own evidence, without regard to personal knowledge.

not indicative of a working system and could only be explained by the wires of the alarm panel melting together in the heat of the fire.  (110-1 at 19-22; citing 110-16 (Willms) at ¶¶ 30-33.)

Adell responds with no contrary opinion or evidence.  How does Adell explain a Zone 3 restore, followed 2 seconds later by a Zone 3 shutoff (followed by 8 straight Zone 3 shutoffs)?  If the PIV (Zone 3) was shut, how does Adell explain a subsequent Zone 1 actuation?  If Zone 1 is actuated, how does it explain two more actuation codes (without an intervening restore)?  The same for Zone 2?  Why is Zone 2 showing as actuated, at all, given there was no Zone 2 sprinkler function (certainly not in the first half hour of the fire[5]).  Why is Zone 4 firing, at all?  Adell has no Zone 4.  These are nonsense signals.  Adell has no alternate explanation.

### III.   THE ADELL VIDEOS ARE AUTHENTIC

Mr. Badra, then an Adell employee, took a 5-second cell phone video of the fire at 1:05:26.  Adell cannot really question that, but asserts there is no evidence of the time.  He still has it on his new phone, and at his deposition, he watched it, compared it to the copy produced in this case, and authenticated the copy.  (Dkt. 110-25 at 124-25: ("That is the video that we just watched on my phone, yes.")  The Court will note the filename his phone assigned when saving it (Dkt. 127, Exh. A): "20161004_130526.mp4."  So 1:05:26 makes sense.  That is also right in the time frame of when the fire was reported by an Adell employee (1:04) to when they were all

---

[5]     Adell indicates that one sprinkler head in B4, nearest the fire door with B5, was found to have "popped" when a contractor later came out to repair its system.  (Opp. at 9.)  Even if one assumed it occurred during this fire, that would have to be much later in the fire than 1:22:04.  For John Bryan inspected B4 and its fire door and sprinklers in the 3:30-4:00 time frame and specifically observed that no sprinklers were flowing (Dkt. 110-11 at 3, ¶ 4); it was exactly what he was looking for (because it indicates heat is coming through to a new building); and his inability to achieve any waterflow when he hooked up the pumper truck to the FDC shortly thereafter also confirmed there was no water flow *through either Zone* at that time.  If the Zone 2 actuation signal were taken at face value, that sprinkler head "popped" open at 1:22:04, just 2 seconds after the first Zone 1 (B5) sprinkler head opened (at 1:22:02) (and it would have been gushing for Mr. Bryan).  But the heat would have had to travel all the way across the ceiling of B5 to reach and breach the fire door and trigger that single sprinkler head in B4.  That these signals show the sprinklers first triggering almost simultaneously in a building that was already fully engulfed (B5) and one next door that never burned (B4), further confirms they are nonsensical if taken at face value.

reported to 911 to be evacuated (1:07); and it is supported by security video showing Mr. Badra

enter the area of the fire at 1:04 and exit at 1:06.[6]

Adell also challenges the summaries, screen shots and excerpts from its own security

video cameras.  The process by which that video was retrieved, from a burned, cracked DVR

unit that Mr. Nava found in the rubble of Adell's building (and gave to Adell), was extensively

negotiated and renegotiated, addressed in at least three court orders (Dkt. 68 at 4-5; Dkt. 71 at 2-

3; Dkt. 72 at 5-6; Dkt. 82 at 2), and performed with Adell directly watching, live, the "clean

room" retrieval process that recovered the data.  The raw data recovered, and the video clips as

translated from that data, were shared with Adell.  There is no genuine question as to

authenticity; indeed, *this is Adell's data*—produced to Mt. Hawley in discovery. *Orr v. Bank of

Am.*, 285 F.3d 764, 777 and Fn. 20 (9th Cir. 2002) ("documents produced in discovery are

deemed authentic when offered by the party opponent.")  That said, Mt. Hawley submits, with

this reply, the declarations of Craig Rager and William Stumme, two technicians involved in the

retrieval of the raw data and its conversion to video files.  [Rep. Ex. 26 (Rager Dec.) ¶3-6; Rep.

