## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MT. HAWLEY INS. CO.,                    *

    Plaintiff,                         *

    v.                                  *              CIVIL NO. JKB-17-252

ADELL PLASTICS, INC.,                   *

    Defendant.                          *

  *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM

This case arises from a fire that demolished several buildings at the Baltimore facility of Adell Plastics, Inc. ("Adell"). Mt. Hawley Insurance Co. ("Mt. Hawley") sued Adell, seeking a declaration that, under their commercial property insurance contract, Mt. Hawley owed no coverage and seeking a recoupment of its $1 million advance payment. Adell filed a counterclaim, claiming that Mt. Hawley breached the insurance contract and acted with a lack of good faith. Adell moved for summary judgment on its breach of contract and lack of good faith claims. Mt. Hawley opposed Adell's motion and moved for summary judgment, in its own right, arguing that it was entitled to a declaratory judgment and restitution as a matter of law. Both sides have also moved to strike certain exhibits relied on by the opposing party. No hearing is required. *See* Local Rule 105.6 (D. Md. 2016). For the reasons set forth below, the Court will deny both motions to strike. The Court will further deny Adell's motion for summary judgment in full and Mt. Hawley's motion for summary judgment in part.

## I. Factual and Procedural Background

On October 4, 2016, Adell's Baltimore facility caught fire. The fire began at approximately 1:00 p.m. and lasted for several days, eventually destroying two buildings and causing over $12.7 million of damage. (Adell Mem. M.S.J. at 6, ECF No. 95; Adell Mem. M.S.J. Ex. 1 at 29, ECF No. 95-2; Ex. 13, ECF No. 95-14; Mt. Hawley Mem. M.S.J. Ex. 11 at 10, ECF No. 110-13.)

At the time of the fire, Adell had a commercial property insurance policy in effect through Mt. Hawley. (Mt. Hawley Mem. M.S.J. Ex. 20(A), ECF No. 110-22.) The insurance contract included coverage in the event of a fire and contained a Protective Safeguard Endorsement ("the Endorsement"), which stated,

> As a condition of this insurance, it is understood and agreed that the protective devices or services set forth in the Schedule below will be maintained in complete working order. . . . We will not pay for loss or damage if the protective safeguard or service in the above Schedule was not maintained in complete working order and such failure to maintain contributed directly or indirectly to the loss or damage or to the extent of such loss or damage.

(*Id.* at 85–86.) The Endorsement "Schedule" listed the "Automatic Sprinkler System" and "Automatic Fire Alarm" as the types of protective devices that Adell had to maintain. (*Id.*) Adell's Baltimore facility had two sprinkler systems, and the Endorsement obligated Adell to maintain "[a]ll" of them in "complete working order." (*Id.*) One sprinkler system connected to Buildings Five and Six while a second connected to Buildings One through Four. (Mt. Hawley Mem. M.S.J. Ex. 24(C, F), ECF. No. 110-26) The fire destroyed Buildings Five and Six. (Mt. Hawley Mem. M.S.J. Ex. 11 at 10.)

Within a week of the fire, Mt. Hawley began its investigation and delivered an advance payment of $1 million to Adell. (Adell Mem. M.S.J. Ex. 13.) At the end of October, Mt.

Hawley informed Adell by letter that its investigation revealed that some of the protective devices may not have responded to the fire:

> Based on the facts known to date, it is believed that the sprinkler system in Building 5 did not activate, and there was no audible sound (water motor gong) indicating the sprinkler system's activation. The lack of a gong usually indicates that water was not flowing in the system. It is also believed that the post indicator valve that controls the system's water flow in Building 5 was in a closed position, which means that water was prevented from entering the sprinkler system.

(Mt. Hawley Mem. M.S.J. Ex. 16(B) at 18, ECF No. 110-18.) The letter made clear that Mt. Hawley would continue to investigate the Adell fire but would do so "under an express reservation of rights." (*Id.* at 19.)

In January 2017, Mt. Hawley filed a complaint in this court, seeking a declaration that it did not owe Adell under the insurance contract and seeking restitution for the advance payment. (Compl. at 1, ECF No.1.) Adell filed a counterclaim, alleging breach of contract and lack of good faith under Md. Code Ann. Cts. & Jud. Proc. § 3-1701 (West 2016). (Answer & Countercl., ECF No. 10; First Am. Countercl., ECF No. 41.) After engaging in a hard-fought discovery battle, *see Mt. Hawley Ins. Co. v. Adell Plastics, Inc.*, No. 17-252, slip op. at 1–2 (D. Md. Aug. 22, 2017), both parties have moved for summary judgment on their claims. In doing so, they attach voluminous exhibits.

