IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MT. HAWLEY INSURANCE COMPANY,
an Illinois corporation authorized to transact
business in Maryland,

              Plaintiff/Counter-Defendant,

    vs.

ADELL PLASTICS, INC., a Maryland
corporation,

              Defendant/Counterclaimant.

Civil Action No. 1:17-cv-00252-JKB

## MT. HAWLEY INSURANCE COMPANY'S OPPOSITION TO

## ADELL'S DAUBERT MOTION TO EXCLUDE DANIEL L. ARNOLD

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES……………………………………………………...………ii,iii

I.     INTRODUCTION……………………………………………………......1

II.    FACTUAL BACKGROUND………………………………………….…..………4

III.   LEGAL STANDARDS…………………………..…………………………....4

      A.    The Law Governing Admission of Expert Opinion Testimony…………..………4

      B.    The Role of NFPA 921 in Fire Investigations………..………………………...5

IV.   ARGUMENT……………………………………………..…………………..7

      A.    Mr. Arnold Considered the Event History Data During His Analysis……………8

           1.  Mr. Arnold's Declaration Confirms He Reviewed Records from Both Fireline and AlarmWatch……………………………………………...……9

           2.  Mr. Arnold's Expert Report also Identified the Event Histories as Part of the Facts and Data He Considered, as well as the Declaration of Carl Willms that More Deeply Analyzed Them……………………...…………9

           3.  Mr. Arnold Explained at Deposition How All Documents He Considered, Including the Event Histories, Factored Into His Analysis…......11

           4.  Mr. Arnold's Investigation Included Inspection of the PIV#1 Tamper Switch………………………………………..………………...13

           5.   The Monitoring Logs Do Not Show Sprinkler Activation In Response to the Fire or that PIV#1 Was Open When the Fire Broke Out…….…………14

      B.    In Considering All the Data, Mr. Arnold Properly Considered the Padlock Found After the Fire Open and Hanging on PIV#1……………………………..…21

      C.    Mr. Arnold's Testimony is Not Needlessly Cumulative of Any Other…...………25

      D.    Mr. Arnold's Rebuttal Report is Not Challenged………………………….…27

V.    CONCLUSION…………………………………………………….…………28

# TABLE OF AUTHORITIES

**Case(s)**:                                                                                  **Page(s):**

*Bresler v. Wilmington Tr. Co.*,
855 F.3d 178 (4th Cir. 2017)……………………………………………………………..8

*Bryte v. American Household*,
429 F.3d 469 (4th Cir. 2005) …………………………………………………...…5,6

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)……………………………………………………………..…4,8

*Fireman's Fund Ins. Co. v. Canon U.S.A.*,
394 F.3d 1054, 1060 (8th Cir. 2005)……………………………………………..…...6

*Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*,
767 F. Supp 2d 549 (D Md. 2011)……………………………………………………4,6

*Kopf v. Skyrm*,
993 F.2d 374 (4th Cir. 1993)…………………………………………………………5,8

*Kumho Tire v. Carmichael*,
526 U.S. 137 (1999) ……………………………………………………...…….…4,5

*Mason v. Safeco Ins. Co. of Am.*,
2010 U.S. Dist. LEXIS 86696 (E.D. Mo. 2010) …………………………………………1

*Nease v. Ford Motor Co.*,
848 F.3d 219 (4th Cir. 2017)…………………………………………………...…8

*United States v. Moreland*,
437 F.3d 424, 431 (4th Cir., 2006) …………………………………...……………4

**Federal**

Fed. R. Civ. P. 26……………………………………………………………….........1

Fed. R. Civ. P. 26(a)(2)(B)(ii) ………………………………………………………1,9

Fed. R. Evid. 104…………………………………………………………………………4

Fed. R. Evid. 702……………………………………………………………….... passim

Fed. R. Evid. 702 Advisory Committee Notes …………………………………...…………………1

Fed. R. Evid. 703………………………………………………………….…………1,4,27

**Case(s)**:                                                                   **Page(s):**

**Other Statutes and Authorities**:

NFPA 921 Section §4.1-4.5……………………………………...…………….…………….6

NFPA 921 Section §4.3.4; …………………….……………………...………….........1,6,10,11

NFPA 921 Section §4.4.3.3…………………….………………………………….…...….. 1,11

NFPA 921 Section §4.5.1…………………….…………………………………….…....7

NFPA 921 Section §4.5.2………………………………………………………………………7

UL 864 § 73.2.9………………………………………………………………………………19

I.    <u>INTRODUCTION</u>

     Adell's Motion to Exclude "David" Arnold should have properly named Mt. Hawley's retained expert Daniel L Arnold, P.E., FSFPE.  Adell argues to exclude Mr. Arnold because: (1) he "failed to analyze" contemporaneous event histories/logs generated by AlarmWatch that Adell incorrectly claims are "materially and irreconcilably inconsistent with his proffered opinions" [Motion at 1, 5-9]; (2) He improperly considered pictures of the padlock found hanging on PIV#1 when it was first discovered by investigators on 10/12/16 in an open, unlocked position partially painted red [*id*. at 9-11]; and (3) Mr. Arnolds opinions are cumulative of each of Mt. Hawley's other experts. [*Id*. at 11.]  The record and evidence demonstrates that each purported reason to exclude Mr. Arnold fails.

     Mr. Arnold did not ignore the AlarmWatch "Monitoring Logs" (i.e., Customer Activity Report, Automation Report, and Raw Data Report).  Those event histories were expressly referenced in Mr. Arnold's Declaration as part of the documents and information he considered in formulating his opinions and conclusions reflected therein.  [Dkt. #110-13 at 4 of 35.]  His 12/6/18 Expert Report also lists the AlarmWatch event histories, and the Declaration of Carl Willms [Dkt. #110-16] that scrutinized that data, in Mr. Arnold's Fed. R. Civ. P. Rule 26(a)(2)(B)(ii) listing of all facts and data considered in forming his opinions and conclusions. [Ex. 1 (Expert Report) at Appendix B, p.16.]  This is both contemplated and permitted by NFPA 921 §4.4.3.2,  §4.4.3.3 and §4.3.4; *see also* Fed. R. Evid. 702 & Advisory Committee Notes to 2000 Amendments ("The term 'data' is intended to encompass the reliable opinions of other experts."); Fed. R. Evid. 703; *Mason v. Safeco Ins. Co. of Am*., No. 4:09-cv-1081, 2010 U.S. Dist. LEXIS 86696 at *8 (E.D. Mo. 2010) ("[a]n expert may rely on the reliable opinion of another expert in forming his own opinion").

At deposition, Mr. Arnold further explained (multiple times) that he both considered the AlarmWatch histories/logs in formulating his Declaration and Expert Report, and that he identified the opinions and conclusions reached and his principal reasoning for reaching them following his review of those documents.  [*See*, *e.g.*, Ex. 2 (Arnold Tr.) at 12:21-13:12; 13:22-14:16; 96:1-11; and 97:3-17.]  Mr. Arnold did not decline to consider anything he was given, including the event history logs; he considered the event logs in light of his hypothesis that PIV#1 was closed on 10/4/16 when the fire broke out.  For the reasons Mr. Arnold has identified and that are detailed below, the event logs do not defeat his hypothesis.

Adell attacks Mr. Arnold for having considered fire cause and origin investigator Mike Spadea's photographs taken of PIV#1 on 10/12/16, after the safety collapse zone was lifted by the fire department.  Those photos show  PIV#1 in a "SHUT" or closed position with its wrench still in its holster and with a Master brand breakaway padlock hanging open on it partially painted in red.  [Dkt. #110-13 at 19-30 of 35; Ex. 1 (Expert Report) at Appendix B (Declaration) at Ex. 2 (same).]  Thereafter, it was also discovered that PIV#1 was captured in the same position in photographs taken by Det. Scally while BCFD fire suppression efforts were ongoing.  [Ex. 3 (Scally Photos.]  Mr. Arnold considered this evidence in forming his opinions and conclusions as he should have.  [*See*, *e.g.*, Dkt. #110-13 at 5 and 12 of 35 and Exhibit 2 thereto (Spadea Photos); and Ex. 1 (Expert Report) at 3-4 and Appendix C (Declaration).]  At deposition, Mr. Arnold also explained that the condition Mr. Spadea found the padlock on 10/12/16 was one of several factors he considered in assessing the condition of PIV#1 on 10/4/16.  [Ex. 2 (Arnold Tr.) at 122:1-123:11; 131:9-132:7; 132:16-133:2.]