Ex. 27 (Stumme Dec.), ¶3-9, Exs B-H.]  Mr. Stumme also created seven short video clips taken

from different cameras on 10/4/2016 which Mt. Hawley submits pursuant to Fed. R. Ev. 1006.[7]

---

[6]       The Stumme Declaration attaches 2-minute video clips from Cameras 1, 6, 9, 10, 15 and 16, each for the
same time period, approximately 1:04 to 1:06.  Cameras 9 and 10 are located in the maintenance office and show
Mr. Badra (in the yellow hard hat) exit that location in the direction of the fire at about 1:04 p.m. and reemerge on
camera at about 1:06 p.m., then exit from the B3 door.  [Ex. 31at Exs. E and F.]  This is consistent with Mr. Badra's
deposition testimony concerning when he took his video.  [Rep. Ex. 30.B (Badra) at 41:15-48:1.]  Heavy smoke
from B5 is also seen at this time (captured on Cameras 1 and 15) [Ex. 31at Exs. I and J], while the images from
inside B5 (Cameras 6 and 16) become obscured from smoke in a matter of seconds.  [*Id.*, at Exs. G and H.]

[7]       FRE 1006 permits use of a summary to prove the content of voluminous recordings.  All content available
to the other party and file it with the Court, if requested.  The video images extracted by Atlantic Data Forensics
were produced to counsel for Adell.  [Rep. Ex. 29 D.]  The seven short video clips of security footage from
10/4/2016 were extracted from the thousands of hours of video taken by Adell between 9/25/2016 and the fire.  *U.S.
v. Bakker*, 925 F2d 728 (4th Cir. 1991) (composite video of over 200 hours admitted).  Mt. Hawley is prepared to
lodge with the Court a complete set of all security videos recovered, upon request.

Adell questions the basis for the 51-minute difference between the time-stamps on Adell's security videos, and real time.  Mr. Long explained the bases in his declaration.  (Dkt. 110-15, ¶ 15.)  Engine 372 arrived at the scene at 1:12 p.m.  Adell's security video time-stamp was 12:20:56, when Engine 372 arrived.  [Rep. Ex. 31, Ex. D.]  The difference is approximately 51 minutes.  Similarly, officer Janowitz arrived at 1:10 p.m., with officer Langelan arriving shortly afterward.  [Dkt. 110-3 at ¶ 6, 110-4 at ¶ 6.]  The time marker displayed on the Camera 12 video excerpt shows officer Janowitz pulling into Adell's parking lot at 12:18:28 and officer Langelan pulling in at 12:19:17, also about 51 minutes behind standard time. [Ex. 31, Ex. D.]

IV.     FIRELINE'S RULE 30(B)(6) DEPOSITION WITNESS, MR. CHENOWITH, LACKS PERSONAL KNOWLEDGE AND HIS TESTIMONY IS NOT APPROPRIATE FOR A SUMMARY JUDGMENT MOTION

Mr. Chenowith was a Rule 30(b)(6) designee for third-party Fireline Corporation.  Rule 30(b)(6) is a discovery device.  A designee can testify on behalf of the corporation, and he or she is not limited to personal knowledge.  Indeed they have a duty to prepare, typically met by reviewing files, interviewing witnesses and meeting with counsel.  All that second-hand knowledge is not transformed into "personal knowledge."  FRCP 56(c)(4) and FRE 602 require personal knowledge for testimonial evidence.  *Soutter*, 299 F.R.D. 126; *McDonald*, 929 F.Supp.2d at 1090; *see also Sutton v. Roth*, 361 Fed.Appx. 543, 550 n.7 (4th Cir. 2010) (affidavit based on a review of documents lacking personal knowledge).

Mr. Chenowith testified about an inspection he did not perform (1/20/16), repair work he did not do (2/16/15; 2/17/15; 7/10/15; 9/7/16), documents he did not create or generate (all) and indeed documents that even his company did not generate (AlarmWatch data).  (Rep. Ex. 30.C (Chenowith) at 87:24-88:8.)  Mr. Chenowith was not at Adell's facility at the time of the fire, is

not a fire protection engineer (*Id.*, 175:11-13), and does not know if the sprinklers sprayed water or the alarms sounded.  (*Id.*, 195:12-15.)  Yet Adell cites his testimony at least 30 times.

Mt. Hawley points to a few facts showing a total lack of foundation, in personal knowledge, of Mr. Chenowith's Rule 30(b)(6) testimony.  But to be clear, it is not the objecting party's burden to *disprove* a witness's personal knowledge.  Rule 56(c)(4) requires that the proponent must "show that the affiant or declarant is competent to testify on the matters stated."