Adell presents the protective devices' monitoring logs; loss control inspection reports of the Baltimore facility; depositions of witnesses to the fire and employees of the companies involved in the insurance dispute; and several pieces of correspondence regarding the facility and the fire. Through this evidence, Adell supports its assertion that it properly maintained the protective devices by hiring Fireline Corp., a fire equipment distribution business, to inspect and repair their protective systems and by allowing both Fireline and other loss control inspectors to

3

inspect the devices and prepare them when needed. (*See* Adell Mem. M.S.J. Ex. 20, ECF No. 95-21; Ex. 55, ECF No. 95-56; Ex. 57, ECF No. 95-58; Ex. 59, ECF No. 95-60; Ex. 65, ECF No. 95-66.) Adell puts forth testimony and monitoring logs that indicate that the post-indicator valve, which connects the sprinklers to the municipal water supply, was locked open and functioning at the time of the fire. (*See* Adell Mem. M.S.J. Ex. 22, ECF No. 95-23; Ex. 45, ECF No. 95-46; Ex. 46, ECF No. 95-47; Ex. 55; Ex. 57.) Testimony from Adell employees and monitoring logs indicate that water flowed from the sprinklers in response to the fire. (*See* Adell Mem. M.S.J. Ex. 22; Ex. 67, ECF No. 95-68.) Finally, Adell's interpretation of the monitoring logs illustrates a functioning sprinkler and alarm system that responded to the fire. (*See* Adell Mem. M.S.J. Ex. 40, ECF No. 95-41; Ex. 45; Ex. 46; Ex. 51, ECF No. 95-52.)

Mt. Hawley's evidence conflicts on each point. Mt. Hawley puts forth inspection reports, the Fireline agreement with Adell, and several witness declarations to show that Adell failed to maintain the sprinklers in complete working order because it failed to contract for and receive complete inspections of the protective devices, as recommended by the National Fire Protection Association ("NFPA"). (*See* Mt. Hawley Mem. M.S.J. Ex. 11; Ex. 21, ECF No. 110-23; Ex. 22(B, C, I), ECF No. 110-24; Ex. 23(B), ECF No. 110-25.) Mt. Hawley presents evidence that the post-indicator valve may have sat in the closed position or, even, in disrepair for some time. (*See* Mt. Hawley Mem. M.S.J. Ex. 11; Ex. 14, ECF No. 110-16; Ex. 21; Ex. 22(B, F, G, H); Ex. 23(O).) Many of the first responders to the fire testify that water was not flowing from the sprinklers in Building 5 on the day of the fire and that the lack of sprinklers contributed to the rapid spread of the fire. (*See* Mt. Hawley Mem. M.S.J. Ex. 3, ECF No. 110-5; Ex. 4, ECF No. 110-6; Ex. 5, ECF No. 110-7; Ex. 6, ECF No. 110-8; Ex. 7, ECF No. 110-9; Ex. 8, ECF No. 110-10; Ex. 9, ECF No. 110-11; Ex. 10, ECF No. 110-12.) Finally, Mt. Hawley interprets the

4

monitoring logs differently and concludes that they reflect a broken sprinkler system that failed to adequately respond to the fire. (*See* Mt. Hawley Mem. M.S.J. Exs. 13, ECF No. 110-15.)

In addition, the parties dispute how Mt. Hawley became Adell's insurer in the first place. Mt. Hawley claims that, when Adell applied for insurance in April 2016, the application contained material misrepresentations as to the Baltimore facility's sprinkler system, code violations, and prior insurance coverage. (Mt. Hawley Mem. M.S.J. at 46.) Mt. Hawley offers communications showing that Adell's prior insurance provider, Verlan Fire Insurance Co., did not renew its policy and that several insurance providers declined to cover Adell—facts Adell omitted from its insurance application. (Mt. Hawley Mem. M.S.J. Ex. 20; Ex. 22(I, J, K, L); Ex. 23(I, J).) Adell offers testimony from Verlan's corporate designee stating that Verlan in fact offered to renew and that the insurance providers that declined to extend coverage to Adell were all under the umbrella corporation of The Hanover Insurance Group. (Adell Opp. & Reply at 28, ECF. No. 118; Adell Opp. & Reply Ex. 90 at 110, 22–23, 27, ECF No. 118-16.)

Despite the volume of evidence, both parties assert that there is no genuine issue of material fact. At this stage, the question for the Court is whether that is true.

## II.    Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then the dispute is material and genuine, and summary judgment should be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage,

"courts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). When faced with cross-motions for summary judgment, the court considers each motion "separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," resolving all factual disputes in the light most favorable to the party opposing that motion. *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014); *cf. Sager v. Housing Comm'n of Anne Arundel Cty.*, 957 F. Supp. 2d 627, 632 (D. Md. 2013) ("When cross-motions for summary judgment demonstrate a basic agreement ... concerning what legal theories and material facts are dispositive, they may be probative of the lack of a factual dispute.").