To anyone who sees the photographs it is clear that PIV#1 was untouched during the fire, and was found shut on 10/12/16 with its wrench secured in its holster without indication that it

had been removed, affixed to the PIV top or manipulated in any way.  The padlock is clearly open/unlocked, undamaged, and with a considerable amount of weathered read paint including on the tip of the hasp. [Dkt. #110-13 at 28-29 of 35.]  This is evident to all who look at the photographs, including Mr. Arnold, a seasoned firefighter and fire investigator.  Mr. Arnold concludes that PIV#1 was closed when the fire broke out relying partly on the discovery of PIV#1 in a closed position on 10/12/16 and the condition of the padlock found hanging on it.  Per NFPA 921, Mr. Arnold properly considered Mr. Spadea's and Detective Scally's photographs.  Indeed, his failure to do so would violate NFPA 921.

His testimony should not be limited or excluded because he conceded at deposition that he is no paint expert.  Mr. Arnold does not claim to be.  The photographs show what they show.  Because the jury can interpret the photos, however, does not dictate that Mr. Arnold cannot rely on them or talk about the significance he draws from them.  Mr. Arnold's testimony concerning the condition of the padlock, including the paint observed on it, will help the jury understand the different possible conditions of PIVs, how valves are open and closed, the correct and incorrect ways PIVs are physically secured, the condition of PIV#1 when the fire broke out on 10/4/16, and the condition of PIV#1 when it was first discovered on 10/12/16.  Mr. Arnold's proffered testimony is thus relevant and proper.  Fed. R. Evid. 702.

Finally, Adell argues without analysis that Mr. Arnold's testimony is needlessly cumulative of all six other of Mt. Hawley's retained and disclosed witnesses.  That simply is not the case.  Of Mt. Hawley's disclosed experts, only three are fire protection engineers: Mr. Arnold, Mr. Long and Dr. Mowrer.  Each of these experts generally concludes based upon unique combinations of reasons that PIV#1 was closed on 10/4/16 when the fire broke out and that the Building 4 sprinklers did not activate (i.e., flow water) in response to the fire.  Each

obviously has unique qualifications, experiences and "takes" on the evidence.  Mr. Arnold also

has "boots on the ground" firefighting and firefighter operations experience the others do not.

Permitting each to testify will permit the jury to consider all evidence supporting their common

conclusion that PIV#1 was shut when the 10/4/16 fire broke out and that the sprinklers were thus

prevented from activating in response to the fire.  The mere fact that some of Mt. Hawley's

experts considered the same evidence and arrived at the same general conclusion does not render

their testimony cumulative.  Their expert testimony is proper.  Fed. R. Evid. 703.

## II.     FACTUAL BACKGROUND

Mt. Hawley has set forth in considerable detail the background facts concerning the fire,

the non-operation of Adell's sprinkler and alarm systems, and Mt. Hawley's claim handling

investigation and denial.  (*See generally* Dkt. #110-1 at pages 5-22; #126 at pages 5-18, 19-20).

Those facts are not all repeated herein.  Mt. Hawley revisits the evidence below as necessary to

address the issues raised by Adell in its Motion.

## III.    LEGAL STANDARDS

### A.    The Law Governing Admission of Expert Opinion Testimony

Where a party seeks to offer the opinion testimony of an expert witness, Federal Rules of

Evidence 104(a) and 702 together require district courts to make an initial determination of the

expert's qualifications and of the relevance and reliability of the testimony. *See Daubert v.*

*Merrell Dow Pharmaceuticals*, *Daubert*, 509 U.S. at 580; *Kumho Tire v. Carmichael*, 526 U.S.

137, 141 (1999); *United States v. Moreland,* 437 F.3d 424, 431 (4th Cir., 2006). "That

determination employs a flexible standard, the aim of which is to prevent the fact-finder from

being unduly swayed by opinions, presented as expert judgments, that in fact amount to no more

than informed speculation."  *Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp 2d

549, 553 (D Md. 2011) (J. Bredar) (citing *Kumho Tire*, 526 U.S. 137, *passim; Bryte v. American Household*, 429 F.3d 469, 477 (4th Cir. 2005)).

Rule 702 is worded in the disjunctive. "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise. . . ." Fed.R.Evid. 702. "Where the expert's qualifications are challenged, 'the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered." *Kopf*, 993 F.2d at 377 (internal citation omitted). The Fourth Circuit instructs that "The witness' qualifications to render an expert opinion are also liberally judged by Rule 702"; and "a person may qualify to render expert testimony in any one of the five ways listed:  knowledge, skill, experience, training or education." *Id.* .

The Fourth Circuit has noted the disjunctive language of Rule 702(a) ("scientific, technical or other specialized knowledge"). *Kopf*, 993 F.2d at 377.  "The subject matter of Rule 702 testimony need not be arcane or even especially difficult to comprehend.  If, again in the disjunctive, the proposed testimony will recount or employ 'scientific, technical or specialized knowledge,' it is a proper subject.  There is no gap between the 'specialized knowledge' that is admissible under the rule and the 'common knowledge' that is not.  The boundary between the two is defined by helpfulness." *Kopf*, 993 F.2d at 377-78. Moreover, "Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Kopf*, 993 F.2d at 377.

B.  <u>The Role of NFPA 921 in Fire Investigations</u>

Generally accepted standards relevant to fire investigations are set forth in National Fire Protection Association 921 Guide for Fire and Explosion Investigations ("NFPA 921").

*Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d at 554 (citing *Bryte v. American Household*, 429 F.3d 469, 478 (4th Cir. 2005) and *Fireman's Fund Ins. Co. v. Canon U.S.A.*, 394 F.3d 1054, 1060 (8th Cir. 2005) (recognizing failure to follow NFPA procedures as reason to support excluding fire investigator's testimony)).

Chapter Four of NFPA 921, entitled Basic Methodology, sets out the application of the scientific method to fire investigation.  NFPA 921 4.1-4.5.  It instructs the investigator to collect data about the fire "by observation, experiment, or other direct... means," to analyze the data objectively and without speculation, to develop a hypothesis based solely on the data collected, to test the hypothesis by comparing it to all known facts, and to repeat the process until all feasible hypotheses have been tested." *Id.* at 4.3.3 — 4.3.6; *see generally, Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F. Supp. 2d at 554.  The iterative nature of the Scientific Method process is shown in Figure 4.3 of the NFPA 921 guide.  Arrows show that data continues to be collected and then analyzed as it becomes available to the investigator or analyst. It does not matter when particular data is analyzed, so long as all relevant data is analyzed.

Section 4.3.4 provides: "Analysis of the data is based on the knowledge, training, experience and expertise of the individual doing the analysis. If the investigator lacks expertise to properly attribute meaning to a piece of data, then assistance should be sought." Thus, investigators and analysts can rely on analyses performed by other experts to understand the meaning or significance of different data.

Section 4.5 recognizes that there are uncertainties in the fire investigation process, stating: "The level of certainty describes how strongly someone holds an opinion (conclusion). Someone may hold an opinion to a higher or lower level of certainty. That level is determined by assessing the investigator's confidence in the data, in the analysis of that data, and testing of the

hypotheses formed. That level of certainty may determine the practical application of the opinion, especially in legal proceedings."  In turn, Section 4.5.1 notes that "The investigator should know the level of certainty that is required for providing expert opinions. Two levels of certainty commonly used are probable and possible: (1) Probable. This level of certainty corresponds to being more likely true or not. At this level of certainty, the likelihood of the hypothesis being true is greater than 50 percent.  (2) Possible. At this level of certainty, the hypothesis can be demonstrated to be feasible but cannot be declared probable. If two or more hypotheses are equally likely, then the level of certainty must be 'possible.'"  Under Section 4.5.2, **"**If the level of certainty of an opinion is merely 'suspected,' the opinion does not qualify as an expert opinion. If the level of certainty is only 'possible,' the opinion should be specifically expressed as 'possible.' Only when the level of certainty is considered 'probable' should an opinion be expressed with reasonable certainty." [*See*, *generally*, Ex. 4 (NFPA 921 Excerpts).]