Mr. Chenowith testified about repair work Fireline performed at Adell on February 16 & 17, 2015, and July 10, 2015.  The 2/16/15 Fireline technician was D. Vecchioni.  The 2/17/15 Fireline technician was S. Hall.  [Rep. Ex. 29.B.]  The July 10, 2015 technicians were S. Dreyer and K. Dean.  [*Id.*]  He also testified about Adell's January 20, 2016 inspection of the Adell facility and his interpretation of the inspection report.  The inspections were performed by Jeremy Mohney and Stephen Dreyer.  [*Id.*]  Mr. Chenowith did not even talk to Mohney or Dreyer.  His testimony was based entirely on his interpretation of their 1/20/16 inspection report.  (Rep. Ex. 30.C at 101:18-102:9.)  Mr. Chenowith testified about a March 3, 2016 incident at Adell where neither he, nor any Fireline employee, went out to Adell. [*Id.* at Ex. B.]  He testified about a 9/7/16 service call where "Keedy" was the technician on site.  [Rep. Ex. 29.B.]  In sum, nothing he has to say about service calls or repairs, or the 1/20/16 inspection and report, is premised on his personal knowledge.  (Adell Opp. Brf. at ¶¶ 62, 64, 65, 66; pages 13, 15, 16-17.)

Mr. Chenowith also admitted that "all of your testimony is based on the electronic report and what you can glean from a written log; correct?"  (Ex. 23.O at 176.)  He was not aware of "any other evidence that would indicate" whether the Zone 1 sprinklers actually activated, other than his review of the reports.  (Rep. Ex. 30.C at 182-83).  And he agreed ("correct"), with: "And you weren't there.  You don't know whether the sprinkler system activated or not, right?" (Ex.

23.O at 195.)  Thus, all Adell's citations to Mr. Chenowith as support for a fact regarding the actual performance of Adell's sprinklers, whether a PIV was open or shut, and whether water ever actually flowed, is also lacking in personal knowledge.  (Adell Opp. Brf. at ¶ 71 at 15, 16, 17, 18.)  Adell asked him, "*To your knowledge*, did Adell maintain its sprinkler system in complete working order?"  His "yes" answer (Adell Opp. Brf. at 19) must be qualified by the fact he has *no* knowledge of what Adell did or did not do, and no knowledge of the abject failure of Adell's system on the scene.[8]  Nor is his interpretation of the documents proper as lay opinion. *Washington v. Dept. of Transp.*, 8 F.3d 296, 300 and Fn. 10 (5th Cir. 1993) (lay opinion not based upon witness's "perception, but upon his self-serving speculation" is inadmissible.)

## V.    THERE IS NO EVIDENCE PIV#1 WAS OPEN PRIOR TO 10/4/16

The normal condition on Zone 3 of Adell's system, is for both PIV's to be OPEN.  A "supervisory" code indicates closure of a PIV; "restore" codes confirm that *both* are once again OPEN.  The last Zone 3 "restore" code, prior to the fire, was on 2/16/15; the next day, 2/17/15, both PIV#1 and PIV#2 were closed.  (Rep. Ex. 28 (Willms Supp. Decl.), ¶ 8-9.)  Fireline's 2/17/2015 work ticket advised Adell: "Customer is aware that the sprinkler system is still shut off due to P.I.V. being broken.  Customer needs to call a utility company to fix this before the sprinkler system can be put back in service."  [Dkt. 110-24 at 12.]  No document produced or witness deposed in this case proves that the referenced work was performed after 2/17/15 [Ex. 23(M) at 138:8-139:15]; there is no work order, invoice or other record of it.[9]  Regardless of

---

[8]    Similarly, his speculation that Fireline would have given Mt. Hawley the monitoring logs, if only Mt. Hawley had asked (Opp. Brf. at 19), only confirms his eagerness to testify to what he does not know (or what Adell wants).  *Washington*, 8 F.3d at 300 & fn. 10 (the point of Fed.R.Evid. 701 is not to "introduce meaningless assertions which amount to little more than choosing up sides.")  His boss, the President of Fireline, Anna Gavin, did not have to speculate: "if it's the customer asking us, we're going to say yes.  If it's not the customer asking us, we're going to say no."  (Dkt. 110-25 at 381 et seq. (Gavin) at 219:19-220:7.)  Adell could have gotten the logs (as requested) and sent them to Mt. Hawley.  Its "bad faith" theory is an artifice.