### III. Evidentiary Issues

As a threshold matter, both parties have moved to strike certain exhibits, and these motions are pending before the Court in addition to the cross-motions for summary judgment. At the summary judgment stage, parties must support their motions with evidence that "[could] be presented in a form that would be admissible." Fed. R. Civ. P. 56 (c)(2). "Depositions and affidavits must be based on personal knowledge, and all documents and other physical evidence must be properly authenticated and either non-hearsay or within a recognized exception." *E.E.O.C. v. Denny's, Inc.*, Civ. No. WDQ-06-2527, 2010 WL 2817109, at *3 (D. Md. July 16, 2017). The Court denies both motions to strike.

Mt. Hawley makes a general objection to all of Adell's exhibits, arguing that Adell omitted supporting affidavits, failed to properly authenticate, offered inadmissible hearsay without satisfying the business records exception, and offered documents containing hearsay within hearsay. (Mt. Hawley's Mot. to Strike at 2, ECF No. 107.) Although Mt. Hawley

6

references rules of evidence, the motion takes a kitchen-sink approach to framing its objections in only the most general terms. Mt. Hawley never identifies any specific exhibits to which each ground for objection applies. *See, e.g., Denny's, Inc.*, 2010 WL 2817109, at *3 (holding that the Court would consider the evidence because the litigant failed to properly object by articulating "the nature of the defects clearly and distinctly"); *Ross v. Ricciuti*, Civ. No. WDQ-11-181, 2015 WL 3932420, at *9 (D. Md. June 24, 2015) (denying motion to strike one affidavit as inadmissible hearsay and consequently denying motion to strike all other affidavits because litigant "only made a general objection to the affidavits as hearsay"). Because Mt. Hawley failed to "clearly and distinctly" articulate the defects in Adell's exhibits, Mt. Hawley's motion to strike is denied.

Adell objects to specific Mt. Hawley exhibits. (Adell's Mot. to Strike, ECF No. 116.) To the extent that Adell objects to evidence not relied on in this memorandum, the Court denies those objections as moot. The remaining objections relate to thirteen declarations. Adell argues that four of these declarations are "shams" and contradict the deposition testimony (Mt. Hawley Mem. M.S.J. Ex. 9; Ex. 10; Ex. 20; Ex. 21); that three of the declarations are inadmissible expert testimony (Mt. Hawley Mem. M.S.J. Ex. 11; Ex. 13; Ex. 14); and that six of the declarants were not properly disclosed during discovery. (Mt. Hawley Mem. M.S.J. Ex. 3; Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8.)

Adell first objects that the declarations must be "shams" because they contradict the declarants' deposition testimony. Mt. Hawley responds that the pieces of evidence do not flatly contradict each other. (Mt. Hawley Mem. Opp. Adell's Mot. to Strike at 4, ECF No. 127.) The Court is inclined to agree. For example, witness Kwasi Korentang testified at the deposition that he inspected the post-indicator valve, and the declaration states that Korentang only inspected

one post-indicator valve because he did not know of a second sprinkler system. (Mt. Hawley Mem. M.S.J. Ex. 21 at 3–4.) These types of differences do not disqualify one piece of evidence in favor of aother; rather, they make the dispute an ideal candidate for trial. Adell seems to argue that Mt. Hawley should have used depositions for these four witnesses, (*id.* at 5) but declarations are an acceptable form of evidence at the summary judgment stage. *See* Fed. R. Civ. P. 56 (c)(4).

Adell next argues that three of the declarations are inadmissible expert opinion testimony, but Mt. Hawley had limited alternatives after the Court delayed expert discovery at Adell's request. (*See* J. Coulson Letter dated Jan. 16, 2018 at 3, ECF No. 71 ("Adell believes it . . . should not be forced to incur the expense of expert discovery . . . . To the extent, Mt. Hawley believes that an affidavit from an expert supports its argument, it can attach one.").) The Court declines to penalize Mt. Hawley for following the procedure instituted in part at Adell's request.

Turning to Adell's third objection, Adell argues that Mt. Hawley failed to disclose some of its declarants during discovery. Mt. Hawley asserts that, in fact, it did disclose some of those declarants in its responses to interrogatories, and it also indicated that it would contact other Baltimore Fire Department members, who had personal knowledge of the event. (Mt. Hawley Mem. Opp. to Adell's Mot. to Strike at 17–22, ECF No. 127.) Mt. Hawley acknowledges, however, that it did not notify Adell of four declarants until May 7, 2018, after discovery closed. (*Id.*) Adell's third objection fails in two ways. First, because the four undisclosed declarants (Adkins, Bury, Melcher, and Riley) provide cumulative evidence, the Court concludes that there remains a genuine dispute of material fact even if the Court does not consider those four declarations. In the alternative, the Court declines to use its discretion to strike entirely these declarations from consideration. If a party fails to identify a witness, the Court may prohibit the