IV.   ARGUMENT

Adell does not challenge Mr. Arnold's qualifications as an expert in fire protection engineering and fire protection systems.  [*See generally*, Ex. 1 (Expert Report) at Appendix A (CV).]  Instead, Adell argues principally that his testimony is unreliable because he "failed to analyze" contemporaneous event histories/logs generated by AlarmWatch that Adell incorrectly claims are "materially and irreconcilably inconsistent with his proffered opinions." [Motion at 1, 5-9]

Rule 702 permits the qualified expert to present opinion testimony if:  "(a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c)

the testimony is the product of reliable principles and methods; and (d) the expert has reliably

applied the principles and methods to the facts of the case."  Fed.R.Evid. 702.

Subsection 702(a) goes to relevance, will the expert's specialized knowledge "help the

trier of fact to understand the evidence or to determine a fact in issue."  *Nease*, 848 F.3d at 228-

29 (noting gatekeeping function under Daubert was "to ensure that an expert's testimony both

rests on a reliable foundation and is relevant to the task at hand").  "Rule 702 is broadly

interpreted, and helpfulness to the trier of fact is its touchstone. . . .  Testimony from the expert is

presumed to be helpful unless it concerns matters within the everyday knowledge and experience

of a lay juror."  *Kopf*, 993 F.2d at 377.  Courts look to reliability, including the factors set forth

in Subsections 702(b), (c), and (d), while acknowledging that "District Courts have 'considerable

leeway' in determining the manner in which they evaluate an expert witness' reliability."

*Bresler*, 855 F.3d at 195.

Further, to the extent Adell argues that Mr. Arnold gave too much weight to certain facts

and not enough weight to others, that is a challenge that plainly goes to weight and not

admissibility.  *Bresler v. Wilmington Trust Co.*, *supra*, 855 F.3d at 195 ("Moreover, 'questions

regarding the factual underpinnings of the [expert witness] opinion affect the weight and

credibility of the witness' assessment, not its admissibility.'") (internal citation omitted).

A.    Mr. Arnold Considered the Event History Data During His Analysis

Adell argues repeatedly that Mr. Arnold failed to consider the "Monitoring Logs," a

generic a generic reference to the AlarmWatch fire alarm event histories (i.e., Raw Data Report,

Automation Software Report, and Customer Activity Reports) produced by Fireline or

AlarmWatch in discovery.  In reality Mr. Arnold did not disregard or refuse to consider any

event history; he has repeatedly referenced having relied on the Fireline and AlarmWatch

productions, including the event histories, and all other documents provided to him in developing

his opinions and conclusions.  [*See, e.g.*, Dkt. #110-13 at 4 of 35; Ex. 1 (Expert Report) at 3-4.]

        1.      <u>Mr. Arnold's Declaration Confirms He Reviewed Records from Both Fireline and AlarmWatch</u>

In his 5/8/18 Declaration supporting Mt. Hawley's summary judgment motion, Mr.

Arnold listed (at Paragraph 8) the materials he reviewed by that date, stating in part:  "To

conduct my work in this matter, I have reviewed and analyzed the following documents, records

and materials:…b. ***Documents produced by*** Adell Plastics, ***Alarm Watch/COPS Monitoring***,

L.J. Broissoit & Sons, ***Fireline*** …g.  Deposition transcripts of: … Frank Chenowith, Paul

Ferguson (2 volumes), … [and] Donavan Maden…."  [Dkt. 110-13 at 4-5 of 35 (emphasis

added).]  Mr. Arnold thus declared over a year ago that he reviewed all documents produced by

AlarmWatch and Fireline, including the subject event histories or logs (i.e., Raw Data Report,

Automation Software Report, Customer Activity Report) that Adell now asserts Mr. Arnold

ignored.  Further, Mr. Arnold declared to having reviewed the deposition testimony of Fireline

(Mr. Chenowith) and Lydia Security Monitoring, Inc. dba COPS Monitoring dba AlarmWatch

(collectively "AlarmWatch" or "Lydia") (Donavan Maden) upon which Adell now relies.  [*Id.*]

While Adell attached Mr. Arnold's Declaration (Exhibit C) to its Motion, it does not address the

fact that Mr. Arnold confirmed having considered the event histories.  Had Adell read Mr.

Arnold's Declaration more closely, it would have realized that its position fails out of the gate.

        2.      <u>Mr. Arnold's Expert Report also Identified the Event Histories as Part of the Facts and Data He Considered, as well as the Declaration of Carl Willms that More Deeply Analyzed Them</u>

Adell also attaches Mr. Arnolds' 12/6/18 Rule 26 Expert Report.  [Motion, Ex. B; *see*

*also*, Ex. 1 hereto.]  In turn, Exhibit B to Mr. Arnold's Expert Report also itemizes "Documents

Reviewed" as required under Rule 26.  Fed. R. Civ. P. 26(a)(2)(B)(ii) (requiring that experts

include in their written report "the facts or data considered by the witness").  Among other things, that listing identifies "Fireline Documents (FL0001-FL604)" and "AlarmWatch Documents (1-660)" and the deposition testimony of Fireline (Mr. Chenowith) and AlarmWatch (Mr. Maden), all previously listed in his Declaration [Dkt. #110-13 at 4-5 of 35.]

Mr. Arnold's Expert Report also references the 5/5/18 Declaration of Carl Willms [Dkt. #110-16], Mt. Hawley's fire alarm and signaling expert, which details the results of his analysis of the Raw Data and Automation Software Report to that point.  As discussed in greater detail in Mt. Hawley's Opposition to Adell's Motion to Exclude Carl Willms, filed concurrently herewith, Mr. Willms' Declaration explained, among other things, Adell's fire alarm system and electric signals [*id.* at pp. 8-10 of 194], Adell's daily communications tests [*id.* at pp. 10-14 of 194], the 20 random signals logged at AlarmWatch on 10/4/16, the day of the fire, and the most likely cause for those them (attack of the fire alarm wiring by heat or fire).  [*Id.* at 15-20  of 194.]  Mr. Arnold has not ignored the AlarmWatch event histories.  He identified and considered them, Mr. Willms' analysis, and all other documents and information provided in forming his opinions and conclusions.

While considering the event histories, Mr. Arnold deferred to Mr. Willms, a fire alarm and signaling expert with vast experience analyzing fire panels including the Silent Knight 5104B panel, and Mr. Willms' analysis of the AlarmWatch Raw Data Report and Automation Report, on that area of expertise.  [*See*, *generally*, Ex. 3 (Willms Expert Report) attached to Opposition to Motion to Exclude Carl Willms.]  Here, Adell argues that Mr. Arnold has violated NFPA 921 Section 4.3.4's directive to "analyze all data collected" [Motion at 5] presumably because he did not perform as detailed an analysis of the event histories as Mr. Willms did.  That is not what NFPA 921 requires.  NFPA 921 both permits and requires an investigator to rely on

the investigation of others, including another expert.  [Ex. 4 (NFPA 921 Excerpts) at §4.4.3.2

("A fire or explosion investigation may include all or some of the following tasks: … review and

analysis of the investigation of others"); §4.4.3.3 ("The use of previously collected data from a

properly documented scene can be used successfully in an analysis of the incident to reach valid

conclusions through the appropriate use of the scientific method."); and §4.3.4 ("If the

investigator lacks expertise to properly attribute meaning to a piece of data, then assistance

should be sought").]  Mr. Arnold's Expert Report also defeats any notion that he ignored the

monitoring logs in developing his opinions and conclusions.

> 3.   Mr. Arnold Explained at Deposition How All Documents He Considered,
> Including the Event Histories, Factored Into His Analysis

By deposition soundbite, Adell seeks to paint a picture that Mr. Arnold conceded at

deposition that he ignored the AlarmWatch event histories and thereby violated NFPA 921's

mandate that all data collected be analyzed.  [Motion at 5-6.]  On multiple occasions during his

deposition, however, Mr. Arnold not only confirmed that he considered all documents provided

(including the event AlarmWatch histories/logs) in formulating his Declaration and Expert

Report, but that he has identified the opinions and conclusions he has reached, and his principal

reasoning for reaching them, following his review of those documents.  [*See*, *e.g.*, Ex. 2 (Arnold

Tr.) at 12:21-13:12 [1]; 13:22-14:16 [2]; 96:1-11 [3]; and 97:3-17 [4]  In the context of the 11 reasons

---

[1]       "Q  And collectively, these reports include a complete statement of all bases and reasons for your opinions, correct? A  Similar answer.  It's not exhaustive of every document and every analysis that I did to come to the conclusions presented in this report, but it's a fair characterization of the conclusions that I reached based on that review.   Q    You have identified all the bases and reasons that you think are pertinent to your opinions in the report, right? A  *I have identified all the documents I have reviewed, and a summary of those opinions are characterized in the written word.*" [Ex. 2 (Arnold Tr.) at 12:21-13:12 (emphasis added).]