[9]    Adell cites to deposition testimony from Ferguson, testifying as its 30(b)(6) witness, in which he asserted that the broken PIV was fixed on 2/18/2018.  But Mr. Ferguson did not do that work, and there is no work order,

which Zone work was performed on 2/16-17/2015, it is undisputed that no Zone 3 "Restore"

code was *ever* transmitted to indicate that both of the earlier-shut PIV's had been reopened.

[Dkt. 110-16, ¶20-24, 39.M, 39.P; Dkt. 110-25 at 138-39; Rep. Ex. 28  at ¶7-10.]

Adell claims that water next flowed through PIV 1 on 7/10/2015, citing Chenowith.

(Opp. Brf. 15.)  But Chenowith has no personal knowledge whether water actually flowed

through a valve he was nowhere near.  Adell cites to the AlarmWatch reports.  But the 7/10/2015

log and the raw data do not show a Zone 1 waterflow switch being actuated.  Rather, the

7/10/2015 signals reference "SOUNDER/RELAY TROUBL [T] 'ZN 1 WATERFLOW

PRODUCTION AREA…" at 12:23:34, and a restoral to normal ("SOUNDER/RELAY

RESTOR (R) 'ZN 1 WATRERFLOW PRODUCTION AREA…") 8 minutes later (12:31:15).

[Ex. 118-4 at 45.]  "Sounder/Relay" signals reflect the condition of the integrated horn/strobe

light circuit of the fire alarm panel, and do not report any waterflow device actuation.  [Rep. Ex.

28 at ¶12-14, Ex. B; Dkt. 110-16 at ¶ 12-13, Ex. G.]

Adell claims that water next flowed through PIV 1 on 1/20/2016, when Fireline

performed its last annual inspection before the fire.  Adell cites the Chenowith deposition, the

1/20/2016 Fireline Inspection Report and the Alarmwatch log and raw data.  (Opp. Brf. 15-16.)

First, as noted above, Chenowith did not perform the 1/20/16 work or even interview the

technicians who did. Second, Fireline's 1/20/2016 Inspection Report is so fraught with errors and

inaccuracies that it is an unreliable indicator of the condition of Adell's sprinkler and fire alarm

systems.  [Dkt. 110-16 (Willms Dec) at ¶35A-L, and Exs. K and L.]  Further, the only Zone 3

"supervisory" signal reported on 1/20/2016 reflects the alarm panel's typical response to a

---

invoice, payment or other indicia that it was done.  Ferguson testified that only Fireline inspected and worked on
Adell's sprinkler system before the fire [Ex. 23(B) at 34:8-36:24].  But Fireline's documents confirm that nobody
was on site on 2/18/2015.  [Rep. Ex. 29 at Ex. B.]  After 2/17/2015, Fireline was next on site 5 months later on
7/10/2015.  [*Id.*]  The electronic data for 2/18/2015 also show no Zone 3 activity.  [Ex. 14, Ex. G.]  No work was
performed on 2/18/2015.  The PIVs remained SHUT.

power-down and power-up sequence whereby, upon power-up, the panel sensed the actuated

Zone 3 signal from 2/17/2015 and sent the appropriate "supervisory" event signal.  [Ex. 14 at

¶35A, and Exs. K and L; Rep. Ex. 30 (Chenowith) at 108:9-109-20.] There is no evidence water

flowed past PIV 1 on 1/20/2016.  Fireline's own inspection report shows that a main drain test

was not performed then because it was "TOO COLD TO FLOW."

Next, Adell cites a 3/3/2016 Zone 1 waterflow supervisory (13:39:02) and restoral

(13:41:36), which Ferguson testified was the date a forklift backed into a valve in B6 and

cracked it, causing Fireline to come out and repair it.  [Rep. Ex. 30.D. (Ferguson) at 132:24-

134:5.]  The logs and raw data for 3/3/2016, however, show no Zone 3 activity, including no

"restore" signal since 2/16/2015.  [ECF 118-4 at 50.]  If PIV#1 was open on 3/3/2016, there

would be a Fireline record of it being reopened and signals showing Zone 3 (monitoring the

PIVs) being restored to normal.  No such records exist.  There is also no documentary evidence

that Fireline was called, or ever on site, on 3/3/2016 (or in the days that followed), or that

Fireline repaired or replaced the cracked valve.  Fireline was next on site on 3/25/2016, when it

performed a site survey.  [Ex.29 at Ex. B.]  On March 28, 2016, Fireline published its proposal to

install or reinstall sprinkler heads in various locations.  [*Id.*, at Ex. C.]  There was no mention of

repairing the cracked valve from 3/3/16 or restoring the PIVs, then or later.