party from using that witness on a motion, at a hearing, or at trial or may impose another appropriate sanction. Fed. R. Civ. P. 37 (c)(1); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 329 (4th Cir. 2011) (concluding that courts have broad discretion to issue sanctions under Rule 37). However, the terms of the Rule clearly state that sanctions are inappropriate if the failure to disclose was "substantially justified or is harmless." Fed. R. Civ. P. 37 (c)(1); *see* 8B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2289.1 (3d ed. 1998) (noting that the Advisory Committee drafted the harmless exception to avoid unduly harsh penalties). Because the content of the undisclosed declarants' testimony mirrors the testimony of declarants who were disclosed, any prejudice to Adell from Mt. Hawley's failure to supplement their disclosure as to these four declarants is minimal, at best. Moreover, Mt. Hawley did disclose the names of the witnesses eventually and well before trial. Because of the Fourth Circuit's "strong policy that cases be decided on their merits," this Court is reluctant to allow the rigid operation of procedural rules to supplant merits-based dispositions, especially where the failure to disclose itself appears harmless. *See United States v. Shaffler Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993). Therefore, the Court also denies Adell's Motion to Strike.

## IV. Analysis

Both parties argue that they are entitled to judgment as a matter of law. For the most part, Adell's breach of contract claim and Mt. Hawley's claim for declaratory judgment boil down to one factual question: whether Adell is covered by its insurance contract with Mt. Hawley. Because the Court concludes that the question of insurance coverage is disputed and that it cannot resolve the dispute without weighing evidence or making credibility determinations, neither party is entitled to judgment as a matter of law. As a result, the Court cannot reach Adell's claim for lack of good faith. Claims made under Md. Code Ann. Cts. &

9

Jud. Proc. § 3-1701, require a threshold finding that the insured is covered by the insurance provider—a question that is very much in dispute at this point. The Court concludes that, if Mt. Hawley prevails on declaratory judgment, Mt. Hawley is entitled to restitution. The Court addresses each of these three issues in turn.

## A. Insurance Coverage

To attain relief for breach of contract, the party seeking relief bears the burden of establishing (1) a valid contractual obligation and (2) the other party's breach of that obligation. *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). Here, the parties dispute the first element, the existence of a valid contractual obligation. Adell argues that it had a valid insurance contract with Mt. Hawley, which Mt. Hawley subsequently breached by not paying the full extent of the losses covered by the contract. (Adell Mem. M.S.J. at 17–19.) Adell asserts that the contract covered fire damage; that Mt. Hawley admitted to liability by making the advance payment; and that Mt. Hawley fails to prove that Adell did not comply with its obligations under the contract. (*Id.* at 20–28.) Mt. Hawley acknowledges that the insurance contract would have covered the October 4 fire but claims that Adell violated the terms of the Endorsement and, thus, failed to satisfy a condition of coverage.[1] (Mt. Hawley Mem. M.S.J. at 27–35.) Consequently, the dispute hinges on whether Adell complied with the Endorsement by maintaining all its protective devices in complete working order such that they responded to the October 4 fire.

---

[1] Mt. Hawley opposes Adell's motion for summary judgment on the breach of contract claim with additional arguments: (1) that Adell made three material misrepresentations on its insurance application; (2) that Adell has introduced no competent evidence of its alleged damages; and (3) that Adell misinterprets the policy limits. (Mt. Hawley Mem. M.S.J. at 45–49.) It is not entirely clear why Mt. Hawley does not support its own motion for summary judgment with these additional arguments. (*See id.*) Rather than speculate, the Court only considers them in evaluating whether Adell's motion for summary judgment succeeds in presenting no genuine issue of material fact. Because the Court denies Adell's motion on the breach of contract claim, the Court does not address Mt. Hawley's additional arguments as to why it should be denied; however, the Court does note that these arguments appear to be disputed.

When included in an insurance policy, a Protective Safeguard Endorsement "requires that an insured maintain a particular means of safeguarding its property, such as a fire or burglar alarm, a smoke detector, or sprinkler." Marjorie A. Shields, *Enforceability of Ins. Policy Protective Safeguards Endorsement*, 73 A.L.R.6th 681 (2012). "Where the conditions are clear and plainly expressed, the court is bound to enforce the contract in accordance with its terms." *Id.* § 2. If an insured fails to comply with the terms of a Protective Safeguard Endorsement, the insured's claim for coverage fails, and the insurance company has no contractual obligation under the insurance policy. *See United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 494–96 (4th Cir. 1998) (granting summary judgment for the insurance company on the issue of coverage because the insured put forth no evidence to show that there were any protective devices as required by the protective safeguard endorsement). Adell does not argue that the provision is void or ambiguous; thus, the only question is whether Adell abided by the terms of the Endorsement. The parties put forward conflicting evidence on four factual questions that bear on Adell's compliance with the insurance contract's Endorsement. These disputes raise genuine issues of material fact that render the court unable to resolve them as a matter of law.