[2]       "Q  But to the extent you had a proposition that might be supported by deposition testimony or some other piece of evidence, you have at least included the proposition, your reasoning and your bases?  A  I have certainly done my best to do that. Q  Right.  So if I understand what you're saying, you have identified your bases and your reasons, but you haven't tried to catalog exactly every piece of evidence that might correlate with those reasons and bases? A  Correct.  *Similarly, nor have I cataloged, as is probably a fair word, cataloged every analysis piece of*

why Mr. Arnold concludes that PIV#1 was closed well before the 104//16 fire, Mr. Arnold

explained at deposition that his report does not attempt to catalogue his every thought and, while

familiar with the event logs, to the extent his analysis of the open/closed status of PIV#1 called

for a consideration of the event history raw data he relied on Mr. Willms.  [*See, e.g.*, Ex. 2

(Arnold Tr.) at 81:6-83:3 [5]; 82:7-83:3 [6]  83:16- 84:3 [7]; and  93:16-95:18. [8]  [*See also, generally*,

Ex. 1 (Expert Report) at 3-5.]  As Mr. Arnold succinctly put it:

---

*information or observation in my review that may be related to, but not in support of, a conclusion*." [Ex. 2 (Arnold Tr.) at 12:21-13:12 (emphasis added).]

[3]        "Q  Did you do any analysis at all of your work, in formulating opinions with respect to the panel and the wiring and monitoring logs? A   No.  I didn't conduct any testing, do any exemplar testing, didn't review catalogs, the raw data.  But *I am familiar with and reviewed the alarm history report and took note of observations of what was there and what wasn't there, in the context of the alarm watch log relative to the position of the tamper switches*."  [Ex. 2 (Arnold Tr.) at 96:1-11  (emphasis added).]

[4]        "[Q] The performance of these tamper switches and the *associated event history* monitoring report is being analyzed by others is beyond the scope of this declaration. A  Uh-huh (affirmative).  That's accurate, but *it doesn't mean I'm not familiar with it. Doesn't mean I didn't review it in the context of my other declaration*. So I didn't review the performance of those  switches and I didn't analyze the specific history report, but I am familiar with the context of it in my overall declaration. *<u>I'm certainly familiar with the history reports.  I certainly studied and looked at it in the context of my review, yes.</u>*"  [Ex. 2 (Arnold Tr.) at 97:3-17  (emphasis added).]

[5]        "Q  And you elaborate on the bases in the declaration, that's attached as appendix C to your report? A  Correct.  And as we described earlier when we first began talking today, *neither the declaration, the attachment or the report contains all aspects of the file* that I reviewed in the context of these themes, these 11 themes, to use your words, *not a catalog of all individual specific pieces of data or evidence or mental test or analyzes that supports the ultimate opinion the PIV was closed making the system nonfunctional, under these 11 themes*" [Ex. 2 (Arnold Tr.) at 81:6-83:3 (emphasis added).]

              [

[6]        "Q  When exactly do you claim PIV-1 was closed? … THE WITNESS:  *My focus was the status of PIV at the time of the fire, sprinkler system at the time of the fire. I'm familiar with the historical aspects of the manipulation of the valve relative to the supervision and the event log. That's really not the primary focus of my review*, so I don't think I'll opine as to date certain. I know there are, there is a basis to do that, but I am not offering that opinion because I'm not familiar with the details, without having my file in front of me to do that…." [Ex. 2 (Arnold Tr.) at 82:7-83:3 (emphasis added).]

[7]        "Q  So determining exact timing was not part of your analysis or opinions? A  It wasn't the primary focus. I think it's knowable, but *it takes diving into the, in great detail the raw data from the premises panel received by the dialer and the event codes within the contact ID script of the raw data*. And while I'm familiar so that I can do that, I haven't done that in great detail in this matter. *It was Mr. Willms's focus*." [Ex. 2 (Arnold Tr.) at 83:16- 84:3 (emphasis added).]

[8]        "Q  And the monitoring log reflects history of the alarms that you would get, like supervisory alarms, flow switch alarms, things of that nature? A  The history log is useful for that purpose, as well as for what events it did not receive that were intended or should have been sent by the premises panel. *So the alarm log is more useful than just the items listed alphanumerically on the label.  It's also important to recognize what events were not received*,

There's lots of analysis that I did in developing my theory, because we use scientific method, right. You develop a theory … based on reviewing all the data that's available and you test the theory based on the available data for its veracity and it's a process. And so ***certainly the status of the alarm history log that I had is part of the data review, so of course I reviewed that***.

[Ex. 2 (Arnold Tr.) at 99:6-19 (emphasis added); *see also*, *id*., at 169:15-170:2 ("As I thought I was clear this morning, that ***I did review the alarm logs for their activity on or about the time that the fire occurred, between approximately 1:00 o'clock or shortly thereafter through the first few hours for any indication of early sprinkler flow early in the day.***") (Emphasis added).]  Adell's contention that Mr. Arnold conceded at deposition that he ignored the AlarmWatch event histories, or that his testimony establishes that, grossly misstates Mr. Arnold's testimony; he plainly did not.

4. <u>Mr. Arnold's Investigation Included Inspection of the PIV#1 Tamper Switch</u>

Citing Paragraph 11 of Mr. Arnold's Declaration,[9] Adell also claims that Mr. Arnold did not analyze the tamper switches installed at Adell on 10/4/16, including the PIV#1 tamper switch.  [Motion at 6.]  That is incorrect.  As Adell is well aware, Mt. Hawley requested a site inspection in this lawsuit, with its experts, which was resisted by Adell but ultimately occurred on 12/1/17.  [See Dkt. #66 at 2 of 3 (Letter Application) , #67 at 2 of 4 (Response), #68 (11/30/17 Order) at 4 of 5.]  That day, with Mr. Arnold and other experts retained by Mt. Hawley

---

because when conditions were set at premises panel -- or I'll use the word restore, restore. Those restores are also transmitted, supposed to be transmitted one-for-one from the premises panel to the monitoring station for, to recognize it's been remedied. ***But again, this is not the focus of my work in this matter, this is just general stuff in response to your question.*** I don't want to get too much in to Mr. Willms, who really went down into detail in this matter relative to raw data, and I haven't done that. I'm familiar with it, it's part of what I do but I didn't do it in this case. … Q   You're relying on him for the analysis of whether there should be restores – not restores, wiring, things of that nature? … THE WITNESS:  Relying on it, I know he did that work in great detail. ***I'm familiar with the work and looked at it and reviewed it in the context of my review, to make sure I was thorough in my analysis relative to PIV. But I didn't offer any specific opinions in Exhibit Arnold 1 related to the topic, other than I'm familiar with it*** and you've asked me questions." [Ex. 2 (Arnold Tr.) at 93:16-95:18 (emphasis added).]

[9]     "Each normally open control valve in a fire sprinkler system is required to be secured in its proper full open position by means of a seal or lock and/or electronically supervised by the use of a valve position tamper switch connected to the associated building's fire alarm system.  If the position of an electrically-supervised PIV is moved from its proper normally open position, a valve tamper supervisory alarm is transmitted to the alarm panel.  In addition to being provided with locks, the proper (i.e. fully open) position of the PIVs at Adell were intended to be electrically-supervised by tamper switches connected to the Adell fire panel and monitoring system.  The performance of these tamper switches and the associated event history monitoring report is being analyzed by others and is beyond the scope of this declaration.'  [Dkt. #110-13, ¶11, at 4-5.]

present, it was learned for the first time that Adell had replaced the Silent Knight 5104B Fire Alarm Control Panel that had been in operation at the time of the fire—making it impossible to analyze or test it.  [*See generally*, Dkt. #174 through #174-3 (Motion for Evidentiary Sanctions and/or Adverse Inferences).]  At that time, PIV#1 was inspected and its tamper switch was inspected, marked, bagged and delivered to Adell's counsel for preservation.  [Ex. 5 (Tamper Switch Photos).]  To say that Mr. Arnold failed to consider the PIV#1 tamper switch is wrong; he was there on 12/1/17 when it was removed, documented and preserved as evidence.