If the valve was cracked and flowing water, as Ferguson testified, that would explain why

Adell told the Fire Department on 3/3/2016 that it had shut PIV#1: "worker ran into pipe with

forklift water main turned off by company staff alarm company notified."  [Rep. Ex. 29, Ex. A

(underlining added).]  Thus, the Fire Department reported a "Shut down system".  [*Id.*]  Even if

PIV#1 had ever been reopened prior to 3/3/2016, it was evidently shut as of 3/3/16, and there is

no evidence that it was opened before the fire.  [*Id.*; ECF 118-4 at 50-54.]

Adell argues that Kwasi Koranteng "physically confirmed" that PIV#1 was "locked open" on 7/14/2016.  That was not his testimony.  He only saw the PIV outside B3, which is PIV#2; and that is the only PIV he refers to in his Report.  (Dkt. 110-23 at ¶¶ 9, 10.)  Adell asserts Mr. Koranteng had "full access" to its facilities; but his testimony was that he was taken around the facility by an Adell representative and that he was never led to the gated area of th property where PIV#1 was later found.  (*Id.*)

Adell points to the daily Periodic Test signals, appearing in the AlarmWatch reports, as evidence that it maintained its sprinkler and alarm systems.  The evidence does not support Adell's argument.  In fact, the daily test signal *only* confirms that the alarm panel at Adell is able to communicate with the receiver at AlarmWatch.  "Nothing more."  (Dkt. 110-16 (Willms), ¶ 16, 39.O.)  Or in the words of AlarmWatch's Mr. Maden: "As far as we can tell from this signal, it's still communicating with us as expected, every day… We have no idea what is happening locally."  Rep. Ex. 30 (Maden) at167:25-168:12. It means nothing regarding the status at Adell. This is demonstrated by one simple fact:  The exact same periodic test reports were received by AlarmWatch's receiver, and logged, on 10/5/2016 and 10/6/2016, with B5 & B6 in ruins.

VI.   <u>MARYLAND LAW PERMITS RECOUPMENT OF ADVANCE PAYMENTS</u>

Adell opposes Mt. Hawley's recoupment claim in a footnote.  (Opp. Brf. 31, fn. 11.) Both the national majority position and two cases from this District (applying Maryland law) have recognized and permitted an insurance company to recover its advance payment, if it later establishes that no coverage was owed.  *See*, *e.g.*, *Admiral Insurance Co. v. American National Sav. Bank*, 918 F.Supp. 150, 153-56 (D.Md. 1996); *Sebastian v. Provident Life & Acc. Ins. Co.*, 73 F.Supp.2d 521, 536 (D. Md. 1999) (follows *Admiral*).

VII.   ADELL MAY NOT CIRCUMVENT THE PSE BY WAIVER OR ESTOPPEL

Maryland law is settled that "an extension of coverage may only be created by a new contract." *Kapiloff*, 155 F.3d at 497.  Waiver and estoppel cannot be invoked where the effect would be an extension of coverage.  *Id.*  That includes circumvention of a condition precedent, such as the protective safeguard endorsement.  *Id.*

Adell's waiver/estoppel is premised on some rather extreme language, with rather little evidentiary support.  Adell says, 20 or 30 times, that Mt. Hawley "admitted coverage." Repeating it does not make it so.  Mt. Hawley made a substantial advance payment requested by Adell, in the early days of the loss, while its investigation into the matter was just beginning. Most courts have held that is not an "admission" of coverage or waiver of coverage defenses. For if it were, insurance companies would likely stop making advance payments.