First, the parties dispute whether Adell took the necessary steps to maintain the protective devices. Adell asserts that its employees never inspected nor adjusted its protective devices; rather, it hired Fireline to inspect the devices and relied on other security monitoring companies to make sure they were functioning properly. (Adell Mem. M.S.J. Ex. 20 at 128–29; Ex. 55 at 99; Ex. 65 at 25, 101–02.) One inspection of the facility in July 2016 reported no problems with any of the protective devices. (Adell Mem. M.S.J. Ex. 57; Ex. 59.) On the other hand, Mt. Hawley asserts that Fireline was only contracted to perform some of the testing that is recommended by the NFPA: for example, Fireline performed annual sprinkler inspections but

11

not monthly inspections of the sprinklers nor weekly inspections of the post-indicator valve to confirm that it was open. (Mt. Hawley Mem. M.S.J. Ex. 11 at 2–3, 5; Ex. 22(C); Ex. 23(B) at 27–36.) Mt. Hawley also points out that the loss control inspectors did not actually test the sprinkler systems and did not know that the Baltimore facility had two post-indicator valves. (Mt. Hawley Mem. M.S.J. Ex. 21 at 2–4.) Because of concerns with Adell's maintenance of its facility, Adell's prior insurance provider sought to drop them as a client, saying Adell was "a claim waiting to happen." (Mt. Hawley Mem. M.S.J. Ex. 22(I).)

Second, the parties dispute whether the post-indicator valve—the piece that connects municipal water to the sprinkler system (Mt. Hawley Ex. 14 at 5–8, 34–35)—was locked in the open position at the time of the fire. An Adell employee testified that the post-indicator valve had to be open because no Adell employee ever operated the post-indicator valves. (Adell Mem. M.S.J. Ex. 22 at 45–46.) When there was a problem with the protective device, Fireline would turn off the post-indicator valves, inspect the problem, and restore the post-indicator valves to the open position. (Adell Mem. M.S.J. Ex. 46 at 131; Ex. 55 at 99.) The monitoring logs documented this type of action; on the morning of October 4, the monitoring logs confirmed that the post-indicator valve was open. (Adell Mem. M.S.J. Ex. 45 at 248.) Adell also asserts that Mt. Hawley's loss control representatives found the valve locked open in July 2016. (Adell Mem. M.S.J. Ex. 57 at 7.) Mt. Hawley points out that the loss control representative was unaware of the second valve and so only checked one of them. (Mt. Hawley Mem. M.S.J. Ex. 21 at 2–4.) Furthermore, reports indicate that the valve was broken and in need of repair in February and December of 2015 and that such repair work was never documented. (Mt. Hawley Mem. M.S.J. Ex. 22(B) at 187; Ex. 22 (F); Ex. 22(G); Ex. 33(H); Ex. 23(O) at 91–95.) Indeed, the valve was found shut after the fire. (Mt. Hawley Mem. M.S.J. Ex. 11 at 6.)

12

Third, the parties dispute whether water actually flowed from the sprinklers when the Adell facility caught fire on October 4. Adell asserts that the sprinklers deployed on the day of the fire because Fireline assured Adell that the sprinklers were working and the monitoring logs confirmed it. (Adell Mem. M.S.J. Ex. 22 at 80–81; Ex. 67.) Mt. Hawley presented numerous eyewitnesses, primarily firefighters, who entered the facility and who saw no water coming from the sprinklers, saw no flashing strobes, and heard no water motor gong. (Mt. Hawley Mem. M.S.J. Ex. 3; Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8; Ex. 9; Ex. 10.) Both parties point to a September 2016 report describing issues with Adell's sprinkler system, but the report itself is ambiguous. (Adell Mem. M.S.J. Ex. 67.) The report states both that the sprinkler system was repaired and that the post-indicator valve needed to be fixed: "Also [post-indicator valve] was leaking water slightly. System is now back in normal service. Recommend for customer to call Fireline to have [post-indicator valve] fixed and trouble cleared on panel." (*Id.*)