5.    The Monitoring Logs Do Not Show Sprinkler Activation In Response to the Fire or that PIV#1 Was Open When the Fire Broke Out

Whether the sprinklers activated and flowed water in response to the 10/4/16 fire is the central issue in this case.  After a thorough review of the documents and information provided, Mr. Arnold has opined that based on eleven (11) separate factors, he concludes that "PIV 1 serving the Zone 1 sprinkler system protecting Adell Buildings 5 and 6 was closed … at the time of the October 4, 2016 fire.  The closed PIV 1 fatally impaired the Zone 1 sprinkler system from working properly to control the initial fire in Building 5 by preventing water flow to the Zone 1 sprinkler system piping and sprinklers." [Ex. 1 (Expert Report) at 3-5, and Appendix C (Declaration) thereto; *see also* Ex. 6 (Rebuttal Report) at 2-11.]

Adell cites the fire alarm event histories as support that PIV#1 was open when the fire broke out and that the sprinklers activated in response to the fire.  [Motion at 7-8.]  In support of its contention that PIV#1 was open when the fire broke out, Adell cites soundbites from the Rule 30(b)(6) deposition of Fireline designee Frank Chenowith about a PIV zone (Zone 3) supervisory signal being received at 1:21:**16** p.m. on 10/4/16.  [Motion at 7 citing Ex. E (Chenowith Tr.) at 144:18-145:17.]  If that signal is interpreted literally, as Adell urges—and not part of the 19 other signals generated in the same two minute time span when the Building 5 interior temperature

14

was hot enough to melt the alarm wiring—that signal would indicate that PIV#1 was closed at that time.  What Adell ignores, however, is that the first of the 20 total signals—a PIV zone (Zone 3) "restoral" signal logged two seconds earlier at 1:21:**14**—read literally would mean that PIV#1 was closed before 1:21:14, opened at that time (for two seconds) and closed again at 1:21:16.  [*See*, *e.g.*, Ex. 7 (Raw Data Report) at AlarmWatch 417-418; Ex. 8 (Automation Report) at AlarmWatch 98-99; *see also*, *generally*, Opposition to Motion to Exclude Carl Willms filed concurrently herewith.]  Adell has cherry-picked the signals it likes and disregarded those it does not.  If the event histories are an accurate reflection of what transpired during the fire (a proposition Mt. Hawley disputes) all the signals generated that day must be considered. [10]

In support of its contention that the Building 5 sprinkler system operated on the day of the fire and is reflected on the AlarmWatch event histories, Adell relies on the Rule 30(b)(6) testimony of Fireline (Frank Chenowith) and Lydia Security Monitoring, Inc. dba COPS Monitoring dba AlarmWatch (collectively "AlarmWatch" or "Lydia") (Donavan Maden). [Motion at 2-3, ¶¶ 3-5.]

Frank Chenowith, however, testified that he has no personal knowledge of anything that transpired at Adell before 1:21:14 p.m. on 10/4/16 when the first signal was logged by AlarmWatch (the restoral of the PIV circuit, discussed above).  Specifically, Mr. Chenowith was not at Adell on 10/4/16 or in the days leading up to the fire.[11]  Mr. Chenowith also confirmed that the first signals logged by AlarmWatch (at 1:21 / 1321)— some 20 minutes after the fire

---

[10]     As was detailed in Carl Willms' Declaration (Dkt. #110-16), Supplemental Declaration (Dkt. #126-4) and Expert Report (Ex. 3 to the Opposition to Motion to Exclude Carl Willms filed concurrently herewith), and in Tom Long's Declaration  (Dkt. #110-15) and Expert Report (Ex. _1to Opposition to Motion to Exclude Tom Long filed concurrently herewith), the 20 signals logged after 1:21:14 on 10/4/16 are evidence of the alarm system wiring being attacked by heat/fire or subjected to other mechanical damage, and are not reliable indicators of sprinkler activity.

[11]     "Q.  Were you at Adell's facilities on – during the fire?  A.  No. . . .Q.  Were you at Adell's facilities anytime in October 2016? A. No." [Ex. 9 (Chenowith Tr.) at 191:2-10.]

started—are not evidence of sprinkler activation.[12]  More generally, Mr. Chenowith had no idea whether the sprinklers in Building 5 activated at all in response to the fire. [13]  Mr. Chenowith thus has no knowledge concerning the operation of the Zone 1 sprinkler system after the fire broke at about 1:00 p.m.  Instead, based solely on the signals logged by AlarmWatch starting at 1:21:14 on 10/4/16 (the Zone 3 "restoral"), Mr. Chenowith believes that the sprinklers worked at that time.  [Ex. 9 (Chenowith Tr.) at 173:15-24; 176:2-5; 176:6-17 ("I'm looking at the alarms that came in… I don't know what happened prior to that."); and 177:5-8.]  Adell's attempt to rely on Mr. Chenowith's testimony as evidence that the Zone 1 sprinklers activated after the fire broke out (at about 1:00 p.m.) fails because he has no personal knowledge.  Because Mr. Chenowith was not at Adell on 10/4/16, and because there is no evidence that "PIV#1 was open" and the sprinkler system activated in response to the fire", his testimony does not support such an argument.

The testimony of AlarmWatch's Donovan Maden also fails to support Adell's contention.  At deposition, Mr. Maden confirmed he holds no certifications in fire alarms [Ex. 10 (Maden Tr.) 13:25-14:3] and has had no specialized education "in connection with fire alarms and how they operate." [*Id.* at 14:19-22.]  On whether he could explain the flurry of 20 random signals

---

[12]      "Q.  And we've talked a lot about the failure of the Zone 3 to ever restart.  That's a fact as well, isn't it true? . . .A. Yes.  Q.  I mean -- I mean it didn't restore until 1321, and then it triggered again, closed two seconds later, right?  A.  Yes. Q.  Is that to you evidence of an operable sprinkler system responding to the fire at Adell that broke out as early as 1305?  A.  I don't see that as evidence one way or the other." [Ex. 9 (Chenowith Tr.) at 193:20-194:8.]

[13]      "Q.  And you weren't there.  You don't know whether the sprinkler system activated or not; right?  A. That's correct.  Q.  And you've already testified that you're not going to testify or comment on whether or not the sprinkler system activated in any way prior to 13:21:06 when that first signal came in on Exhibit 15 [the Customer Activity Report] on the day of the fire; right? . . .A.  That's correct."  [Ex. 9 (Chenowith Tr.) at 195:12-22]

commencing at 1:21:14 logged by AlarmWatch—well after the fire started—Mr. Maden declined to speculate.[14]

Adell, of course, does not rely on the deposition testimony of either Mr. Chenowith and Mr. Maden defeating its propositions.  The excerpts Adell does cite, however, highlights the fatal problems with relying on the electronic signals sent by Adell's fire panel and logged by AlarmWatch as evidence of what actually happened with the Building 5 sprinkler system on 10/4/16.

Adell cites to Mr. Chenowith's testimony concerning Adell's daily communications test log entries sent by the fire panel and logged at AlarmWatch (Motion at 7, Ex. E (Chenowith Tr.) at 131:24-136:5), and testimony confirming that items logged on the Customer Activity Report, the AlarmWatch Automation Software Report and Baltimore County 9-1-1 records related to the fire generally line-up. [*Id*., Ex. E at 137:18-147:15.]   Adell also relies on Mr. Maden's testimony that daily communications tests generate a "602" code at AlarmWatch which Adell's lawyers then seek to embellish by calling 602 codes an "all clear" and an indication of "no problem." [Motion at 7, Ex. G (Maden Tr.) at 161:22-162:19 ("Q.  602 is all clear, right? ... THE WITNESS: To the best of my ability, it is… Q And those test results come back with no problem.  A. 602 is repeated. Not 608.").]   Mr. Maden's testimony is also cited for the proposition that a "602" communications tests would have been logged as a "608" if there was a problem with the alarm system.  [*Id*. at 165:9-168:17.]