Adell acuses Mt. Hawley of "reversing course" or like verbiage, many many times.  It simply does not fit.  The fire happened on October 4, 2016.  Mt. Hawley issued a reservation of rights letter on October 27, 2016.  The main issue it identified is still the main issue today:  the PSE.  Following further investigation, including retaining two experts to advise as to the second prong of the PSE, Mt. Hawley denied coverage on January 29, 2016.  Again, the main issue relied upon remains the main issue today.  While some of the details change as discovery proceeds and more facts are learned, this has been a remarkably stable position.  To the extent Adell claims "delay" because Mt. Hawley took 23 days to issue a reservation of rights, *Kapiloff* again squarely refutes that notion, as a matter of law.  155 F.3d at 497.

Adell accuses Mt. Hawley of "demolishing" or "destroying" its building after the fire. There is no evidence, whatsoever, to support that utterly ridiculous assertion.  Adell's buildings were demolished by a fire, because Adell did not maintain a water supply to its sprinkler system.

- 19 -

While the firefighters risked their lives putting out the fire, the scene commander worked with a heavy machine contractor (Belfor – hired directly by Adell) to perform some "selective demolition" of parts of the building, as necessary, to extinguish hot spots and keep the firefighters safe.  (Dkt. 110-19, ¶ 4.) Mt. Hawley's cause and origin investigator, Mr. Spadea (himself a longtime former fire marshal), consulted with Det. Scalley (the fire marshal), for the purpose of asking them to try to *preserve* certain areas for their cause and origin investigation.

Adell's wild, unsupported accusations lead into a throw-away argument for "spoliation." (Opp. Brf. at 26.)  There is no evidence of any misconduct, nor that any evidence was lost or disposed of by Mt. Hawley.  Vitriol and rhetoric are not enough.

VIII.   ADELL'S SECTION 3-1701(e) CLAIM FAILS AS A MATTER OF LAW

Adell repackages its accusations of admissions of coverage, shifting coverage positions and "demolition of the site" (??) – but still unsupported by any evidence.  (Opp. Brf. 31-32.)  A few more bullet points (but no more evidence) are tacked on: (1) holding Adell to its proof of damages in this case (nothing to date); (2) not agreeing with Adell's misinterpretation of Mr. Koranteng's inspection report (Mr. Korentang himself does not agree with Adell); and (3) filing documents in opposition to Adell's motion (drafted by counsel)—to "unnecessarily prolong the case."  Adell's new "bad faith" theories appear to misconstrue Maryland law.  If Adell loses on coverage, its statutory claim fails too.  If Adell wins on coverage, then it must be able to prove that Mt. Hawley's declination of coverage for the claim was "lacking in good faith" *at the time of the denial*.  Md. Courts and Judicial Proceedings Code Ann. 3-1701(a)(5).  Regardless, the claim is legally meritless and should be summarily adjudicated.

## **CONCLUSION**

For each of the foregoing reasons, Mt. Hawley submits that its motion for summary judgment or partial summary judgment should be granted.

Dated: June 22, 2018                    By:___/s/ *Michael Prough*_____

Michael D. Prough (*pro hac vice*)
Dean C. Burnick (*pro hac vice*)
MORISON & PROUGH, LLP
2540 Camino Diablo, Suite 100
Walnut Creek, CA 94597
(925) 937-9990 telephone
(925) 937-3272 facsimile
mdp@morisonprough.law
dcb@morisonprough.law

Andrew T. Stephenson (Bar No.26504)
FRANKLIN & PROKOPIK, A.P.C.
2 N. Charles Street, Suite 600
Baltimore, MD 21201
(410) 230-3638 telephone
(410) 752-6868 facsimile
astephenson@fandpnet.com

*Attorneys for Plaintiff and Counter-Defendant*
*Mt. Hawley Insurance Company*

- 21 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22th day of June, 2018, a copy of the REPLY

MEMORANDUM IN SUPPORT OF MT. HAWLEY INSURANCE COMPANY'S MOTION

FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT was electronically

filed through the Court's ECF filing system and served on the following recipients:

John A. Gibbons, Esq.
BLANK ROME LLP
1825 Eye Street, NW
Washington, DC 20006-5403
Telephone:  (202) 420-2200
Facsimile:  (202) 420-2201
jgibbons@blankrome.com


Omid Safa, Esq.
BLANK ROME LLP
1825 Eye Street, NW
Washington, DC 20006-5403
Telephone:  (202) 420-2200
Facsimile:  (202) 420-2201
osafa@blankrome.com

*Attorneys for Defendant and Counterclaimant*
Adell Plastics, Inc.


_____/s/_____
Dean C. Burnick (*pro hac vice*)