Fourth, the parties disagree over how to interpret the monitoring logs, and each use the logs to come to opposite conclusions. Adell argues that the monitoring logs reflect functioning protective devices that responded to the fire. (*See* Adell Mem. M.S.J. Ex. 45 at 248; Ex. 51 at 65.) An employee from the alarm monitoring company testified that the logs reflect an "all clear" signal rather than a "problem" signal leading up to the time of the October 4 fire and that they responded appropriately—with fire trouble warnings, supervisory signals, and fire alarms— when the fire began. (Adell Mem. M.S.J. Ex. 40 at 126–28, 162–65.) Another witness testified that, when problems did occur in the past (for example, when Fireline performed maintenance on the valve), the logs accurately reflected those issues. (Adell Mem. M.S.J. Ex. 46 at 115–17, 131–37.) Mt. Hawley argues that the logs tell a different story: a catastrophic failure of the protective devices. A witness retained by Mt. Hawley to analyze the fire and the fire protection

13

systems noted that the protective devices specifically failed to alert the monitoring company of the fire until twenty minutes after the fire was discovered by eyewitnesses. (Mt. Hawley Mem. M.S.J. Ex. 13 at 23–24.)

To sum up, the parties dispute whether Adell maintained its protective devices; whether the post-indicator valve was open to receive municipal water on October 4; whether the sprinklers released water; and whether the monitoring logs accurately reflect how the system responded. These factual disputes are genuine because the parties present conflicting evidence such that the Court cannot decide the issue without weighing the evidence and assessing the credibility of witnesses. The disputes are also material because Adell's compliance with the Endorsement determines whether Mt. Hawley has a contractual obligation to cover Adell's damages from the fire. This factual analysis is best suited for further development at trial, where the witnesses can testify and be subject to cross-examination. Therefore, Adell's breach of contract claim and Mt. Hawley's claim for declaratory relief cannot be decided on summary judgment.

### 1. Waiver

Before turning to Adell's lack of good faith claim, the Court addresses two arguments Adell raises to support its assertion that Mt. Hawley owes a contractual obligation and to respond to Mt. Hawley's lack of coverage argument. Adell first argues that, by investigating the fire, making an advance payment, and failing to immediately send a reservation of rights letter, Mt. Hawley waived its defense that Adell failed to satisfy the Endorsement. (Adell Mem. M.S.J. at 20, 25–26, 28.) Mt Hawley disputes Adell's characterization of the Endorsement as a condition subsequent and argues that the Endorsement constitutes a condition precedent to coverage. (Mt.

Hawley Mem. M.S.J. at 30 n.8.) Because this Court concludes that the Endorsement is a condition precedent and, thus, not subject to waiver and forfeiture, Adell's first argument fails.

"[W]hen construing [the provisions of] insurance contracts, words and phrases are given their ordinary meaning." *Kendall v. Nationwide Ins. Co.*, 702 A.2d 767, 773 (Md. 1997). To determine whether waiver applies, "the pivotal issue is whether a policy clause or condition proffered as a defense pertains to coverage or whether it arises from the failure of the claimant to satisfy some 'technical' condition subsequent." *Creveling v. Gov't Emp. Ins. Co.*, 828 A.2d 229, 244 (Md. 2003). Conditions defining the coverage or scope of a policy, "as distinguished from those furnishing a ground for forfeiture," may not be waived by the insurance company—either expressly or by its conduct. *Id.*; *see also Gov't Emps. Ins. Co. v. Grp. Hospitalization Med. Servs., Inc.*, 589 A.2d 464, 467 (Md. 1991) (stating that defenses for lack of basic coverage may not be waived by a company's initial response "for the effect of that would be to expand the policy to create a risk not intended to be undertaken by the company"). "The question therefore becomes whether the clauses in the instant case[] pertain to coverage or provide grounds for forfeiture." *Creveling*, 828 A.2d at 245.

When faced with a similar question in *Minnesota Lawyers Mutual Insurance. Co. v. Baylor & Jackson, PLLC*, 852 F. Supp. 2d 647 (D. Md. 2012), this Court held that a provision requiring the claimant to file a claim within the policy period constituted a condition precedent to coverage. 852 F. Supp. 2d at 662. The provision stated, "A CLAIM is covered only if made during the POLICY PERIOD or extended reporting period and reported to US." *Id.* at 654. The court concluded that, under Maryland law, such a provision was "no mere notice provision"; rather, it defined the coverage because "coverage was never triggered" unless a claim was timely filed. *Id.* at 662.

Maryland courts have analyzed whether Protective Safeguard Endorsements create conditions precedent or conditions subsequent on a case-by-case basis. In arguing that the Endorsement is a condition subsequent, Adell references *Board of Education of Charles County., Md. v. St. Paul Fire & Marine Insurance Co.*, 420 F. Supp. 491 (D. Md. 1975), but that case assumes without deciding that the Endorsement is a condition subsequent. 420 F. Supp. at 493. Moreover, the language of the Endorsement in *St. Paul Fire* differs from the language in the Mt. Hawley Endorsement: "In the event of failure to comply with the foregoing, this insurance with respect to the peril and at the location affected is suspended during the period of time that the Automatic Sprinkler System is inoperative." *Id.* at 492. This language makes clear that failure to maintain the sprinklers does not negate coverage; rather, it suspends coverage until the sprinklers are back in business. Applying Maryland law, the Fourth Circuit has concluded that at least some Protective Safeguard Endorsements are conditions precedent to coverage. *See Kapiloff*, 155 F.3d at 495–96 (holding that the insurance company was entitled to judgment as a matter of law on the conclusion that the insured was not covered because the insured presented no evidence that protective devices even existed to comply with the condition of the policy).