---

[14]     "Q.  So  Lydia would not have an opinion one way or the other to explain the exposure of this system to heat for 15-, 16 minute time frame and render an opinion concerning 20 signals generated in the 2-mimute-50 second time frame? . . .THE WITNESS:  That would be correct.  It's not our area of expertise" [Ex. 10 (Maden Tr.) at 49:2-11]; " Q.  Can you explain for me why there was not an alarm signal received by Lydia Monitoring prior to 1321 and 14 seconds, the earliest alarm trouble signal received by your company on October 4, 2016?  MR. SAFA: Objection.  Calls for Speculation. THE WITNESS:  Yes.  It would be speculation.  I have no idea why we didn't receive a signal earlier" [*id*. at 188:19-189:3; see also, *id*. 161:22 -164:21 ("***We have no idea what's happening locally.***" (emphasis added).]

The premise of Adell's argument— that a lack of "608" coded periodic test means its alarm system was fully functional—is false.  The periodic communications test logged at AlarmWatch (as reflected on the Customer Activity Reports, Raw Data Report, Automation screenshots, and the like) evidence that Adell's automatic sprinkler systems and fire alarm system in fact were not "fully functioning" or in complete working order on 10/4/16.

First, the "602" periodic tests logged at AlarmWatch are daily communications tests to make sure that Adell's fire panel is capable of connecting (via telephone landline) with AlarmWatch.  [Ex. 10 (Maden Tr.) at 69:19-20 ("Transmission of a test signal to us; correct. Supervision."); 161:22 -164:21 ("to the extent it is communicating to us as scheduled, there are no problems. We have no idea what's happening locally."); 167:1-168:12 ("So looking here, this would indicate that at 3:21 [on 10/4], Adell's system was functioning. … THE WITNESS: It was capable of reporting signals to us.  We would take actions based on the signals received.  Q  So you were receiving signals?  A. Correct."]

Second, Adell's Silent Knight 5104B panel was not capable of generating a system trouble (aka abnormal) test code "608".  No electronic log or record produced in this case—not the Customer Activity Reports, or the Raw Data Report, the Automation Software Report, or any other event history—references a "608" abnormal test code.  [Ex. 7 (Raw Data Report); Ex. 8 (Automation Report); Ex. 11 (Customer Activity Report).]  The reason is simple: the executive software comprising Adell's Silent Knight 5104B panel was incapable of sending such a signal. That feature (sending a "608" abnormal test code) was not added as a feature to the Silent Knight 5104B panel until November 2002, long after Adell's panel was manufactured (in July 2001). [*Compare* Ex. 3 (Willms Expert Report) in Opposition to Motion to Exclude Carl Willms at Ex. 5 (at Reporting Formats) *With* Ex. 12 (Fireline Manual produced).]  Instead, Adell's Silent

Knight 5104B sent *two different kinds* of "602" periodic test signals depending on whether there was an unrestored out-of-normal condition detected.[15] [*Id*.]

AlarmWatch's Raw Data Report shows that when there were no out-of-normal condition being reported (e.g., no unrestored PIV tamper switch "supervisory" signal) that the raw data of these periodic test signals were logged by AlarmWatch as a "E602 00 C000" and by its automation system software as a "SIGNAL – Periodic Test (*E) S: 1A:1RL: 75TX-ID :6514 Key: E602".  When a daily test reported an unrestored out-of-normal (abnormal) condition with the fire alarm system (including each and every test logged between 2/17/15 and 1:21:14 on 10/4/16 reporting on the unrestored PIV tamper switch "supervisory" signal) the raw data for that daily test would be logged as either a "E602 C099", "1 602 00 Z099", "E60200099" or "160200099" depending on the receiver being used (over time, AlarmWatch used several) and would be recorded by AlarmWatch's automation system software as a "SIGNAL – Periodic Test (*E) S: 1A:1RL: 75TX-ID :6514 Key: E602 <u>OZ:99</u>." [Ex. 3 (Willms Expert Report) attached to Opposition to Motion to Exclude Carl Willms at 12-16.[16]]

Between 2/18/15 (when Adell's PIV tamper "supervisory" signal was left unrestored) and 10/4/16, Adell's fire panel reported, and AlarmWatch logged, ***close to 600 consecutive Zone "99" abnormal tests*** (597 to be exact) reporting on the unrestored PIV supervisory signal (and

---

[15]     UL 864 (8th Ed.) requires fire panels to be restored to normal (no abnormal conditions present) for the panel to send a normal daily test.  If the panel is not restored to normal following an activation of a zone or other system monitored fault, UL 864 requires that the test signal be distinctively different. [Ex. 3 (Willms Expert Report) attached to Opposition to Motion to Exclude Carl Willms, filed concurrently herewith at Ex. 9 (UL 864 § 73.2.9).]

[16]     In his Expert Report, Mr. Willms discussed the daily tests logged at Adell in detail, including the differences between the periodic tests that referenced Zone "00" (no unrestored condition) and the abnormal tests that reference Zone "99" (referencing at least one unrestored condition), including the following: "A review of all the DACT test signals from 1/1/2014, which was the first raw data signal and automation screenshot provided, to 11/1/2016 identified the following: (1) - There were 8 tests logged from 1/4/2014 to 1/8/2014 with a zone identifier of 000  (2) – There were 5 tests logged from 1/9/2014 to 1/13/2014with a zone identifier of 099  (3) – There were 401 tests logged from 1/14/2014 to 2/17/2015 with a zone identifier of 000 (4) - There were 597 tests logged from 2/18/2014 to 10/6/2016 with a zone identifier of 099."  [Ex. 3 (Willms Expert Report) to Opposition to Motion to Exclude Carl Willms at 17-19.]

perhaps other deficiencies) that were present continuously since 2/17/15 and through the time the fire started (at about 1:00 p.m.) on 10/4/16.  [*See, generally*, Ex. 3 (Willms Expert Report) to Opposition to Motion to Exclude Carl Willms.]  In fact, even ___**after**___ Buildings 5 and 6 had been destroyed, Adell's fire panel continued to send the exact same Zone "99" abnormal tests, it had sent after 2/17/15.  [Ex. 7 (Raw Data Report) atm AlarmWatch 454-465; Ex. 8 (Automation Report) at AlarmWatch 98-131; Ex. 11 (Customer Activity Report) at FL 000079-101.]  In each instance, Adell's abnormal Zone "99" periodic test accurately reported on the unrestored PIV zone "supervisory" signal that was on AlarmWatch's Raw Data report and Automation Reports each day, without interruption, since it was first logged on 2/18/15.[17]  On this issue, and despite recognizing the importance of abnormal test signals, Mr. Maden did not know what Zone "99 " signified.  [Ex. 10 (Maden Tr.) at 165:3-8 ("I don't know what a 99 in its own value means.  I don't know if that's some indicator.  We're expecting to receive a daily check of a 602, and we're receiving it as expected." ]  The problem with the superficial analysis employed by Adell and adopted by Chenowith and Maden at deposition is that the Raw Data and Automation Reports establish that two different "602" test codes were sent, one for a normal condition (Zone "00") and one for an abnormal condition (Zone "99").

Third, and while there is no evidence that Mr. Chenowith consulted Adell's Customer Activity data prior to 11/29/16 when he generated the Customer Activity Report through AlarmWatch's website portal, what is clear is that the periodic tests logged on that report do not differentiate between Zone "00" periodic tests and Zone "99" abnormal tests.  [Ex. 11 (Customer Activity Report).  This differentiation is, however, evident on AlarmWatch's Raw Data report and Automation Software Report.  [*Compare* abnormal tests logged on 2/18/15 through

---

[17]     This is also why Fireline reported to Adell on 9/7/16, less than a month before the fire, that the "There was a trouble on the Fire panel" and "Recommend for customer to call Fireline to have PIV fixed and trouble cleared on panel."  [Ex. 13 (9/7/16 Field Report).]

10/4/2016 on Ex. 7 (Raw Data Report) at AlarmWatch 350-417 and Ex. 8 (Automation Report) at AlarmWatch 67-99 *With* abnormal tests logged for 2/15/17 through 10/4/16 on Ex. 11 (Customer Activity Report) FL000052-000065-.]

Yet another flaw with Adell's decision to rely on the event histories is that the AlarmWatch automation software was not capable of detecting unrestored supervisory signals and did not require that they reappear on a daily basis, which would have been industry best practice at the time. [Ex. 10 (Maden Tr.) at 53:16-54:25 [18].] Thus, although abnormal tests indicating the unrestored PIV zone "supervisory" signals (caused by the PIVs being closed on 2/17/15) were logged by AlarmWatch without interruption from 2/18/15 through the 10/4/16 when the fire broke out, that longstanding problem condition went undetected.