The Endorsement in this case is a condition precedent. The text of the insurance policy explicitly makes compliance with the Endorsement a condition that must be met before enforcing the contract. *See Kendall*, 702 A.2d at 773. According to the Endorsement, Adell "understood and agreed" that, "[a]s a condition of th[e] insurance," it had to maintain the protective devices "in complete working order," and, in the event that Adell failed to do so, Mt. Hawley assured Adell, "[w]e will not pay for loss or damage." (Mt. Hawley Mem. M.S.J. Ex. 20(A) at 85–86.) This language is common in Protective Safeguard Endorsements, and courts across the country have interpreted the language as creating a condition precedent to coverage. *See, e.g., Am. Way*

16

*Cellular, Inc. v. Travelers Prop. Cas. of Am.*, 157 Cal. Rptr. 3d 385, 389, 397 (Cal. Ct. App. 2013) (holding that the endorsement's requirement that the insured maintain protective devices, including sprinklers, as "a condition of coverage" was a condition *precedent* to coverage); *Great Lakes Reinsurance (UK), PLC v. JDCA, LLC*, No. 11-00001-WGY, 2014 U.S. Dist. LEXIS 163863, at *31 (D. Conn. Nov. 21, 2014) (holding that "the existence of a functioning sprinkler system within the Property is unambiguously a condition precedent of the contract" because "the agreement states explicitly that a functioning sprinkler system is a condition of coverage"); *Tuscany Bistro, Inc. v. Sirius Am. Ins. Co.*, No. A-6293-08T2, 2011 N.J. Super Unpub. LEXIS 2181, at *11 (N.J. Super. Ct. App. Div. Aug. 12, 2011) (rejecting the argument that the endorsement was a condition subsequent because "[t]he fire alarm system was clearly denoted in the policy as a condition of coverage").

The Endorsement defines the scope of the coverage, triggering Mt. Hawley's obligation only if Adell maintains its protective devices in "complete working order." The text of the insurance policy creates an obligation that is not "technical" but, instead, foundational to the very reason that any insurance company would extend coverage. *See Creveling*, 828 A.2d at 244. As in *Minnesota Lawyers Mutual Insurance. Co.*, in which coverage only existed for claims filed within the coverage period, liability for fires at the Adell Baltimore facility only arises if Adell maintains functioning fire alarm and sprinkler systems. 852 F. Supp. 2d at 662. Such a substantive provision defines the extent to which Mt. Hawley owes any obligation in the event of a fire. The language of the Endorsement, which conditions coverage on the maintenance of protective devices, coupled with judicial interpretation of similar language in policies across the country, indicates that the Endorsement defines the scope of coverage.

It can be difficult to draw the line between conditions precedent and conditions subsequent, *Creveling*, 828 A.2d at 244, but it makes sense to conclude that a Protective Safeguard Endorsement would form a condition precedent to coverage under a fire insurance contract. It is a common and understandable—even, lifesaving—requirement of fire insurance policies that commercial properties contain functioning fire alarm and sprinkler systems. *See Am. Way Cellular*, 157 Cal. Rptr. 3d at 389; *Great Lakes*, 2014 U.S. Dist. LEXIS 163863, at *31; *Tuscany Bistro*, 2011 N.J. Super Unpub. LEXIS 2181, at *11; *see generally* Marjorie A. Shields, *Enforceability of Ins. Policy Protective Safeguards Endorsement*, 73 A.L.R.6th 681 § 2 (2012) ("Conditions precedent are commonly found in fire insurance policies . . . ."). Therefore, the Endorsement constituted a condition precedent to Adell's coverage, and such a condition cannot be waived or forfeited by Mt. Hawley's words or conduct.

### 2. *Equitable Estoppel*

Second, Adell raises equitable estoppel, asserting that Mt. Hawley cannot argue that the Endorsement bars coverage because, after Mt. Hawley made the advance payment, Adell detrimentally relied on Mt. Hawley paying in full. (Adell Mem. M.S.J. at 25–26.) But the Fourth Circuit faced the question of whether an insured could prevail on a detrimental reliance claim where the insurance company delayed in notifying the insured that the property might not be covered. *Kapiloff*, 155 F.3d at 497. The Fourth Circuit held that such a detrimental reliance claim must fail; otherwise, the court would be interfering with the terms of the insurance contract. *Id.* ("Not only would this create a duty between the parties outside of the insurance contract, it would be creating new law for Maryland."). Here, Maryland law does not impose a duty on Mt. Hawley—outside of its own ability to contract with its clients—to report

immediately any suspicion that an insured might not be covered under the policy. Therefore, Adell's equitable estoppel claim fails.