The AlarmWatch raw data and automation software logs show hundreds of Zone "99" abnormal tests reporting on the unrestored PIV supervisory signal logged between 2/18/15 and 10/4/16 when the fire broke. The periodic tests are thus evidence that PIV#1 was closed when the fire broke out and that the sprinkler system did not operate in response to the fire. Adell's attempt to spin the alarm data to the contrary is baseless.

   B.   In Considering All the Data, Mr. Arnold Properly Considered the Padlock Found After the Fire Open and Hanging on PIV#1

The materials Mr. Arnold reviewed in forming his opinions and conclusions included photographs taken by the Baltimore County Fire Department ("BCFD") arson investigator, Det. Tom Scally, and Mt. Hawley fire cause and origin investigator, Mike Spadea formerly of PT&C/LWG. [Ex. 1 (Expert Report), Appendix B, p. 16 ("Baltimore County Police Photos

---

[18]       "Q. Can you describe for me what COPS – excuse me. What Lydia's procedure is to comply with NFPA 72's requirement to redisplay signals received by a supervisory station that are not restored. … A. THE WITNESS: I do not believe within the automation there is anything addressing fail to restore for particular supervisory signal to reappear after a day. … Q. Does Lydia have a procedure to comply with that part of NFPA 72 requiring that the nonrestored signal be reported to the subscriber? … THE WITNESS: I do not believe so, because I do not believe we have anything in the automation that indicates a nonrestoral state after a day." [Ex.10 (Maden Tr.) at 53:16-54:25.]

(Parts 1 & 2)" and PT&C/LWG (1-519)"); Dkt. #110-13 at 5 of 35 (listing "photographs taken

by the Baltimore County Police Department, Exponent Engineers, and Fire Investigator Michael

Spadea"), 12 of 35 and Exhibit 2 thereto (Spadea Photos).]

On 10/12/16, immediately after the safety collapse zone was lifted by the BCFD, Det.

Scally and Mr. Spadea entered the Building 4/5 alcove area and discovered (for the first time)

PIV#1 in a "SHUT" or closed position with its wrench still in its holster and with a Master brand

breakaway padlock hanging open on it partially painted in red.  That discovery was fully

documented.  [Dkt. #110-13 at Ex. 2 at 22-25 of 35]  .]  Thereafter, it was also discovered that

PIV#1 was captured in the same position in photographs taken by Det. Scally while BCFD fire

suppression efforts were ongoing.  [Ex. 3.]  Mr. Arnold considered this evidence in forming his

opinions and conclusions.  [*See*, *e.g.*, Dkt. #110-13 at 12 of 35 and Exhibit 2 thereto (Spadea

Photos); and Ex. 1 (Expert Report) at 3-4 and Appendix C.]  In his Declaration, and reaffirmed in

his Expert Report, Mr. Arnold noted:

> 16.  Photographs taken on October 12, 2016, after the fire department-established
> collapse safety zone (that encompassed the location of PIV 1 protecting Buildings 5 and
> 5) was lifted, show that PIV 1 was found in the "SHUT" position with the operating
> wrench stored and held in place with a painted, closed but unlatched padlock.... The
> wrench's  stored position and paint patterns on its padlock indicate that PIV 1 was closed
> well before the time of the fire and at the time of the fire, and had not been manipulated
> since the fire.
>
> 17.  A "SHUT" PIV 1 would create a complete and total impairment of the Zone 1
> sprinkler system by isolating and preventing discharge of water from the system to
> control the initial fire in Building 5.  The complete impairment of the Zone 1 sprinkler
> system due to the closed PIV is consistent with the subject fire's spread to destroy both
> Buildings 5 and 6. ...
>
> 18.  In addition to PIV 1 being found in the shut position a few days after the fire with its
> operating wrench still stored and secured, there are numerous other facts and
> observations that evidence PIV 1 was shut at the time of the fire and was not closed
> thereafter by some unknown and unreported party...[Dkt. #110-13 at 7-13 of 35.]

Mr. Arnold clearly analyzed the Spadea and Scally photographs as NFPA 921 requires.

At deposition, Mr. Arnold also explained that the condition Mr. Spadea found the padlock on 10/12/16 was one of several factors Mr. Arnold considered in assessing the condition of PIV#1 on 10/4/16.  [Ex. 2 (Arnold Tr.) at 122:1-123:11.[19]]  At deposition, Adell tried to recast the facts (i.e., that PIV#1 was found shut, the undisturbed position of the PIV wrench, the unlocked status of the padlock, the paint on the lock, etc.) into "theories" in an effort to create some basis for their rejection but Mr. Arnold declined to take the bait.  [Id. at  123:12-125:16 [20]; see also 125:21-126:10; and 128:11-129:13; and 130:4-19.  Mr. Arnold was steadfast that the photographic evidence showing PIV#1 shut, its wrench in place, and its padlock open and painted including on the tip of the hasp (that would be unexposed when locked), when

---

[19]      "Q  So Mr. Spadea acknowledges that finding the PIV shut on October 12 doesn't tell him anything about the PIV on October 4 before the fire? … THE WITNESS:  I really haven't read his entire testimony, but clearly in a vacuum, in a myopic sense its position on the 12th, its position on the 12th is one of many, many factors or facts in evidence that demonstrate the position of the valve on the 4th.  So by itself, no. I would agree with him, one photograph taken on one day in a vacuum does not, is not sufficient to demonstrate the valve was closed on the 4th.  *But in this case there is abundant information, in addition to not only its position found, but how it was found.  And its condition, not just its position, is important to my conclusion that it was shut on the 4th and before*. BY MR. SAFA:  *Q  Is one of those additional bases you are referring to the presence of the unlocked padlock in the position of the wrench?  A Yes. That's a factor that guides and forms the larger opinion that it was not manipulated and changed since the fire or during the fire*, I should say." [Ex. 2 (Arnold Tr.) at 122:1-123:11 (emphasis added).]

[20]      "Q  You're aware that the unlocked padlock theory is not a theory that you came up with, right? A  *I don't know that it's a theory, it's a fact.  It's, it's a contributing fact that supports the opinion that the PIV was shut*.  Q  The reliance on the padlock found on October 12, 2016 as support for the condition of the PIV on October 4 is a theory that you did not come up with? A  *It is not a theory, it's a fact.*  I'm confused by your term word theory. *It's not only a fact it's unlocked, it's a condition relative to its paint, its position on the, on the saddle of the PIV, maintaining the handle in a stored position*. So it's … one of the facts that supports the conclusion that the PIV was closed at the time of the fire. Q  Well, the theory about the lock and the paint and the wrench, all those factors coming together and forming a theory related to the position of the PIV, that's not something that originated with you? A  No. … THE WITNESS:  *I am not understanding your use of the term theory in that context. I consider the position as documented by Mr. Spadea on the 12th and earlier photographs from a distance by Detective Scally one of many facts and factors that support the conclusion that the PIV was shut at the time of the fire. So it's not a theory that the lock is as it was found, it's documented by photograph*. BY MR. SAFA: Q   On the 12th? A   On the 12th and the condition of the PIV, including its location, its position behind the collapse zone, all those other factors that are described later, all are contributing facts to the conclusion that the PIV was shut at the time of the fire." [Ex. 2 (Arnold Tr.) at 123:12-125:16 emphasis added.]

considered with all other facts, supports his opinion and conclusion that PIV#1 was shut when the fire broke out:

> As I just explained, the paint on the tip of the lock, the fact the lock is not broken in this position, storing the handle in its stored position on a shut PIV, that body of knowledge supports, supports the ultimate conclusion along with all the other items of evidence that this PIV was shut at the time of the fire and remained shut when it was found on, and photographed I should say by Mr. Spadea on October 12.

[*Id*. at 132:16-133:2; *see also*, 131:9-132:7 ("A. The condition of the paint on the lock, in conjunction with its position on the PIV and the wrench in totality indicates that the PIV was not manipulated during the fire.  If the padlock was locked at the time of the fire, the fire department or any other person who had manipulated that would not have had the key to unlock it, would likely not have had the key to unlock it and would have broken it as intended. It's a breakaway lock.  You're familiar with breakaway locks, which are provided on PIVs. There is no damage to this lock, it's still nested in the way it would be stored.  The handle is still stored as it was intended to be nested to be stored. So this totality of all that supports the conclusion that the PIV was not manipulated since the fire, and since it's found shut that supports the condition that the, it supports along with many other pieces of evidence that the PIV was shut at the time of the fire."]