### B. Adell's Lack of Good Faith Claim

Because the Court cannot determine whether a contractual obligation existed at the time of the fire, the Court does not reach Adell's claim that Mt. Hawley acted in bad faith. In actions against insurance providers to determine coverage, *see* Md. Code Cts. & Jud. Proc. § 3-1701, the insured may make a failure of good faith claim against the provider pursuant to Md. Code Ann. Ins. § 27-1001. Section 3-1701 requires a finding "in favor of the insured" on the question of whether coverage actually exists and, second, on the question of whether the insurer acted in bad faith. *St. Paul Mercury Ins. Co. v. Am. Bank Holdings, Inc.*, 819 F.3d 728, 739 (4th Cir. 2016) (holding that, because the insured failed to satisfy a condition precedent of coverage, the insured had not received a finding in its favor and, thus, could not make a claim under § 3-1701). Consequently, although the Maryland Code provides this independent cause of action for breach of duty, "a plaintiff may only prevail on such a claim where the plaintiff proves that it was entitled to coverage under the policy." *Dominent Invs. 113, LLC v. U.S. Liab. Ins. Co.*, 247 F. Supp. 3d 696, 704 (D. Md. 2017). Because the Court found a genuine dispute of material fact on the question of coverage, it cannot resolve the lack of good faith claim.

### C. Mt. Hawley's Claim for Restitution

If, at trial, the Court finds that Adell failed to comply with the Endorsement and is not entitled to coverage, Mt. Hawley can recover the $1 million advance payment under principles of restitution.

Where an insurance company makes a payment before realizing that the insured is not covered, the insurance company's mistake is one of fact and the company is entitled to recovery.

19

*Admiral Ins. Co. v. Am. Nat'l Savings Bank, F.S.B.*, 918 F. Supp. 150, 154 (D. Md. 1996) (concluding that, although Maryland courts had not explicitly ruled on the recovery of advance insurance payments, "the overwhelming weight of persuasive authority" indicated that erroneous payments constituted "a mistake of fact which permits recovery"); *see also Young v. Cities Serv. Oil Co.*, 364 A.2d 603, 607 (Md. Ct. Spec. App. 1976) ("It has long been held that monies paid under a mistake of fact may be recovered by the payor, but that monies paid under a mistake of law cannot be recovered."); *but see Harnischfeger Corp. v. Harbor Ins. Co.*, 927 F.2d 974, 978 (7th Cir. 1991) (questioning the purpose of distinguishing between mistake of fact and law when the line is unclear and no case law explains the purpose for allowing recoupment for some mistakes but not others). "Under . . . Maryland law an insurer may recover payments made to an insured under a mistake of fact or as a result of fraud or misrepresentation." *Sebastian v. Provident Life & Accident Ins. Co.*, 73 F. Supp. 2d 521, 536 (D. Md. 1999). In the insurance context, payments based on a mistake of fact occur where, for example, the insurance company pays before realizing that the building would have been covered for the specific damage that occurred if the building had been, as the application wrongly stated, a residential property as opposed to a commercial one. *See Admiral*, 918 F. Supp. at 154.

Here, Mt. Hawley made an advance payment of $1 million during the course of its investigation of the Adell fire. (Adell Mem. M.S.J. Ex. 13.) Mt. Hawley made the payment before realizing that Adell may not have complied with the Protective Safeguard Endorsement. Like in *Admiral*, in which the insurance company discovered an inaccuracy in the application that negated the insured's coverage for the specific damage, Mt. Hawley's investigation revealed information that may negate Adell's coverage. 918 F. Supp. at 154. As in *Admiral*, this mistake is one of fact, which permits recovery. *Id.* at 153. Public policy is best served by encouraging

insurance companies to make advance payments. *See, e.g.*, *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, n.15 (Md. 2007) (noting that courts will usually grant restitution if insurers "defend their insured even where there is a dispute over liability or coverage."). Consequently, if the Court finds that Mt. Hawley is entitled to declaratory relief, Mt. Hawley is entitled to restitution too.

## V. *Conclusion*

For the foregoing reasons, an Order shall enter denying Mt. Hawley's motion to strike, denying Adell's motion to strike, denying Adell's motion for summary judgment, denying Mt. Hawley's motion for summary judgment as to declaratory relief, and granting Mt. Hawley's motion for summary judgment as to restitution.

DATED this 11th day of October, 2018.

BY THE COURT:

James K. Bredar
Chief Judge