To anyone who sees these photographs, especially Mr. Spadea's several close-ups [Dkt. #110-13 at 23-25 and 28-29 of 35], it is clear that PIV#1 was untouched during the fire, and found shut on 10/12/16 with its wrench secured in its holster without indication that it had been removed, affixed to the PIV top bolt or manipulated in any way.  Focusing on the padlock, it is clearly documented to be open/unlocked, undamaged (not having been struck),with a significant amount of worn read paint including on the tip of the hasp (that part of the lock that is pushed into the lock body when locked).  [#110-13 at 28-29 of 35.]  This is evident to anyone who looks at the photographs and was equally evident to Mr. Arnold, a seasoned firefighter and fire

investigator.  [*Id.*]  Mr. Arnold concludes that PIV#1 was closed when the fire broke out in part

by relying on the discovery of PIV#1 in a closed position on 10/12/16 as documented by Mr.

Spadea [*id.*] and as confirmed in photos taken by Detective Scally during the fire [Ex. 3 (Det.

Scally Photos); Ex. 1 (Expert Report) at 3.]  Per NFPA 921, Mr. Arnold properly considered Mr.

Spadea's and Detective Scally's photographs.

Adell seeks to exclude Mr. Arnold because he is not a forensic investigator of paint

patterns.  [Motion at 9-11.]  Mr. Arnold does not claim to be.  As discussed, Mr. Arnold has

considered the photographs of PIV#1, the PIV wrench and padlock taken by Detective Scally

during the fire and by Mr. Spadea on 10/12/16, and a vast amount of other photographs, videos,

documents and testimony.  [*See* Dkt. #110-13 at 4-5 of 35; Ex. 1 (Expert Report) at Appendix B;

and Ex. 6 (Rebuttal Report) at 2.]  Adell's argument that because the jury can interpret the

photos Mr. Arnold cannot rely on them or talk about them is illogical and absurd.  Permitting Mr.

Arnold to testify to the significance of the subject photographs will help the jury understand the

different possible conditions of PIVs, how valves are open and closed, the correct and incorrect

ways PIVs are physically secured, the condition of PIV#1 when the fire broke out on 10/4/16,

and the condition of PIV#1 when first photographed (while the fire was ongoing) and when it

was discovered shut on 10/12/16.  Mr. Arnold's proffered testimony is relevant and clearly

appropriate for expert testimony.  Fed. R. Evid. 702.

### C.   Mr. Arnold's Testimony is Not Needlessly Cumulative of Any Other

Finally, Adell argues without analysis that Mr. Arnold's testimony is needlessly

cumulative of Mt. Hawley's six other retained and disclosed witnesses.  [Motion at 11.]  That

simply is not the case.  Of Mt. Hawley's six disclosed experts, Mr. Newton is a forensic

accountant and CPA retained to testify on damages issues, Jeffrey Stempel is a nationally

recognized expert in insurance claims standards and practices, and Mr. Willms is a certified expert in fire alarms and fire alarm signaling among other things.  As Adell correctly notes, Mt. Hawley has also disclosed three fire protection engineers: Mr. Arnold, Mr. Long and Dr. Mowrer.

Dr. Mowrer was retained during the course of Mt. Hawley's coverage investigation to assess the capability of the Zone 1 sprinkler system to respond to the observed fire on 10/4/16. That retention has continued into this litigation during which Dr. Mowrer opinions and conclusions have grown to include the estimated time when the Building 5 sprinklers should have activated in response to the fire and other things.  [*See generally*, Opposition to Motion Exclude Frederick Mowrer at Ex. 1 (Expert Report) and Ex. 2 (Rebuttal Report), filed concurrently herewith; *see also* Dkt. #110-14.]  Mr. Long was also first retained during the course of Mt. Hawley's investigation and has continued to analyze all evidence gathered concerning the Adell facility and the fire, including without limitation inspection, testing and maintenance issues of Adell's sprinkler systems, whether PIV#1 was closed when the fire broke out, whether there is any evidence of an explosive event early on that may have contributed to the fire's rapid growth, analyzing the fire ground audio, 911 audio and video footage, and whether there is any evidence of PIV#1 being closed after the fire broke out.  [*See generally*, Opposition to Motion Exclude Tom Long at Ex. 1 (Expert Report) and 20 (Rebuttal Report), filed concurrently herewith; *see also* Dkt. #110-15.]  In contrast, Mr. Arnold was retained post-litigation to consider the same body of evidence as Mr. Long did given his unique blend of fire investigation and firefighting/fire operations experience.  [Ex. 1 (Expert Report) at Appendix A (CV); Dkt. #110-13 at Exhibit A.]

Dr. Mowrer, Mr. Long and Mr. Arnold generally conclude for different reasons that the PIV#1 was closed on 10/4/16 when the fire broke out and that the Building 4 sprinklers did not activate (i.e., flow water) in response to the fire.  Obviously each has a unique take on the evidence based on their qualifications and experiences, including Mr. Arnold 's "boots on the ground" firefighting and firefighter operations experience.  Their testimony will not be duplicative or cumulative other than in the most general sense because they uniformly have concluded PIV#1 was closed when the fire broke out and that the Building 5 sprinklers did not activate in response to the fire.  With that said, permitting each to testify will permit the jury to fully consider all the evidence they rely on in support of their complimentary opinions and conclusions.  The testimony of Dr. Mowrer, Mr. Long and Mr. Arnold are not needlessly cumulative and should be permitted.  Fed. R. Evid. 703.

  D. <u>Mr. Arnold's Rebuttal Report is Not Challenged</u>

Adell's Motion does not challenge Mr. Arnold's 1/22/19 Rebuttal Report which took issue with several aspects of the report of Adell's retained experts, Dr. Richard Roby and Dr. Michael Klassen, and identified additional facts and bases supporting his opinions and conclusions. [Ex. 6 (Rebuttal Report).]  Mr. Arnold will also testify to these added opinions and conclusions at trial.

V.     <u>CONCLUSION</u>

For the foregoing reasons, Adell's Motion to Exclude Mr. Arnold should be denied.  If

the Court is inclined to grant any relief Adell seeks in its Motion, an evidentiary hearing on any

such issues is requested.

Dated: May 17, 2019                              MORISON & PROUGH, LLP


                                                 By:  /s/ *Michael D. Prough*

                                                 Michael D. Prough (*pro hac vice*)
                                                 Dean C. Burnick (*pro hac vice*)
                                                 MORISON & PROUGH, LLP
                                                 2540 Camino Diablo, Suite 100
                                                 Walnut Creek, CA 94597
                                                 (925) 937-9990 telephone
                                                 (925) 937-3272 facsimile
                                                 mdp@morisonprough.law
                                                 dcb@morisonprough.law

                                                 Andrew T. Stephenson (Bar No.26504)
                                                 FRANKLIN & PROKOPIK, A.P.C.
                                                 2 N. Charles Street, Suite 600
                                                 Baltimore, MD 21201
                                                 (410) 230-3638 telephone
                                                 (410) 752-6868 facsimile
                                                 astephenson@fandpnet.com
                                                 rbowen@fandpnet.com

                                                 *Attorneys for Plaintiff and Counter-Defendant*
                                                 *Mt. Hawley Insurance Company*

*3233*

1:17-cv-00252-JKB

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on <u>May 17, 2019</u>, Mt. Hawley Insurance Company's Mt. Hawley

Insurance Company's Opposition To Adell's Daubert Motion To Exclude Daniel L. Arnold was

electronically filed through the court's ECF filing system and electronically served on the

following recipients:


John A. Gibbons, Esq.
BLANK, ROME LLP
1825 Eye Street, NW
Washington, DC 20006-5403
Telephone: (202) 420-2200
Facsimile: (202) 420-2201

Omid Safa, Esq.
BLANK ROME, LLP
1825 Eye Street, NW
Washington, DC 20006-5403
Telephone: (202) 420-2200
Facsimile: (202) 420-2201

*Attorneys for Defendant and Counterclaimant*
*Adell Plastics, Inc.*



By: _/s/ *Michael D. Prough*___

- 1 -

1:17-cv-00252 JKB